UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | Crim. No. 05-10019-RGS |
| DANIEL W. MCELROY and | ) | |
| AIMEE J. KING MCELROY | ) | |
| | ) | |
| Defendant. | ) | |

## GOVERNMENT'S TRIAL BRIEF

The United States hereby submits this trial brief in advance of the trial in this matter, which is scheduled to begin on January 22, 2008 and likely to last approximately twelve trial days. The brief outlines the elements of the offenses and summarizes the evidence the government intends to offer in its case-in-chief.

The defendants, who are husband and wife, are charged in a multi-count indictment with conspiracy, mail fraud, and procuring false tax returns. The charges arose out of the defendants' ownership and operation of a temporary employment agency named Daily A. King ("DAK"), which was based in Easton, Massachusetts. DAK provided hundreds of low-skilled laborers to factories and food processing business throughout Eastern Massachusetts, especially in the fish processing plants on the New Bedford waterfront. Like every other employer, the defendants were required to pay payroll (or FICA) taxes on their payroll, and to insure their employees against work-related injuries by obtaining workers compensation insurance. The amounts a business pays in payroll taxes and workers compensation insurance premiums are based largely on the size of its payroll.

The essence of this case is that the defendants willfully under-reported the size of their large payroll both to the IRS and their workers compensation insurance carriers. The defendants actively concealed their payroll primarily by paying their employees, most of whom were recent immigrants,

in cash under-the-table.  By concealing their cash payroll – which, in the last four years of the conspiracy alone totaled approximately $40 million – from the IRS and their insurance carriers, the defendants saved millions of dollars in payroll tax and insurance premium payments.

Of central relevance to the government's case is that the defendants were subject to a court order issued by The Honorable Rya Zobel in 1994 that forbade them and DAK from paying cash to their employees, after having been the subject of a civil action brought by the United States Department of Labor.  For several years the defendants had operated a temporary employment agency with a large under-the-table payroll under the names Daily A. King, the Dan Agency, and the Daily Agency, and paid their employees in cash under-the-table.  Judge Zobel's order prompted the defendants to take additional measures to conceal their payroll.  Most of all, they established a straw corporation called ProTemp Co. through which they funneled most of their cash payroll.  Later they opened another straw corporation called Precission (sic) Temp, Co. for the same purpose.

Although nominally separate, DAK, ProTemp and Precission Temp were run as a single business.  To disguise their ownership and control of the ProTemp and Precission Temp, the defendants installed two of their employees, Dich Trieu and Xieu Van Son,[1] as the nominal presidents of the two companies.  As explained below, Trieu and Van Son will testify that they exercised no control over the companies and took their direction from defendant Daniel McElroy. The defendants also veiled their control of the two companies by directing their in-house accountant, Charles Wallace, to keep track of the cash payroll, and to complete and file false tax returns in the names of the three businesses that omitted the company's cash payroll.  To mislead their insurance

---

[1] Trieu and Van Son were charged with willfully failing to keep tax records and supply tax information, in violation 26 U.S.C. § 7203.  Both have pleaded guilty and will testify in the government's case-in-chief.

auditors, Wallace fabricated payroll records that reflected a smaller payroll than even that reflected in the false tax returns they filed. All along, the defendants were aware that at their direction, Wallace was not reporting the cash payroll to the IRS and the insurance companies.

## OFFENSES CHARGED

### A.    Klein Conspiracy (18 U.S.C. §371)

#### 1.    The Statute

The defendants are charged in Count One of the indictment with conspiracy, in violation of Title 18, United States Code, Section 371, which provides as follows:

> If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both. If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor.

The defendants are alleged to have violated both the first clause of the statute, "to commit any offense against the United States," namely mail fraud, as well as the second clause, in that they are alleged to have conspired to defraud the IRS out of tax payments.

#### 2.    Elements

In general, conspiracy to violate the first clause of Section 371, requires proof of the following elements:

(1)    that the agreement specified in the indictment existed between at least two people to violate a federal statute;

(2)    that the defendant willfully joined in that agreement; and

(3)    that one of the conspirators committed an overt act in an effort to further the purpose of the conspiracy.

See generally Pattern Jury Instructions of the First Circuit (Criminal) §403;  United States v. Piper, 35 F.3d 611, 614-15 (1st Cir. 1994); United States v. Rivera-Santiago, 872 F.2d 1073, 1078-80 (1st Cir. 1989).

A conspiracy to violate the second clause of Section 371, that is, to impair the lawful functions of a government agency (here the I.R.S.) is referred to as a "Klein conspiracy," after the seminal Second Circuit case of that name.  See United States v. Klein, 247 F.2d 908, 915 (2nd Cir. 1957); see also United States v. Chambery, 902 F.2d 144, 146 (1st Cir. 1990).  The elements of this offense are as follows:

1.  An agreement by two or more persons to defraud the United States by interfering with or obstructing the Internal Revenue Service's ("IRS") ability to collect taxes;

2.  Knowing participation in the conspiracy; and

3.  One or more overt acts in furtherance of the conspiracy.

United States v. Hurley, 957 F.2d 1, 4-5 (1st Cir. 1992); Chambery, 902 F.2d at 146.

The purpose of the conspiracy need not be tax-related; it is enough if one purpose of the conspiracy is tax motivated.  E.g., Hurley, 957 F.2d at 5 (money laundering scheme); United States v. Tavers, 833 F.2d 1068 (1st Cir. 1987) (same).  Nevertheless, the government must prove that interfering with the proper functioning of the IRS was purpose of the conspiracy, and not merely a foreseeable consequence.  United States v. Goldberg, 105 F.3d 770, 773 (1st Cir. 1997).

In this case, the defendants pursued both the mail fraud and tax fraud objectives of the conspiracy in the same way.  In essence, they operated a temporary employment agency that paid most of its employees under-the-table in cash so as to conceal the true size of the agency's payroll. They deliberately caused their accountant, Charles Wallace (who has pleaded guilty in this case) to

4

file payroll tax returns and to present payroll information to insurance auditors that, as the defendants were aware, omitted the cash payroll. The evidence will establish that evasion of tax and insurance payments was not merely a foreseeable result of the conduct, it was the core purpose of their business. By saving on insurance and tax payments, the defendants were able to charge less for their services, giving them a competitive advantage for labor services.

**B.    Mail Fraud (18 U.S.C. § 1341)**

**1.    The Statute**

Counts 2 through 4 charge the defendants with violating the mail fraud statute, Title 18, United States Code, Section 1341, which provides as follows:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be [guilty of an offense].

**2.    Elements**

The First Circuit described the elements of mail fraud as follows:

> To demonstrate a violation of the mail fraud statute, 18 U.S.C. § 1341, the prosecution must prove "(1) the devising or attempting to devise a scheme or artifice to defraud; (2) the knowing and willing participation in the scheme with the specific intent to defraud; and (3) the use of the mails in furtherance of the scheme."

United States v. Pimental, 380 F.3d 575, 584 (1st Cir. 2004) (quoting United States v. McCann, 366 F.3d 46, 51 (1st Cir.2004) and United States v. Montminy, 936 F.2d 626, 627 (1st Cir.1991)). It appears, however, that a fourth element, "materiality of falsehood" must also be proven. Neder v.

5

United States, 527 U.S. 1, 25 (1999) ("[M]ateriality of falsehood is an element of the federal mail

fraud, wire fraud, and bank fraud statutes.")

The broad contours of the primary statutory terms are well settled.  As the First Circuit's

pattern jury instructions state:

> A scheme includes any plan, pattern or course of action. The term "defraud" means to deprive another of something of value by means of deception or cheating. A scheme to defraud is ordinarily accompanied by a desire or purpose to bring about some gain or benefit to oneself or some other person or by a desire or purpose to cause some loss to some person. It includes a scheme to deprive another of the intangible right of honest services.

> The term "false or fraudulent pretenses" means any false statements or assertions that concern a material aspect of the matter in question, that were either known to be untrue when made or made with reckless indifference to their truth and that were made with the intent to defraud. They include actual, direct false statements as well as half-truths and the knowing concealment of facts.

> A "material" fact or matter is one that has a natural tendency to influence or be capable of influencing the decision maker to whom it was addressed.

Pattern Jury Instructions of the First Circuit, Criminal, Instruction No. 4.13 (1998).

The intent standards for mail and wire fraud are also familiar:

> [Defendant] acted "knowingly" if he . . . was conscious and aware of his. . . actions, realized what he . . . was doing or what was happening around him . . . and did not act because of ignorance, mistake or accident.

> An act or failure to act is "willful" if done voluntarily and intentionally, and with the specific intent to do something the law forbids, or with specific intent to fail to do something the law requires to be done; that is to say, with bad purpose either to disobey or to disregard the law.

> To act with "intent to defraud" means to act willfully and with the specific intent to deceive or cheat for the purpose of either causing some financial loss to another or bringing about some financial gain to oneself.

Pattern Jury Instructions of the First Circuit, Criminal, Instruction No. 4.13.

As described above, the defendants engaged in a scheme to defraud their insurance carriers

6

by causing their employees to be paid in cash and omitting the cash payments from the payroll figures they presented to their insurance carriers. The mailing alleged in Counts 2 through 4 were insurance policies that were mailed to the defendants by their workers compensation insurance carriers. These mailings were "in furtherance" of the defendants' scheme in that the defendants, like every other employer in Massachusetts, were required to obtain insurance coverage to operate their business. These mailings were reasonably forseeable to the defendants in that the defendant had previously received similar mailings. See United States v. Pimental, 380 F.3d 575, 589 (1st Cir. 2004)("[I]t is simply the 'use of the mails' in the course of the scheme rather than the particular mailing at issue that must be reasonably foreseeable for the causation element of a mail fraud offense to be satisfied.").

### C.    Procuring False Tax Returns (26 U.S.C. § 7206(2))

Counts 5 though 18 charge the defendants with procuring false tax returns, in violation of 18 U.S.C. § 7206(2). That statute provides:

> Any person who--
>
> * * *
>
> (2) Aid or assistance.--Willfully aids or assists in, or procures, counsels, or advises the preparation or presentation under, or in connection with any matter arising under, the internal revenue laws, of a return, affidavit, claim, or other document, which is fraudulent or is false as to any material matter, whether or not such falsity or fraud is with the knowledge or consent of the person authorized or required to present such return, affidavit, claim, or document; . . .

[shall be guilty of an offense].

2.    Elements

The elements of the 26 U.S.C. §7206(2) offense are:

(1)    Defendant aided, assisted in, procured, counseled or advised the preparation of or presentation under the internal revenue laws, a return or other documents;

    (2)      that the return was fraudulent or was false as to a material matter;

    (3)      Defendant acted willfully, with specific intent to violate the law.

United States v. Bishop, 412 U.S. 346, 350 (1973); United States v. Drape, 668 F.2d 22, 25 (1st Cir. 1982).

For purposes of this section, an item is material if it is necessary for a correct computation of the tax.  See United States v. Morse, 491 F.2d 149, 157 (1st Cir. 1974) (gross receipts); Siravo v. United States, 377 F.2d 469, 472 (1st Cir. 1967).  Under 26 U.S.C. §7206, the government need not prove that a tax loss actually occurred.  See, e.g., United States v. Puerto, 730 F.2d 627, 630 (11th Cir. 1982) (conspiracy); Silverstein v. United States, 377 F.2d 269 (1st Cir. 1967) (false tax return).

Section 7206(2), the so-called aiding and abetting tax statute, is often used to prosecute tax preparers who prepare false returns for taxpayers.  The language of the statute,  however, does not limit its application to tax return preparers but to anyone who causes a false return to be filed.  See United States v. Lefkowitz, 125 F.3d 608, 618 (8th Cir. 1997) (affirming § 7206(2) conviction against corporation president who provided false information to accountant which he knew would result in filing of false return); cf. United States v. Hooks, 848 F.2d 785, 791 (7th Cir. 1988) (observing that defendant willfully caused tax preparer to file a false estate tax return and, therefore, violated section 7206(2), regardless of whether the tax preparer knew of the falsity or fraud).

Willfulness has the same meaning in section 7206(2) cases as it does in other criminal tax violations.  As the Supreme Court has noted, "the word 'willfully' in these statutes generally connotes a voluntary, intentional violation of a known legal duty." United States v. Bishop, 412 U.S. 346, 360 (1973).

Count 5 through 12 charge the defendants with procuring false payroll tax returns (Forms 941) filed in the name of Daily A. King for eight consecutive quarters starting with the fourth quarter of 1998. Similarly, Counts 13 through 18 allege that the defendants procured false payroll tax returns filed in the name of ProTemp Co. for the same quarters.[2]

## III.    SUMMARY OF THE EVIDENCE

The evidence in this case will be presented in the form of testimony of the following witnesses.

### A.    Witnesses

#### 1.    Client Company Representatives

Representatives of DAK's clients will testify about the business arrangements between their companies and DAK, including that DAK was responsible for the taxes and insurance for their employees. They also will testify that they observed the employees being paid in cash.

#### 2.    Cash Couriers

The government will call individuals who distributed cash to employees on behalf of the defendants, and will establish the defendants' awareness of the cash payroll.

#### 3.    Office employees

DAK office employees will explain how payroll was managed and the roles of the defendants in the business.

#### 4.    Insurance Auditors

Insurance auditors will recount what Wallace and McElroy reported to them about DAK's operations and their payroll. The first of the auditors, Joseph Dirico, will briefly explain how the

---

[2] Forms 941 were not filed on behalf of the other straw corporation, Precission Temp.

workers compensation system in Massachusetts works and the process by which an employer applies for and maintains coverage, and what the annual audit process entails.   Dirico and other auditors will testify that Wallace presented them with payroll tax returns that grossly understated DAK's actual payroll.

### 5.    Straw owners

Trieu and Van Son will testify that Dan McElroy paid them to  be the "President" of ProTemp and Precission Temp, respectively.  They will state that their principal job was to cash checks written either to themselves or to ProTemp or Precission Temp at a local branch of Eastern Bank.  Many of these checks were written by Aimee King.  Trieu and Van Son were invariably accompanied to the bank either by Wallace or McElroy, who would take the cash from them and return to DAK's office, where behind closed doors, they would divvy and stuff it into envelopes, each marked with an employee's name and the amount.  Trieu, Van Son and others, including at times Wallace, would then distribute the cash to employees at the facilities where the employees worked.

Neither Van Son nor Trieu is fluent in English and there is no indication that either is sophisticated in business matters.  Both have pleaded guilty in this case and are cooperating with the government.

### 6.    Charles Wallace

Wallace pleaded guilty in a related matter before Judge Lindsay and is cooperating with the government.  He will testify that he was hired by the defendants in 1991 to complete their tax returns and keep their books for their temporary employment agency, which at the time was called the Dan Agency.  They hired Wallace despite his having told them that he was on supervised release for a

tax fraud conviction in federal district court. The defendants ran the Dan Agency out of their home in Brockton, where Wallace would go to work at least once a week. Wallace will testify that it appeared that the defendants were paying employees in cash by the time he was hired because he regularly observed the defendants go behind closed doors with individuals who would later leave with brief cases or other containers. Eventually, the defendants told Wallace what they were doing and Wallace agreed to assist them. Specifically, they instructed him to keep the cash payroll off the books and not to report it either to the IRS or their insurance carriers.

At trial, Wallace will walk through his weekly process of administering the cash payroll: calculating individual pay amounts (some employees received checks, some received cash, some received a combination of cash and checks); calculating the total amount of cash needed to meet payroll; obtaining the cash by accompanying Xieu Van Son and Dich Trieu to the bank; working with McElroy to sort the cash into envelopes; and distributing the envelopes to the managers of the "satellite" offices in Chelsea and Lowell, as well as to various individuals who distributed the pay envelopes directly to workers. Wallace will explain that while there were some efforts to separate the various entities that the defendants operated, on the whole the various companies operated as a single business. The various entities maintained separate bank accounts into which were deposited the businesses' revenues (fees paid by the various companies to whom they supplied workers). There were also separate accounts for the businesses' "legitimate" (i.e., non-cash) payroll. But when it came time to gather up cash needed to meet the weekly under-the-table payroll there was no distinction among accounts, and no real inter-company bookkeeping was done to keep track of which entity was supplying money for the cash payroll.

Wallace also will corroborate Trieu's and Van Son's descriptions of the roles they played.

11

Wallace explained that while there was a separate business office for Xieu Van Son's company, Precission Temp. Corp., he (Wallace) opened that office and used it only to maintain the appearance of a separate corporate identity.  In reality, Van Son had no access to the books and records of Precission Temp. Corp. and did not even control the checkbook for the company.  Instead, Van Son and Trieu routinely traveled to the defendant's offices (initially in Brockton, later in South Easton), once or twice a week, whereupon McElroy or Wallace accompanied them to the bank where they signed and cashed checks that had previously been filled out by Wallace in the names of their respective companies.

Wallace will further testify that after Judge Zobel issued her cease and desist order concerning the defendant's payment of cash, King stopped her direct handling of the cash and restricted her activities to preparing the "legitimate" payroll, which was prepared on the computerized payroll system.  King also instructed the office personnel under her supervision that they should be careful not to accept telephone inquiries for Pro Temp. or Precission Temp. Corp. and should refer callers to the separate office that Wallace had set up.  In addition, Wallace's testimony will establish that although King took steps to remain ignorant of the cash payroll that passed through ProTemp and Precission Temp, King directly funded the cash payroll by writing checks from Daily A. King's account either to ProTemp or Precission Temp, or to Trieu and Van Son.  Wallace also will detail his dealings with McElroy.  For instance, he will testify that he would, in effect, ask McElroy how much McElroy wanted to pay for workers compensation coverage and then fabricate documentation accordingly, "backing into" the numbers that were disclosed to the insurance auditors.

In short, Wallace will readily admit that he fabricated payroll and tax documents so as to

conceal the agency's true payroll, and that he did so at the behest and with the knowledge of the defendants.

### 7.   Summary Witnesses/Experts

The government will call three summary witnesses who are arguably also "experts." Although none of them will offer an opinion, each will testify about their application of some degree of specialized knowledge to evidence in the case. Letters summarizing their testimony and qualifications are attached hereto.

As in other under-the-table payroll tax cases, the government will call an IRS revenue agent to summarize the defendants' tax filings and calculate the actual payroll based on the defendants' bank records for each tax year. Based on these figures, he will calculate an overall "tax loss" for each period. Similarly, a representative of Liberty Mutual Insurance will take the total payroll calculated by the IRS revenue agent and calculate the amount of insurance premiums the defendants should have paid, based on common formulas in the insurance industry in Massachusetts. The difference between these figures and the premiums the defendants actual paid in corresponding period represents the loss to the insurance companies.

The government also will call James Donahue, an IRS computer specialist who will testify about his review of Aimee King's computer and certain electronic media found in Daily A. King's offices. Specifically, he will identify the type of system she used, including the relevant software applications, the network, and hardware. He will explain that he took a random sampling of payroll files from her hard drive as well as from floppy disks, and looked up the author and last known user for each document. He will provide summary testimony of his findings, including that many of the ProTemp and Precission Temp cash payroll lists were authored on a computer that contained

software that was registered to Aimee J. King.

**8.      Law Enforcement Agents**

The government also will call law enforcement agents to provide testimony about items found during the search and statements made by the defendants.

**B.      <u>Documentary Evidence</u>**

The vast majority of the more than three hundred government exhibits are either bank or insurance records, or tax returns.  The defendants have stipulated to the authenticity, and where applicable, the business records nature, of the records.  Most of these exhibits will be introduced through the summary/expert witnesses.

The government also will introduce the complaint and cease and desist orders from the Department of Labor action in 1994.  The orders put the defendants on unambiguous notice that the defendants were forbidden from paying cash to their employees.

Very truly yours,

MICHAEL J. SULLIVAN
United States Attorney


By:     <u>/s/ Jonathan F. Mitchell</u>
        JONATHAN F. MITCHELL
        SARAH E. WALTERS
        Assistant U.S. Attorneys

<u>Certificate of Service</u>

I hereby certify that on this 11th day of January, 2008, I served a copy of the Government's Trial Brief on defense counsel of record by means of the ECF system.

<u>/s/ Jonathan F. Mitchell</u>
Jonathan F. Mitchell



**U.S. Department of Justice**

*Michael J. Sullivan*
*United States Attorney*
*District of Massachusetts*

---

*Main Reception: (617) 748-3100*

*John Joseph Moakley United States Courthouse*
*1 Courthouse Way*
*Suite 9200*
*Boston, Massachusetts 02210*

December 18, 2007

By Fax: (617) 342-6899
Stephen R. Delinsky, Esq.
Eckert Seamans Cherin & Mellott, LLC
One International Place, 18th Floor
Boston, MA 02210

By Fax: (617) 342-6899
Jack I. Zalkind, Esq.
Zalkind & Associates
One International Place
Boston, MA 02210

Re:    United States v. Daniel W. McElroy and Aimee J. King McElroy,
       Criminal No. 05-10019-RGS.

Dear Counsel:

As promised, I write to provide you with notice of the government's intention to call witnesses in its case-in-chief who may be construed as "experts," and to summarize their anticipated testimony. The resumes of each are attached.

First, the government intends to call IRS Revenue Agent Joseph Guidoboni. Agent Guidaboni will explain the tax obligations of employers, including the payment of payroll taxes and the withholding of employee payroll and income taxes. He will explain the tax forms that employers and individuals are required to file, including Forms 941, 1120, 1040, and 1099, as well as relevant tax terminology.

Agent Guidoboni will describe his analysis of the tax returns and financial records for the period charged in the conspiracy count in the indictment. Specifically, he has examined your clients' business records, as well as those of their clients, banks and workers compensation insurers. Based on this analysis, he will testify as to what, by his calculation, the defendants should have reported on their tax returns. He will compare these figures with what your clients

December 18, 2007
Page 2

actually reported, and he will determine for each tax year the amount your clients failed to pay to the IRS in payroll taxes and withheld income taxes.

Second, the government will call Neil Johnson, an Assistant Vice-President and Manager of the Special Investigations Unit at Liberty Mutual Group, to testify about the loss to your clients' workers compensation insurance carriers occasioned by your clients' conduct. Mr. Johnson will explain that all employers in Massachusetts must insure their employees against work-related injuries, and that for those employers who cannot obtain insurance on the open market, the state directs them to the "assigned-risk pool." He will explain that in either event, insurance premiums are based on the size of the insured's payroll and the risk profile of the work performed. He will add that each year, an employer must re-apply for insurance and, among other things, estimate the size of its payroll. At the end of the policy period, the employer is subject to an audit in which it must produce evidence detailing the size and nature of its business, including the size of its payroll.

Mr. Johnson also will identify and explain the significance of the forms associated with workers compensation insurance policies, including the policy application, the audit report, the premium adjustment notice, and notice of assignment. He will explain the terminology associated with the workers compensation system, and the methods by which workers compensation insurers are defrauded by hiding payroll, including by paying employees off-the-books, changing company names to avoid audits, and by using straw owners.

Mr. Johnson will describe his analysis of the records in this case, including your clients' payroll and banking records, as well as the records of their various insurance carriers, particularly their audit reports. Based on these records, as well as on the payroll analysis performed by Agent Giudoboni, Mr. Johnson will estimate the loss to the insurance carriers caused by your clients' misrepresentations about the size of their payroll for each policy period.

We anticipate that prior to trial we will be able to produce to you draft charts that set forth Agent Guidoboni's and Mr. Johnson's loss calculations. Their final calculations may be subject to revision based on the testimony at trial, and we anticipate that both witnesses will be present in the courtroom during the trial. We will make available to you their final loss figures prior to their taking the witness stand.

Finally, we intend to call James Donahue, an IRS Special Agent and Computer Investigative Specialist, to testify about his analysis of the "meta-data" on certain of the electronic media recovered in the search of your clients' office. He will explain generally that meta-data is information stored on a computer disk or drive that may not be readily apparent to the user. The most common example of meta-data are deleted files that, although no longer viewable by the casual user, may be recovered by virtue of the fact they continue to exist in an unreadable form. Special Agent Donahue will explain the process by which meta-data may be recovered.

December 18, 2007
Page 3

 Special Agent Donahue will testify that he was asked to analyze the meta-data on certain floppy disks that contained payroll records of the companies in whose name your clients operated their business. Twenty of the floppy disks were recovered in the search in Aimee King's office, and the other set of one hundred disks came from other parts of the Daily A. King office. Special Agent Donahue will testify that in particular he was asked to determine the user names of the individuals who either authored or "last modified" the payroll records. He will testify that based on his meta-data analysis, he concluded that Aimee King authored and last modified numerous payroll records on the disks.

    Very truly yours,

    MICHAEL J. SULLIVAN
    United States Attorney

    By: _____

    JONATHAN F. MITCHELL
    Assistant U.S. Attorney

Enclosures

# NEIL I. JOHNSON, CFE

## LIBERTY MUTUAL INSURANCE GROUP

### PREMIUM FRAUD SPECIAL INVESTIGATION UNIT

**1994 to Present-Assistant Vice President/Manager**-Home Office-Responsible for establishing and managing Liberty Mutual's first premium fraud special investigations operation.  Created protocols within Liberty's internal operations for  the detection of premium fraud for all lines of insurance.  Includes managing civil litigation and assisting on both federal and state criminal prosecutions. Known as one of the premier operations in the industry.  Often called upon by Federal and State Law Enforcement Agencies to provide technical expertise as well as various professional associations to serve on committees.  Designated as an expert in the areas in forensic accounting, premium fraud, workers' compensation and workers' compensation premium determination.

### FINANCIAL FIELD AUDITING

**1990-1994 Director of Field Operations**-Home Office-Established and supervised the implementation of operating procedures for the Company's 9 Division Financial Field Auditing Units and 250 field auditors.  Responsible for interdepartmental coordination and cooperation to ensure quality service to policyholders.  Conceptual development and documentation of new system requirements for Data Processing.   Interpreted and disseminated legislative rulings that affect auditing procedures.   Staff development, reinforce training, and made promotional recommendations to the Department Manager. Represented the department at meetings.  Developed and administered various Corporate Internal Auditing Programs.

**1988-1990 Director of Loss Auditing-** Home Office-Responsible for establishing and supervising the implementation of operating procedures for the loss auditing department. Provide a smooth transition into the consolidation process.

**1987-1988 Director of Training -** Home Office -Developed, organized, and administered auditing training and development programs from entry to the middle management level.   Interpreted and disseminated rulings that affected auditing procedures.  Developed and instituted the use of a two volume premium auditing reference manual by the field staff.   Represented the department at meetings. Administered an automated automobile leasing billing system for the Company's 9 Division Auditing units.  Developed, organized, and administered training seminars on how to successfully screen, interview, and hire entry level auditing and computer system personnel.

**1984-1987 Audit Supervisor/Manager of Field Operations** - New England Division - Responsible for the direct supervision of 10 Premium Auditors in an assigned territorial split. Accompanied auditors on field calls to observe performance and offer instructional assistance. Prepared job evaluations and salary recommendations. Coordinated the Department's divisional activities with those of other company operating units. Assisted in the training and supervision of the clerical personnel in the unit.

**Division/Home Office Financial Field Services Recruiter** -Responsible for conducting interviews and making hiring recommendations to 8 different department managers. In some cases, responsible for making the hiring decision. The recruiting responsibility was in addition to my regular management duties.

**1977-1984 Premium Auditor** - New England Division Performed functional audits on policyholders' financial records for premium determination purposes. Acquired a detailed knowledge of insurance coverage, classification procedures, and special rules. Worked closely with controllers, independent CPA's and managers of client companies. Progressed to Supervising Auditor in May 1980; charged with disseminating work, developing premium auditors, and handling larger, more complex accounts. Made initial service calls on large new Business and National risks. Completed comprehensive narrative reports and worked directly with other departments to resolve audit, service, or coverage problems. Accompanied salespeople on large risk solicitations.

**PROFESSIONAL DESIGNATIONS & AWARDS**
**Certified Fraud Examiner**
**Diplomate with American Board of Forensic Accountants**
**Recipient of Massachusetts Insurance Fraud Award of Distinction**
**Recipient of New Jersey Office of the Insurance Fraud Prosecutor Commendation**

**PROFESSIONAL ASSOCIATIONS**
**Mass Fraud Bureau-Board of Governors**
**Association of Certified Fraud Examiners**
**American College of Forensic Examiners**
**International Association of Special Investigation Units**
**National Coalition Against Insurance Fraud**
**National Society of Accountants**
**National Society of Insurance Premium Auditors**
**NCCI Task Force on Premium Fraud**
**New York- Commercial Automobile Task Force**
**PAAS Task Force on Premium Fraud & Commercial Automobile /General Liability**
**Premium Fraud subcommittees for the states of Alabama, Florida, New Jersey, New York and South Carolina**

**EDUCATION**

**1973-1977-University of Maine**- BS degree in accounting.

**CV of Special Agent-Computer Investigative Specialist James Donahue**

Name:                      James P. Donahue
Position:                  Special Agent, IRS – Criminal Investigation, Boston
Specialized Position:      Computer Investigative Specialist

## Educational Background:

1983: Graduate of Boston College, Chestnut Hill, MA.  Bachelor's Degree, Political Science.

1985-1987:  Earned 24 credits in Accounting and Business related courses at Bridgewater State College, Bridgewater, MA  (in order to become special agent with IRS).

1995:  Cum Laude graduate of Southern New England School of Law, Dartmouth, MA. Became member of Massachusetts Bar in June, 1996.

## IRS Training:

Basic special agent training, which includes Criminal Investigator Training (CIT), 1988, Tax for Criminal Investigation, 1988, and Special Agent Investigative Techniques (SAIT), 1989.  All at Federal Law Enforcement Training Center, Glynco, GA.

## Specialized Computer Training:

1998:  Basic Seized Computer and Evidence Recovery Specialist (BSCERS), Federal Law Enforcement Training Center, Glynco, GA.  (four week course)

1999:  Computer Evidence Analysis Training (CEAT), University of North Texas, Denton, TX.  (four week course)

2000:  Advanced Computer Evidence Recovery Training (ACERT), US Immigration and Customs Enforcement Cybersmuggling Center, Fairfax, VA.  (two week course)

2000:  Basic Encase Training, Guidance Software, Fairfax, VA.  (one week course)

2003:  Advanced Computer Evidence Recovery Training (ACERT), US Immigration and Customs Enforcement Cybersmuggling Center, Fairfax, VA.  (two week course)

2007:  Advanced Computer Evidence Recovery Training (ACERT), US Immigration and Customs Enforcement Cybersmuggling Center, Fairfax, VA.  (two week course)

Since becoming a CIS I have periodically attended numerous in-service training modules to maintain proficiency.

To: Jonathan Mitchell and Sarah Walters

From: Joseph P. Guidoboni, Revenue Agent, Small Business/Self-Employed Division

Date:December 6, 2007

Subject:Background and Education

## BACKGROUND:

I have been an internal revenue agent with the Internal Revenue Service for nineteen years.

From approximately June 1988 to January 1992 I have conducted examinations of both personal, corporate, and partnership federal tax returns.

From January 1992 to November 1995 I was a member of the review staff. In that capacity, I reviewed the work of other revenue agents for compliance with the auditing standards set forth in The Internal Revenue Manual. In addition, I was assigned various coordinator duties, including the duty to serve as the statutory notice of deficiency coordinator.

Finally, from November 1995 to the present I have been assigned to the Special Enforcement Program. Duties include reviewing and analyzing records obtained during the course of an investigation; reconciling the reported income to the books and records obtained during the investigation; participation in interviews with the taxpayer, preparer and third party witnesses and participation in meetings with the Assistant United States Attorney during the investigation; preparing calculations of tax and providing technical expertise to the Special Agent and/or Assistant United States Attorney during preparation for trial; providing testimony as a summary witness regarding the actual determination of income based upon evidence admitted during trial.

## EDUCATION:

I received a Bachelor of Science degree in Business Administration with an accounting major from the University of Maine-Orono.

I completed the five phases of revenue agent training, which included instruction in individual, corporate and partnership tax law.

Annually attended the Internal Revenue Service's continuing professional education program (CPE).

My address is located at Internal Revenue Service, JFK Building, Stop #41225, Group #1219, Boston, MA 02203. Any questions feel free to call me at (617) 316-2116.

Sincerely,

Joseph Paul Guidoboni



**U.S. Department of Justice**

*Michael J. Sullivan*
*United States Attorney*
*District of Massachusetts*

---

*Main Reception: (617) 748-3100*

*John Joseph Moakley United States Courthouse*
*1 Courthouse Way*
*Suite 9200*
*Boston, Massachusetts 02210*

January 11, 2008

By Fax: (617) 342-6899
Stephen R. Delinsky, Esq.
Eckert Seamans Cherin & Mellott, LLC
One International Place, 18th Floor
Boston, MA 02210

By Fax: (617) 342-6899
Jack I. Zalkind, Esq.
Zalkind & Associates
One International Place
Boston, MA 02210

　　　　Re:　　United States v. Daniel W. McElroy and Aimee J. King McElroy,
　　　　　　　　Criminal No. 05-10019-RGS.

Dear Counsel:

　　　　As discussed, I write to clarify certain representations contained in Jon Mitchell's
December 18, 2007 letter notifying you of the government's intention to call witnesses in its case-
in-chief who might be construed as "experts," and summarizing their anticipated testimony. As
an initial matter, and as explained in our telephone call today, none of the three witnesses
identified in the December 18 letter will offer opinions. Rather, they are summary witnesses who
will testify about their calculations and observations based on information and documents that
were provided to you both before and after the Indictment of this case.

　　　　As we explained, IRS Special Agent James Donahue will testify regarding his review of
certain floppy disks that were found at Daily A. King's offices and that were provided to you
previously. Specifically, he will testify that certain files on certain floppy disks containing
payroll records were "authored," "created," or last reviewed on a personal computer with
software registered to Aimee J. King. As Special Agent Donahue participated in the search of
Daily A. King's offices, he will also provide testimony regarding his observations of the
computers and computer systems seized during the search. Later today, under separate cover, we

January 11, 2008
Page 2

are providing copies of Special Agent Donahue's notes.  Finally, as we discussed, please let us know when on Monday, January 14 you would like to speak to Special Agent Donahue to clarify any of your concerns.

Very truly yours,

MICHAEL J. SULLIVAN
United States Attorney

By:

SARAH E. WALTERS
Assistant U.S. Attorney