UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO. 05-10019-RGS |
| | ) | |
| DANIEL W. McELROY and | ) | |
| AIMEE J. KING McELROY | ) | |
| | ) | |

## DEFENDANTS' MOTION TO SUPPRESS IDENTIFICATION EVIDENCE AND REQUEST FOR HEARING

Defendants Daniel McElroy and  Aimee King McElroy move to suppress any and all evidence at trial of the identification of Daniel McElroy as a principal, owner and/or operator of Daily A. King Labor, Inc. ("DAK"), Pro Temp Co.("PT")  and Precession Temp Corporation ("PTC").   Specifically, Defendants  move to suppress evidence of any and all photographic identifications, witness testimony or documentary evidence relating to identifications allegedly made by witnesses Richard Donovan and Richard Demello identifying Daniel McElroy as a principal, owner and/or operator of PT, PTC or DAK.  Defendants also move to suppress and exclude from trial any evidence of any in-court identification procedures of Daniel McElroy by these witnesses.  Such identifications could only have been based on impermissibly suggestive and unreliable procedures.  Further,  the Defendants move for suppression of any evidence derived from such impermissibly suggestive and unreliable identification procedures.

The Defendants state that the admission of such testimony would violate their Rights to Confrontation under the Sixth Amendment to the Constitution of the United States and their rights to Due Process under the Fifth and Fourteenth Amendments to the U.S. Constitution.  The

photographic identification procedures undertaken by the government, viewed in the totality of the circumstances, were so impermissibly suggestive and unreliable as to give rise to a very substantial likelihood of irreparable misidentification. Further, any evidence derived from such a suggestive procedure is constitutionally tainted. Manson v. Brathwaite, 432 U.S. 98, 111-114 (1977), Simmons v. United States, 390 U.S. 377,383 (1968), Stovall v. Denno, 388 U.S. 293, 301-302 , U.S. v. Wade, 388 U.S. 218, 239-241 (1968), U.S. v. Crews, 445 U.S. 463, 472-473 (1980), Wong Sun v. United States, 371 U.S. 471 (1963) and U.S. v. Nava-Ruiz, 515 F.Supp. 2d 198, 202-206 (1st Cir 2007).

Background:

The procedural basis for the Defendants' motion is as follows: On January 24, 2008 the government provided the defense for the first time with the FBI report of SA Nancy McCormick describing an identification procedure that she conducted with a government witness named Rick Demello of Sea Fresh Corporation in New Bedford, MA, on January 11, 2008. In her report dated January 10-11, 2008, McCormick writes that she told Demello that she was faxing him a photograph of a man she identified as Daniel McElroy. (See Defendants' exhibit 1). The next day, on January 12, 2008, McCormick called Demello who told her that he had received the faxed photograph and that, "while the image was dark, it looked like McElroy as he recalled from his meeting with him."(Defendants' exhibit 1). No exigent circumstances were present to justify such an unnecessarily suggestive procedure. The photograph that McCormick faxed to Demello was a photograph obtained from the Massachusetts Registry of Motor Vehicles dated February 4, 1998, almost ten years old. This identification procedure was undertaken just days before the start of the trial in a ten year old investigation. No exigency existed to justify such a suggestive procedure. Its unreliability is made more so by the lack of familiarity that Demello

has with McElroy and the conflicting claims that Demello has made concerning McElroy's physical appearance, alternately claiming that McElroy was "short"(see Defendants' exhibit 2, IRS report of SA Thomas Demeo dated 9.27.02 interview with Demello) and later claiming that McElroy was 5'8" tall(See Defendants' exhibit 1). Such discrepancies undercut any claim by the government that despite the impermissibly suggestive procedure the identification by Demello is reliable. None of the factors supporting reliability of the identification are present in the Demello/McElroy relationship. United States v. Nava-Ruiz, 515 F. Supp. 2d 198 , 203-206 (2007).

Previously, in her report dated on or about December 21, 2007, FBI Agent McCormick interviewed Richard Donovan of On A Roll Sales Corporation ("OAR") of 121 Liberty Street, Brockton, MA. At that time McCormick presented a single photograph of McElroy to Donovan and Donovan identified McElroy from the photograph (See Defendants' exhibit 3, page 2). It appears likely that SA McCormick adhered to the procedure she used with Demello and told Donovan that the single photo she was showing him was a photo of McElroy. This procedure was also undertaken approximately one month prior to the start of trial. As with Demello, there are exigent circumstances to justify such an unnecessarily suggestive identification procedure. Donovan claims to have interacted with McElroy on only a "few occasions" (page 3 Defendants' exhibit 3) prior to this suggestive identification procedure. Donovan most recently saw McElroy "one or two times" following a government executed search warrant in 2001 or 2002(page 3 of Defendants exhibit 3). Viewed in the totality of the circumstances, Donovan lacked familiarity with McElroy such that when viewed in the totality of the circumstances, the single photographic show-up procedure was impermissibly suggestive and gives rise to a very substantial likelihood of misidentification. As with the Demello/McElroy relationship, none of

the factors supporting reliability of the identification are present in the Donovan/McElroy

relationship. <u>United States v. Nava-Ruiz</u>, 515 F. Supp. 2d 198 , 203-206 (2007).

The government will prosecute this indictment based on a theory that McElroy was a

principal and/or owner of DAK and used the straw companies PT and PTC as a means to avoid

paying taxes. Accordingly, this illegally tainted identification connecting McElroy to any of

these alleged two straw businesses is central to proof of the crimes charged and also highly

prejudicial. (See indictment paragraph 4-6).

Wherefore, the Defendants request that the Court:

i). suppress evidence of any and all photographic identifications, witness

testimony or documentary evidence of an alleged identifications of McElroy as a principal,

operator and/or owner of PT, PTC or DAK;

ii). suppress and exclude from trial any evidence of any in-court identification

procedures. Such identifications could only have been based on impermissibly suggestive and

unreliable procedures;

iii). suppress any evidence derived from such impermissibly suggestive and

unreliable procedures as violative of the Defendants' Constitutional Rights under the Fifth, Sixth

and Fourteenth Amendments to the Constitution of the United States; and

iv). the Defendants move the Court to Order the government to make no

reference in opening statement or on closing argument to the existence or results of such

identification procedures.

## REQUEST FOR ORAL ARGUMENT

Pursuant to LR 7.1(D) the Defendants hereby request a full evidentiary hearing on this Motion.


Respectfully submitted:

**AIMEE J. McELROY**
By her attorney,


_____
Jack I. Zalkind (BBO# 538840)
One International Place
Boston, MA 02110
Telephone No. (617) 227.3950


DATED: January 25, 2008

Respectfully submitted

**DANIEL McELROY**,
By his attorney,


_____
Stephen R. Delinsky (BBO# 119120)
**ECKERT SEAMANS, CHERIN & MELLOTT, LLC**
One International Place, 18th Floor
Boston, MA 02110
Telephone No. (617) 342.6800


CERTIFICATE OF SERVICE
I hereby certify that this document(s) filed through the
ECF system will be sent electronically to the registered
participants as identified on the Notice of Electronic Fil-
ing (NEF) and paper copies will be sent to those indi-
cated as non-registered participants on  1-25-08
By: _____

{k0362829.1}

# EXHIBIT 1

FD-302 (Rev. 10-6-95)

COPY

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription    01/23/2008

       RICK DEMELLO, SEA FRESH, New Bedford, Massachusetts
(MA) was contacted regarding his recollection of DANIEL MCELROY.
DEMELLO thereafter provided the following information:

       He described MCELROY as having blonde hair, being
approximately 5'8" tall, thin and fair complected.  Special
Agent (SA) NANCY MCCORMICK advised DEMELLO that she was going to
fax him a photograph of MCELROY.  DEMELLO provided his fax
number as 508-997-4322.  (SA MCCORMICK faxed A REGISTRY OF MOTOR
VEHICLES photograph of DANIEL MCELROY, Image Date: 02-04-1998,
to DEMELLO.)

       The next day, January 12, 2008, SA MCCORMICK contacted
DEMELLO.  DEMELLO advised he had received the fax and viewed the
photograph.  DEMELLO stated that while the image was dark, it
looked like MCELROY as he recalled from his meeting with him.

---

Investigation on   1/10&11/2008  at    Boston, MA   (telephonically)

File #  196B-BS-86742

Date dictated  1/23/2008

by   SA NANCY L. MCCORMICK/nlm

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

TO: RICK DEMELLO

FM: NANCY McCORMICK    617·223·6469



# EXHIBIT 2

# Internal Revenue Service
## Criminal Investigation Division

## Memorandum of Conversation



| | | | |
|---|---|---|---|
| **In Re:** | AIMEE KING, et al | **Location:** | **Telephonically** |
| **Investigation #:** | 040130259 | | **Sea Fresh of New Bedford** |
| **Date:** | September 27, 2002 | | |
| **Time:** | 10:42 AM | | |
| **Participant(s):** | Rick DeMello, President | | |
| | Thomas Demeo, Special Agent | | |

I introduced myself to RICK DEMELLO (R DEMELLO) as a special agent with the Internal Revenue Service assisting the United States Attorney's office with a Grand Jury Investigation. I explained that the purpose of my visit to Sea Fresh on September 25, 2002 was to ask him a few questions regarding the use of temporary employees from DAILY A KING LABOR INC. (DAK), PRECISSION TEMP CORP. (PTC) and PRO TEMP CO. (PT). R DEMELLO agreed to speak with me and the following is a summary our telephone conversation.

1. R DEMELLO is the president of Sea Fresh of New Bedford (Sea Fresh). His telephone number is (508) 997-1260 and the fax number is (508) 997-4322. His wife is Kelly DEMELLO, the bookkeeper for Sea Fresh.

2. R DEMELLO stated that PT, PTC and DAK are one business that changes its name only. Dan MCELROY (MCELROY) is the owner of the temporary employment agencies. He is a short white male with blonde hair in his fifties.

3. R DEMELLO started using DAK in 1997. His first contact was with Charlie WALLACE (WALLACE). Subsequently, his contact was George WALLACE (G WALLACE). Both WALLACE and his brother G WALLACE worked for MCELROY.

4. R DEMELLO stopped using DAK for the following reasons; he felt uncomfortable, he had to make numerous phone call requesting the worker compensation insurance certificates, the name of the business continuously changes from DAK to PT to PTC back to DAK, some of the temporary workers received bounced checks, they started requesting payment early, they paid most of their employees cash and they could not supply extra workers. R DEMELLO switched to BJ Temp Service. The rates increased but R DEMELLO was more comfortable and satisfied with BJ Temp Services.

5. G WALLACE paid the temporary workers. Sometimes G WALLACE would hand out the payroll in front of R DEMELLO. R DEMELLO observed workers opening up envelopes and removing US Currency. R DEMELLO questioned G WALLACE and G WALLACE stated "We take out payroll Ricky". Subsequently, R DEMELLO again questioned G WALLACE and G WALLCE stated "Ricky we take out taxes". Though confirmed by G WALLACE that the temporary workers were receiving cash net of applicable payroll taxes and withholdings, R DEMELLO thought the contrary.

This memorandum was prepared on 9/27/2002.


Thomas Demeo
Special Agent

Attachment A

# EXHIBIT 3



FD-302 (Rev. 10-6-95)

- 1 -

### FEDERAL BUREAU OF INVESTIGATION

Date of transcription    12/28/2007

RICHARD DONOVAN, ON A ROLL SALES, 121 Liberty Street, Brockton, Massachusetts (MA), telephone 508-583-FOOD, was interviewed pursuant to a proffer agreement in the presence of his attorney, KEVIN MCGRATH. Participating in the interview was Assistant United States Attorney (AUSA) SARAH WALTERS. After being advised of the official identities of the interviewing parties and after reviewing and signing the proffer letter, DONOVAN provided the following information:

ON A ROLL (OAR) was first called BOOMERS INDUSTRIAL CATERERS. BOOMERS purchased a growing concern from CHRISTIE's and called it OAR. DONOVAN joined the company in 1990 as General Manager. The company had two locations and two markets. In the early 1990s, greater regulations were imposed on the food industry by the USDA and in 1994, OAR built a USDA approved facility and merged the two entities into OAR.

OAR uses a lot of temporary laborers as all its line workers are temps. When BOOMERS/OAR started, hiring temps gave the company "quick hits," bodies to fill positions at both locations as needed. Further, BOOMERS had a number of workers compensation claims and had been unable to get reasonable insurance coverage as their "mods were through the roof." Using temporary workers fixed the problem. Lastly, by using temp workers, OAR was not responsible for health insurance as that requirement became the responsibility of the temporary employment agency that provided the workers.

Temp workers have been a great option for OAR. People show up and do the work, yet they are employed by the temp agency and as such, the temp agency is responsible for everything, including workers compensation, taxes and health insurance. DAILY A. KING LABOR (DAK) even helped OAR establish the pay rate.

DONOVAN is familiar with DAK, PRO TEMP and PRECESSION TEMP/PTC. He associates them with one another and considers them all to be part of DAK because the salesmen that initially came to pitch temporary services represented themselves as being from DAK. The salesmen were MIKE POWERS and MARK RUSSO. Even though DAK changed its name a couple of times, the workers and the contacts always remained the same.

Investigation on    12/21/2007    at    Boston, MA

File #    196D-BS-86742                                     Date dictated    12/28/2007

by    SA Nancy L. McCormick/nlm

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 10-6-95)

196D-BS-86742

Continuation of FD-302 of ____Richard Donovan_____, On _12/21/2007___, Page ___2___

     In approximately 1995 or 1996, OAR was struggling financially and was having trouble with the banks and paying its bills.  OAR had payment terms with DAK which it was not meeting. After OAR bounced a check to DAK, DAN MCELROY and CHARLIE WALLACE "came knocking at the door."  DONOVAN had never met either of them before.  (DONOVAN was presented with a photograph and identified MCELROY from the photo.)

     During the visit/meeting, MCELROY did most of the talking.  MCELROY introduced WALLACE as the "tax guy/accountant."  DONOVAN could not recall how MCELROY introduced himself, but DONOVAN's impression based upon the conversation was that MCELROY was in charge.  As a result of the meeting, the previous terms were terminated.  A weekly payment plan was set up and OAR agreed to go to a COD (cash on delivery) payment plan.  Additionally, OAR paid DAK on Wednesdays, thus allowing DAK time to ensure OAR's check cleared before distributing the payroll to the temp workers on Friday.

     At least initially, logistically, POWERS and/or RUSSO and WALLACE came by and gave the van drivers the pay for the workers who were transported to and from work in their vans.  At least 3 to 4 vans of workers were dropped off and picked up daily.  Later, the drivers picked up the payroll at DAK/PRO TEMP's offices.  GEORGE WALLACE, after he was hired, served as backup to his brother, CHARLIE WALLACE.

     The number of temporary workers used by OAR was fairly steady.  If a change in the number of workers was necessary, DONOVAN would typically make the request of the van drivers because they were there on a daily basis and could provide the quickest response.  DONOVAN also dealt with RUSSO, POWERS and later WALLACE and his brother.

     As OAR's business grew and production needs expanded, the company began operating on weekends as well as week days and needed a bigger group of available workers to cover the new shifts.  DONOVAN contacted WALLACE to accommodate these changes.

     The temporary workers were paid in cash.  DONOVAN knows this because whenever there were discrepancies in a worker's pay, the worker came to DONOVAN and notified him that he/she had not been paid enough.  Typically, the worker handed the envelope, with the cash inside, to DONOVAN.  DONOVAN was

FD-302a (Rev. 10-6-95)

196D-BS-86742

Continuation of FD-302 of ___Richard Donovan_____ , On _12/21/2007_ , Page ___3___

responsible for reporting the hours to DAK/PRO TEMP and knew
each worker's pay rate.  In an attempt to resolve the
discrepancy, DONOVAN counted the cash, pulled the worker's time
cards to see what his/her pay should have been.  He also
reviewed what he submitted to DAK/PRO TEMP to make sure he had
not made a mistake and submitted the wrong hours.

DONOVAN was presented with a white envelope and asked
if that type of envelope looked familiar.  DONOVAN advised that
the envelope was the same as the envelopes in which temp workers
received their cash/pay.  The envelopes were smaller in size
than the envelopes that contain paychecks and did not have a see
through glass like window.

Initially, the cash envelopes were labeled with the
names of the employees only.  Later, because there were so many
discrepancies, the dollar amount contained within the envelope
was also added.  DONOVAN estimated that there were problems with
temp employees' pay at least 1 or 2 times per week.

DONOVAN was presented with a form in the name of OAR
and asked if it looked familiar.  DONOVAN advised it was a sign
sheet and that temp employees used to sign their names on the
sign sheets in the OAR lunchroom upon receipt of their pay.  The
drivers were handed the sign sheets with the cash envelopes
folded up inside.  Drivers included ROBERT MUNRAYOS, EDDIE
OCHOA, MARCOS (RODRIGUEZ) and MARTA (RODRIGUEZ).  Van/workers
came in from Chelsea and Providence.

DONOVAN interacted with MCELROY on a few occasions.
MCELROY came by on holidays because OAR had become such a big
client and was billing so many hours.  DONOVAN occasionally ran
into MCELROY in area restaurants as they were both local guys.
DONOVAN does not recall ever meeting MCELROY's wife, AIMEE KING.

At some point in 2000 or 2001, OAR stopped using
DAK/PRO TEMP.  DONOVAN recalled calling MCELROY after reading
about the government's search of DAK's offices in the local
newspaper.  DONOVAN asked MCELROY what was going on to which
MCELROY responded with words to the effect, "Don't worry.  This
is all a misunderstanding.  Everything is going to work out."
MCELROY indicated the search was conducted by the FBI only and
was generally very evasive about the issue.  But some of the
drivers had been interviewed and they mentioned that the IRS was

FD-302a (Rev. 10-6-95)

196D-BS-86742

Continuation of FD-302 of ___Richard Donovan_____ , On 12/21/2007 , Page 4

involved as well.  With everything DONOVAN read and heard, he became very concerned and contacted MCELROY again.

MCELROY came to see DONOVAN at least once if not twice after the search.  WALLCE was with MCELROY during the face to face meeting wherein MCELROY told DONOVAN that things were not working out and that he was shutting the operation down. MCELROY told DONOVAN that he had found OAR a replacement agency and stated words to the effect, "I cut you over to another company located in Boston.  I'll introduce you to the owner." MCELROY told DONOVAN that WALLACE would be going to work for the new owner, HAROLD KNIGHT, as part of the transition and that the temporary workers would remain the same.

The replacement company was called LABOR NOW and was owned by KNIGHT.  KNIGHT previously wrote DAK/PRO TEMP's insurance and provided them with their insurance certificates. OAR had to re-do all the employment applications for LABOR NOW because they had all been confiscated in the search.  OAR had applications within their office space which the workers filled out and DONOVAN subsequently submitted to LABOR NOW.

OAR used LABOR NOW for a few years before switching companies again.  The switch came after KNIGHT advised DONOVAN that LABOR NOW was not getting the mark up it needed with OAR and that he was not happy with the arrangement any longer. WALLACE told DONOVAN that he some partners were going to be starting up their own temporary employment agency and that KNIGHT was okay with the move.  DONOVAN began using WALLACE's company, now known as ATS.  As after the move to LABOR NOW, the workers remained the same after the move to ATS.



PRO TEMP COMPANY
750 WASHINGTON STREET
SOUTH EASTON, MA 02375

ON A ROLL
121 LIBERTY STREET
BROCKTON, MA 02401

W/E 2/21/98

| WORKER | | DUE WORKER2 | LINE |
|---|---|---|---|
| AMBROSINA VARELLA | $ | 150 | |
| AMILCAR DEPINA | $ | 250 | |
| CARLA OLIVEIRA | $ | 21 | |
| CLARA GONSALVES | $ | 207 | |
| CUONG LAM | $ | 54 | |
| ELIZABETH SANTOS | $ | 183 | |
| ESTEPHANIA RIBERIO | $ | 273 | |
| FILOMENA GOMES | $ | 162 | |
| FLAVIO DE PINA | $ | 215 | |
| GEORGE GOMES | $ | 332 | |
| INACIA MARTINEZ | $ | 345 | |
| JOAO ANDRADE | $ | 268 | |
| JOSE LOPES | $ | 219 | |
| JULIA ROSA | $ | 261 | |
| LAUREGO CENTEIO | $ | 263 | |
| LIDIA SILVIA | $ | 258 | |
| LOAN LAM | $ | 54 | |
| LOU MILERO | $ | 363 | |
| MARIA LOPES | $ | 229 | |
| MARIA SANTOS | $ | 121 | |
| MARIA VICENTE | $ | 329 | |
| MIGUEL MARTINEZ | $ | 426 | |
| MIKE GOODWIN | $ | 39 | |
| MIZE ROSA | $ | 265 | |
| PAULA DUARTE | $ | 214 | |
| RUTH ELIAS | $ | 106 | |
| THU TRAN | $ | 187 | |
| TUYET BUI | $ | 339 | |

PRO TEMP COMPANY
750 WASHINGTON STREET
SOUTH EASTON, MA  02375

ON A ROLL
121 LIBERTY STREET
BROCKTON, MA  02401

W/E 2/21/98

| WORKER | TOTAL ORIGIN | HOURS | GROSS PAY | TRAVEL | DUE WORKER2 | LINE |
|--------|------|-------|-----------|--------|---------|------|
| CALLETANO PORTILLO (WI we 2/28 | NIGHT | 37.50 | $206 | $20 | $ | 186 |
| BRENDA ROMAN | NIGHT | 39.32 | $216 | $20 | $ | 196 |
| CALLETANO PORTILLO | NIGHT | 39.32 | $216 | $20 | $ | 196 |
| CALLETANO PORTILLO (WI we 2/14 | NIGHT | 8.00 | $44 | $4 | $ | 40 |
| FLORIVERTA GONZALEZ | NIGHT | 39.13 | $215 | $20 | $ | 195 |
| GUILLERMA VASQUEZ | NIGHT | 39.77 | $218 | $20 | $ | 198 |
| MEDARDO PALENCIA | NIGHT | 39.30 | $216 | $20 | $ | 196 |
| NANCY ESTRADA | NIGHT | 39.98 | $239 | $20 | $ | 219 |
| REINA SANCHEZ | NIGHT | 39.15 | $215 | $20 | $ | 195 |

payroll

PRO TEMP COMPANY
750 WASHINGTON STREET
SOUTH EASTON, MA  02375

MODERN FISH CO., INC.          W/E 05/20/2000
16 HASSEY STREET
NEW BEDFORD, MA 02740

                              DUE

W

BE

BE

CE

DA

DA

ER

ES

FEL                    $440      never picked up   so George
HERIBERTO MONTANO      $138                        p/u 8/4/00
ISMAEL RODRIGUEZ       $400      Ismael Rodriguez
JORGE CARDOZA          $320      DAniel GardotA
JOSE DAVID SUSTAITA    $400
JOSE DURAN             $203
JOSE GARCIA            $480
JOSE LUIS FLORES       $280

Page  1