UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | CASE NO. 05-10019-RGS |
| ) | |
| DANIEL W. McELROY and ) | |
| AIMEE J. KING McELROY ) | |

### MOTION OF THE DEFENDANTS, DANIEL W. MCELROY AND AIMEE J. MCELROY, TO EXCLUDE TESTIMONY OF JOSEPH DIRICO BASED ON THE GOVERNMENT'S VIOLATION OF LOCAL RULE 117.1(A)(4)(b)

The Defendants, Daniel W. McElroy and Aimee J. McElroy, move that the Court exclude the testimony of Joseph Dirico that is exemplified on page one of the FBI 302 report, dated January 18, 2008 (attached hereto) on the grounds that the disclosure of this report on January 24, 2008 constitutes a violation of Local Rule 117.1(A)(4)(b). The Defendants submit the following reasons in support of this motion:

1. The indictment contains no allegations of insurance fraud allegedly committed by Aimee King McElroy in connection with the Daily Agency. The government has never alleged in any previous discovery that Aimee McElroy engaged in Workmen's compensation Fraud with the Daily Agency.

2. The only direct evidence the government has to support its insurance fraud allegations that are set forth in the indictment is the testimony of Charles Wallace. Without the testimony of Charles Wallace these allegations would be dismissed.

3. The proposed testimony of Mr. Dirico is only admissible pursuant to Rule 404(b). Yet, the government has had this evidence in their possession since December 12, 2007, more

{K0362859.1}

than twenty-one days prior to the start of the trial. This late disclosure is highly prejudicial to the defendants because this evidence introduces new evidence unconnected to the indictment.

4. Currently, the Defendants have prepared a defense to the charges in the indictment; not a defense to some other wrongdoing not alleged in the indictment. In addition, the Defendants have received no documents or other supporting material regarding these allegations.

5. The only fair remedy for this serious discovery violation is to exclude the proposed testimony of Joseph Dirico.

For the reasons set forth above, the Defendants move that the Court grant the requested relief.

Respectfully submitted:

**AIMEE J. McELROY**
By her attorney,

_____
Jack I. Zalkind (BBO# 538840)
One International Place
Boston, MA 02110
Telephone No. (617) 227.3950
DATED: January 25, 2008

Respectfully submitted

**DANIEL McELROY,**
By his attorney,

_____
Stephen R. Delinsky (BBO# 119120)
**ECKERT SEAMANS, CHERIN & MELLOTT, LLC**
One International Place, 18th Floor
Boston, MA 02110
Telephone No. (617) 342.6800

{K0362859.1}

FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription  01/18/2008

    JOSEPH DIRICO, Auditor, A.I.M. MUTUAL INSURANCE COMPANY (A.I.M.) was interviewed at the UNITED STATES ATTORNEY'S OFFICE in connection with the upcoming trial of DANIEL MCELROY and AIMEE KING MCELROY (KING).  Participating in the interview were Assistant United States Attorney (AUSA) SARAH WALTERS and INSURANCE FRAUD BUREAU OF MASSACHUSETTS (IFB) Investigators ANTHONY DIPAOLO and KATE MULLIGAN.  DIRICO was advised of the identities of the interviewing agents and the nature of the interview.  He thereafter provided the following information:

    A.I.M. had a couple of predecessor company names including AMERICAN MUTUAL and AMERICAN POLICY HOLDERS.  DIRICO began working for the company in 1986.  A.I.M. insured the DAILY AGENCY in 1993/1994.  DIRICO's first contact with the DAILY AGENCY was for an interim audit which took place in Brockton.  KING was DIRICO's audit contact and he told her what he needed in order to conduct the audit.

    The office was located in a seedy area of Brockton and a lot of people were coming and going.  The company's record keeping was not that great and it appeared as though they were "flying by the seat of their pants" and/or "winging it."  KING was unable to tell DIRICO what their client companies did, but she understood how workers compensation worked.

    DIRICO advised that the DAILY AGENCY had estimated their payroll to be approximately $716,000, resulting in a premium of approximately $200,000.  As a result of his audit, DIRICO estimated the payroll to be over $2 million dollars, resulting in a premium of $604,000.

    Following the interim audit, DIRICO wrote KING a letter.  He explained the purpose of the audit and the fact that KING's estimates appeared way under and that his findings were going to increase the premium.  The DAILY AGENCY cancelled their policy shortly thereafter on June 12, 1993.  When it was time to do the final audit for the DAILY AGENCY, DIRICO had difficulty getting in touch with anyone.  When he went out there, the place was closed up.

    A.I.M. insured DAILY A. KING LABOR (DAK) in 2000/2001.  The policy period went from July 26, 2000 to July 26, 2001.

Investigation on  12/12/2007  at  Boston, MA

File #  196B-BS-86742                                      Date dictated  1/18/2008

by  SA NANCY L. MCCORMICK/nlm

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 10-6-95)

196B-BS-86742

Continuation of FD-302 of    JOSEPH DIRICO   , On 1/18/2008 , Page 2

    DIRICO conducted the DAK audits as well. His audit contact was CHARLES WALLACE. DIRICO was aware that the DAILY AGENCY and DAILY A. KING LABOR (DAK) were related companies and believed he may have been told this by JOHN MCDOUGAL. He recalled inquiring as to why A.I.M was providing coverage for a company with such a shady past and being told by DON BARBER that A.I.M. had to take them because it was a voluntary or direct account.

    Typically, DIRICO's first contact with a company is for either an interim/test audit or for a year end audit. Interim audits are typically conducted based on premium size and/or type of businesses, i.e. temporary agencies or contractors where payroll typically fluctuates. Audits are conducted because premium is based primarily on payroll and classification. Classification is determined by the risk associated with the job type. DIRICO went on to explain that a company provides an estimate of its payroll at the start of the policy, but that at the end of the year, an audit is conducted to determine any differences or variances. The rate per $100 of payroll is set by the state.

    Workers' compensation insurance is required by law/statute in the state of Massachusetts. The purpose of workers' compensation insurance is to compensate employees for time off due to injury or to pay for medical bills associated with job related injuries. Massachusetts has a no fault system whereby the injured party does not sue his/her employer, but taps into the employer's workers' compensation policy. Benefits or payments are a percentage of the worker's weekly pay.

    When conducting an audit, DIRICO typically asked for payroll records, either in house or out source, and items to corroborate the payroll records such as Forms 941/Quarterly tax returns, Massachusetts tax Forms WR-1 or DUAs. DIRICO advised that he asks for a second set of records to backup the payroll so that he can determine if the records are accurate and if not, if the client lied or just "screwed up." DIRICO relied on quarterly tax forms as they are supposed to be based on wages and accurately reflect a company's payroll.

    An invoice goes out after the final audit is conducted. DIRICO advised this is a little out of his area of expertise but that he was aware that a final statement of account, along with a statement of the final audit containing a summary of what was picked up in the audit, is mailed out.