1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
2

3

4    THE UNITED STATES OF AMERICA        )
                                         )
5                                        )
                                         )
6    vs.                                 )  CR No. 05-10019-RGS
                                         )
7                                        )
     DANIEL W. McELROY, AIMEE J.         )
8    KING McELROY, and XIEU VAN SON      )

9

10

     BEFORE:  THE HONORABLE RICHARD G. STEARNS
11

12

                        HEARING ON MOTIONS
13

14

15
              John Joseph Moakley United States Courthouse
16                      Courtroom No. 21
                        One Courthouse Way
17                      Boston, MA 02210
                      Monday, October 17, 2005
18                         2:38 P.M.

19

20

21                   Cheryl Dahlstrom, RMR
                     Official Court Reporter
22        John Joseph Moakley United States Courthouse
                   One Courthouse Way, Room 3209
23                      Boston, MA 02210
            Mechanical Steno - Transcript by Computer
24

25

1    APPEARANCES:

2         OFFICE OF THE UNITED STATES ATTORNEY
          By:  Paul G. Levenson, AUSA, and
3              Jack W. Pirozzolo, AUSA
          1 Courthouse Way
4         Boston, Massachusetts 02210
          On behalf of the Plaintiff.

5

          ECKERT, SEAMANS, CHERIN & MELLOTT, LLC
6         By:  Stephen R. Delinsky, Esq., and
               Andrew R. McConville, Esq.
7         One International Place
          Boston, Massachusetts 02110
8         On behalf of the Defendant Daniel W. McElroy.

9         LAW OFFICE OF JACK I. ZALKIND
          By:  Jack I. Zalkind, Esq.
10        One International Place
          Boston, Massachusetts 02110
11        On behalf of the Defendant Aimee J. King McElroy.

12        LAREDO & SMITH, LLP
          By:  Mark D. Smith, Esq.
13        15 Broad Street
          Boston, Massachusetts 02109
14        On behalf of the Defendant Xieu Van Son.

15

16

17

18

19

20

21

22

23

24

25

<u>P R O C E E D I N G S</u>

THE CLERK:  This is United States of America vs.
Daniel McElroy, et al, Criminal 05-10019.  Would all counsel
please identify themselves for the record.

MR. LEVENSON:  Good afternoon, your Honor.  Paul
Levenson for the United States.  And with me is Jack Pirozzolo,
also for the United States.

MR. DELINSKY:  Stephen Delinsky for Dan McElroy.  With
me, my colleague, Andrew McConville.

MR ZALKIND:  Jack Zalkind, your Honor, for Aimee
McElroy.

MR. SMITH:  Good afternoon, your Honor.  Mark Smith
for Xieu Van Son.

THE COURT:  I have, I think, by counting, five motions
that are pending.  Mr. Delinsky, is there any particular order
you'd like to proceed?

MR. DELINSKY:  Yes, your Honor.  I'd like to proceed
on the motion to dismiss Count 1 first.

THE COURT:  All right.

MR. ZALKIND:  Your Honor, may I just ask that Mr.
Delinsky argues in substance, may I be allowed to make a short
rebuttal, if necessary, after the prosecution gives its
opposition?

THE COURT:  We can do that, understanding that we have
only the afternoon.

4

1          MR. ZALKIND:  I understand.  When I say "short," I

2     know what "short" means.

3          THE COURT:  Okay.  Good.  All right.  Motion to

4     dismiss Count 1.  This is on the alleged duplicity argument,

5     right?

6          MR. DELINSKY:  Correct.  My understanding of a 371

7     conspiracy is that it can be proved by one or two means under

8     the defraud clause or the commit clause.  The argument that we

9     have put forward is that, if the government alleged for the

02:44 10     underlying conduct the same conduct, it could charge in the

11     disjunctive both the commit and the defraud clause.  And the

12     jury could return a verdict of guilty on either one, and it

13     would be a valid indictment.

14          What the government has done instead is to take the

15     lesson from a 371 conspiracy and charge two distinct crimes:

16     one, a Klein conspiracy to defraud the Internal Revenue Service

17     out of its efforts in collecting proper taxes where the victim

18     is the United States; and under the defraud clause -- rather,

19     under the commit clause, charges mail fraud, alleging that the

02:45 20     defendants essentially engaged in a scheme to defraud private

21     insurance companies.

22          The government has alleged that there's an overarching

23     conspiracy.  The overarching conspiracy is that these companies

24     and these defendants, through the use of false tax returns,

25     defrauded the IRS and private insurance companies.  But they

1   were different false tax returns.  They are two different

2   schemes and two different purposes.

3        As a result as to how the government has charged this

4   case, the jury is faced with a dilemma because, instead of

5   being able to decide in the alternative what clause has been

6   violated by the defendants -- either the defraud or the commit

7   clause -- for the same underlying conduct, i.e., how we used to

8   charge in state court a bribery case.  You could commit bribery

9   under 268A or under 268A, B, by engaging in a whole series of

02:46 10  acts.  But the underlying -- by having different effects.  But

11  the underlying behavior was identical.

12       Here the behaviors are separate, but it's charged in

13  one conspiracy indictment.  So, therefore, it is duplicitous

14  because it charges two conspiracies in the same indictment by

15  separating the underlying conduct.  Consequently, the jury, if

16  this is left unattended, could return a verdict of guilty by

17  finding the defendant guilty of the Klein conspiracy but not

18  guilty of the mail fraud conspiracy and vice versa.  And that

19  would put these defendants --

02:47 20      THE COURT:  Isn't the essence of a conspiracy, though,

21  an agreement?  If the government proves an agreement that has

22  as its object multiple crimes, can't the government charge that

23  in a single count?

24       MR. DELINSKY:  The government can prove -- has the

25  right to allege in a conspiracy indictment various conduct and

1    various purposes.  But I submit that the charging document

2    can't allege in itself two separate crimes.  In other words,

3    otherwise, the defendant is defending in one case two separate

4    underlying crimes as charged.

5         THE COURT:  Doesn't almost every RICO conspiracy

6    indictment charge multiple crimes?

7         MR. DELINSKY:  Yes, but there are separate elements.

8         THE COURT:  They conspired to do X, Y and Z?

9         MR. DELINSKY:  Yes.  But there are separate elements,

02:48 10   and there are separate elements of a conspiracy indictment.

11        Here, as I read the case law, the case law says that

12   you can allege a 371 conspiracy if the underlying conduct is

13   the same.  For example, if Mr. Levenson said that these

14   defendants engaged in a Klein conspiracy, and in carrying out

15   the Klein conspiracy they used the mails to commit mail fraud

16   to defraud the United States by mailing in the false tax

17   returns or something else, that is alleging the same acts under

18   a 371 conspiracy under both prongs.

19        Here they've alleged under a 371 conspiracy a

02:49 20   conspiracy to defraud the United States and a conspiracy to

21   defraud private insurance companies.  That's why there are two

22   conspiracies alleged, I say, in violation of the case law.  We

23   cite the cases as to why it's a violation in the case law.

24        According to Mr. Levenson, the First Circuit hasn't

25   specifically dealt with this; but according to the case law

1    that we have cited, that you have to allege in a 371 conspiracy

2    -- to allege in the disjunctive both crimes, they have to be

3    the same conduct because now, your Honor, whereas the jury

4    could -- you could charge the jury, if it was the same

5    underlying conduct, listen, this count has been charged in the

6    alternative as a conspiracy to defraud and a conspiracy to

7    commit.  If you find that the defendant has committed either

8    one beyond a reasonable doubt, they are guilty on Count 1.

9        Right now, because the underlying conduct is different

02:50 10   and we don't know, I submit the jury, if this were allowed to

11   go to the jury this way, would have to be charged that the

12   defendants -- unless you find beyond a reasonable doubt on each

13   prong that they're guilty beyond a reasonable doubt, they are

14   not guilty.  So, in other words, if you find beyond a

15   reasonable doubt that they're guilty of prong one but not

16   guilty of prong two, they are not guilty.

17       THE COURT:  Wouldn't a simpler remedy be simply to

18   submit a special verdict to the jury?

19       MR. DELINSKY:  Well, I think it would also require a

02:51 20   charge as to -- that they would have to be found guilty of both

21   because there's two -- it's two underlying separate conducts

22   alleged in the same indictment.  In order to save a duplicitous

23   indictment, as I understand a duplicitous indictment, the

24   remedy is for the government to say I'm going to prove both.

25   If I don't prove both, if I only prove one, they are not

1    guilty, or the government can recharge properly.

2          But I don't think the jury has a choice to say you're

3    guilty of one but not guilty of the other and you're, in fact,

4    guilty of Count 1.  If it was the same underlying conduct, yes,

5    because you can charge the same underlying conduct

6    disjunctively because the case law says a 371 conspiracy allows

7    you to prove the same conduct that I've alleged two different

8    ways.

9          They've alleged two separate sets of conduct, with two

02:52 10   separate victims, two separate frauds.  They say that they are

11   connected somehow, but they've alleged them differently.  The

12   government has said in its brief that they could have charged

13   it in one count properly but they didn't.  So, therefore, to

14   me, either it should be dismissed or the remedy -- a possible

15   remedy to save it is they have to prove both prongs beyond a

16   reasonable doubt; and if they don't and only prove one or none,

17   of course, the defendants would be found not guilty.  That, in

18   substance, is my argument on the motion to dismiss Count 1,

19   Judge.

02:52 20         THE COURT:  Mr. Levenson, I think Mr. Delinsky is

21   saying he's willing to accept your representation that you're

22   going to prove -- or at least are willing to see the jury

23   instructed that they are required to find that both of these

24   allegedly disparate crimes have been proved beyond a reasonable

25   doubt to sustain a conviction on Count 1 if I follow the

1    argument.

2         MR. LEVENSON:  Right.  I don't agree with that.  I

3    think the Barbato case, or Barbato, cited in our papers, 471

4    F.2d 918, specifically addresses the issue of duplicity where

5    you have multiple means of violating a single statute.  And the

6    tried and true remedy in this area is to instruct the jury that

7    they must be unanimous as to what crime was committed.

8         You can't have a jury where half the jurors are

9    persuaded that there was a Klein conspiracy, half were

02:53 10   persuaded that there was a mail fraud and have a guilty

11   verdict.  But if a jury is instructed that you must be

12   unanimous as to whether either prong or both was committed and

13   on that basis they may return a verdict of guilty provided that

14   they find a conspiracy substantially as alleged in Count 1

15   existed and that the defendants intentionally participated in

16   it.

17        THE COURT:  You lean more to my special verdict

18   theory?  You see it as a jury unanimity issue?

19        MR. LEVENSON:  I see it entirely as a jury instruction

02:54 20   issue.  The case law, I think -- it's reviewed in the briefs,

21   but I don't think there's much in the way of significant split.

22   There's this one case, the Haga case, from the Fifth Circuit,

23   from 1987, that supports the defendants' viewpoint in dictum,

24   saying, you know, under a single count you may charge either

25   conspiracy to defraud or conspiracy to commit offenses, but you

1    can't charge both.  That's what the Fifth Circuit said in 1987.

2         Nobody has jumped on that band wagon; and, in fact,

3    the issue wasn't squarely presented in that case because that

4    was a case where the government charged a conspiracy to commit

5    offenses, and the Court, sitting without a jury, found that

6    there had been a conspiracy to defraud the United States.  And

7    the Court of Appeals said, if the government charged the

8    offense clause, you can't return a verdict, and you can't

9    convict a defendant on something that wasn't charged.  They are

02:55 10    not -- they are separate elements to the two prongs of 371.

11         But every other case that's addressed the issue and

12    the one cited in the Bilzerian case from the Second Circuit or,

13    to my way of thinking, this District Court case in United

14    States vs. Levine, 750 F.Supp 1433, does a very good job of

15    both summing up the state of the case law back in 1990 but,

16    also, of weighing the factors that really inform this decision.

17         In effect, 371, like a lot of other statutes, presents

18    the issue of do you break up a conspiracy into multiple counts

19    and subject a defendant to, in effect, double the penalties,

02:56 20    the multiplicity issue?  Or do you consolidate it in a single

21    count?  And Levine says, to paraphrase crudely, given the

22    choice of multiplying the potential punishments that somebody

23    faces for what is essentially any crime or, alternatively, the

24    need to make sure a jury is properly instructed so that you

25    have both clear notice to the defendant as to the charges --

1    and there's no issue about notice here -- and a clear

2    instruction to the jury on unanimity.

3        So you don't have a risk of a half-and-half kind of

4    verdict that, as between the two sets of risks, you have to

5    default, in reading the statute, in favor of the view that says

6    let's make sure we have a proper unanimous verdict.  Let's not

7    pile on multiple punishments for the same offense.  And that

8    proposition the First Circuit has squarely addressed and is

9    clearly on board with that.

02:57 10       Going back, the Verricchia case was a good example,

11    where, if you've got multiple firearms possessed on a single

12    occasion, the First Circuit says that's an offense of

13    possession.  It's not 21 offenses of possession.  Given the

14    rule of levity, you don't interpret a statute to say, gosh, in

15    committing this crime -- in this case we'd be saying, in

16    entering into this agreement and committing at least one overt

17    act, the First Circuit says, unless Congress has said otherwise

18    clearly, you don't assume that by that single act and that

19    single statute a defendant is, therefore -- or thereby

02:58 20    subjected to sort of this prism effect where in an instant the

21    defendant has committed 21 offenses and faces 21 times as much

22    punishment.

23        What we describe in this case is under-the-table

24    payroll fraud.  There's bells and whistles to it.  Every case

25    has them.  It's essentially a scheme to run a business under

1    multiple headings or multiple storefronts, as it were, and to

2    hide payroll from tax authorities and from the insurance

3    authorities.  It's a single unified scheme.

4        THE COURT:  Your argument, in essence, is that we have

5    one conspiracy with two distinct sets of victims?

6        MR. LEVENSON:  Correct.

7        THE COURT:  Okay.

8        MR. LEVENSON:  And two objects that are neatly -- and

9    that are both properly charged under the statute and are neatly

02:59 10    outlined in the statute.  I don't think we're any different

11    from Barbato where it was a money laundering and they said they

12    did money laundering both with intent to promote and intent to

13    conceal.  Either one of those prongs would have been sufficient

14    to make out the crime.  The First Circuit said you instruct the

15    jury that they've got to be unanimous and the problem is

16    solved.

17        MR. DELINSKY:  You know, Judge, under the Barbato

18    case, what was being alleged was the same conduct.  Mr.

19    Levenson cites the Bilzerian case, which is a Second Circuit

02:59 20    case, decided in 1990.  The relevant language in that case

21    states, "Although it is recognized that the government may not

22    obtain two convictions or punish the defendant twice for the

23    same conduct, by alleging violations of both the defraud and

24    offense clauses of the conspiracy, it may simultaneously

25    prosecute the same conduct under both clauses."  "The same

1    conduct under both clauses."

2         By the remedy suggested by Mr. Levenson, well, we're

3    going to give a grab bag, the jury is going to have a choice of

4    either mail fraud or a Klein conspiracy with two different

5    victims.  We'll have the same spillover effect, and we'll let

6    the jury poison -- hear poison about one that wouldn't

7    necessarily be admissible against the other and then they can

8    decide.  But they don't have to prove both.

9         And I say that where it's the same conduct it is

03:00 10  disjunctive, and you can prove the same conduct by alternate

11   means.  The case law is ripe with that quote, "The same conduct

12   by alternate means," not two different conducts, by two

13   different means, and then giving the jury an either/or.

14        THE COURT:  What is the clear distinction in conduct

15   that you see?

16        MR. DELINSKY:  The distinction is --

17        THE COURT:  I understand the different sets of

18   victims.  But what is different in the conduct?

19        MR. DELINSKY:  What is different is that under the

03:01 20  Klein conspiracy it is alleged that the defendants submitted to

21   the Internal Revenue Service false tax returns about the amount

22   of -- about the numbers of workers that were being employed,

23   and they submitted a lower number than in actuality.  They only

24   submitted the individuals who were receiving checks as opposed

25   to individuals who were receiving cash; and, therefore, the IRS

1    was defrauded out of receiving the proper withholding and FICA

2    insurance.

3            The fraud alleged, vis-a-vis the insurance companies,

4    were that, in substance, the defendants, in order to achieve a

5    lower premium for workmen's compensation insurance, submitted

6    to the IRS tax returns which showed a lower number of employees

7    on the payroll than actually occurred so that -- so they

8    submitted documentation of alleged tax returns that were

9    submitted to the Internal Revenue Service -- which, in fact,

03:02 10    the government says -- were never submitted to the Internal

11    Revenue Service -- which showed a fewer number of employees.

12    Therefore, they would get a lower premium for unemployment.

13            The tax returns in question were different.  The tax

14    returns submitted to the Internal Revenue Service were

15    different than the tax returns submitted to the insurance

16    companies.  Those are -- the commonality is the use of tax

17    returns.  That's it.  And to say that both of those constitute

18    the same conspiracy to defraud the United States is wrong.

19    That's not the same underlying conduct.  It's two separate

03:03 20    conducts, and the government can't have it either/or.  They can

21    put it all in and let the jury decide.  Let the government

22    prove both beyond a reasonable doubt.  They've charged it.

23    They've charged it both ways.  And if they want to keep the

24    indictment, we'll take the risk of multiple punishments.  But

25    if they say it's -- then let them prove it.

1     As I understand duplicity, either they have the right

2  to elect -- as I understand duplicity arguments, when I've

3  dealt with them in the past, prior to the start of the trial,

4  the government has a choice of electing which theory to go

5  forward on.  Or if they want to go forward on both, where

6  there's different underlying conduct, they have to prove both

7  beyond a reasonable doubt to get a conviction on Count 1.

8  Otherwise, the indictment should be dismissed and let the

9  government recharge; or they go forward, but they have to prove

03:04 10  both beyond a reasonable doubt.  Those are two separate crimes.

11     THE COURT:  How would you distinguish this:  You and I

12  were corporate officers.  We conspired to commit securities

13  fraud.  We overstate the amount of inventory.  Now, in the

14  process don't we -- we defraud shareholders.  We defraud the

15  market.  We commit a crime against the SEC.

16     MR. DELINSKY:  Correct.  But it's the same underlying

17  conduct.  You would introduce the same underlying conduct of --

18  what you have done is you have understated your inventory

19  deliberately so that there will be false financial statements

03:04 20  that the market will rely on to invest in your public company.

21  And that act that flows from that has various consequences.

22     These acts are two separate acts, two separate acts.

23  They're not the same way to commit the same crime.  Your

24  example, I have no problem with because it's the identical

25  conduct.  This is two separate conducts, one involving the

1  Internal Revenue Service and one involving the private

2  insurance.  It's a different scheme.  The government has

3  alleged it's the same.  As I read the case law, you can charge

4  it disjunctively if it's the same conduct.  I allege -- I think

5  it's obvious on its face it's separate conduct; and, therefore,

6  it is duplicitous.  The remedy for duplicity is either a

7  dismissal, an election, or the government proves both beyond a

8  reasonable doubt.

9  MR. ZALKIND:  Your Honor, I'll be very brief, but I

03:06 10  think that in the government's brief you're going to find your

11  answer.  On Page 7 the government says that in the First

12  Circuit, in the case of United States vs. Cloutier, the way

13  that you distinguish on these single and multiple conspiracies

14  is the similarities of the fraud involved, the coconspirators'

15  objectives, the means used to achieve these ends, the

16  similarities and difference in the evidence used to prove the

17  conspiracy, and the identity of all persons involved.  All

18  together different in each one of these acts, your Honor.

19  In the case involving the IRS, it is two companies the

03:06 20  McElroys had.  They were legitimate companies, same officers.

21  And the income tax returns, your Honor, were shown.  They were

22  different than what they should be.  And as a result of that,

23  the scheme was to lower the price of the insurance.

24  Now, in the other scheme where -- not to pay the

25  taxes, it was entirely different.  They set up -- according to

1    the government's allegations, they set up straw companies,

2    straw corporations.  They had straw managers.  The straw

3    managers did not pay the taxes.  The straw managers changed

4    their insurance policies every year so they wouldn't have to

5    pay these high premiums.

6         And so when you look at the indictment, your Honor,

7    the answer is right there.  The acts that were committed to

8    prove these two separate conspiracies is right there in this

9    brief, your Honor.  You can look at it all day long.  And the

03:07 10   big serious problem that I see -- and I'm not going into the

11   cases again -- is the prejudice involved that spills over.

12   From one to the other in one case, your Honor, you have these

13   workers that are not paying taxes, and the jury is going to

14   say, oh, ghee, they didn't pay their taxes, and these people

15   made money, et cetera, so forth and so on, which would never be

16   allowed in in the scheme for the insurance company.  And then

17   by separating both of them, you don't get this tremendous

18   prejudicial spillover, your Honor.

19        And I think that's my serious point that bothers me so

03:08 20   much in this case, your Honor.  I don't see how you can --

21   sure, you can set up charges.  But how do you stop the evidence

22   every five minutes by saying you can't consider it on this one,

23   but you can consider it on this one?  I think it's a very

24   serious point.  The First Circuit recognized it, your Honor.

25   That's my point.  That's all I have to say on rebuttal.

1          THE COURT:  Of course, that argument is premised on

2    the notion that had the government, in fact, indicted two

3    separate conspiracies it would be improper to join them for

4    trial, am I right?

5          MR. ZALKIND:  Yes.

6          THE COURT:  You're going to have the same prejudice.

7    Oddly enough, at the moment I'm trying a case that actually

8    combines exactly the same two, a scheme against --

9          MR. ZALKIND:  You say you tried 21 counts of gun

03:08 10   conspiracy, but the way you buy it is the same.  You may buy it

11   from the same person, the mold.

12         These cases are -- when you read the indictment,

13   they're so different.  One is a simple plan to reduce the

14   amount of taxes by various methods that you show that you did

15   pay the taxes.  You show it to the insurance company and say,

16   okay, we'll lower the rates.

17         The other one you don't even do that.  The other one

18   has nothing to do with that.  According to the government's

19   allegations, we're not going to pay the taxes, and the way we

03:09 20   do it is we won't pay the workers.  The workers won't have to

21   file a withholding.  It's an entirely different scheme.  I

22   don't understand how they can put it in the same conspiracy,

23   your Honor.  The workers were being paid.  It's the taxes that

24   weren't being paid.

25         MR. DELINSKY:  I have -- I think from my perspective,

1    as I understand the remedies for duplicity, other than

2    dismissal -- and as I understand, duplicity is waived unless

3    it's raised pretrial so the judge can make appropriate

4    decisions.  The remedies are a dismissal of the duplicitous

5    charges; a government election as to which duplicity charge to

6    go forward on; or the requirement to prove both elements.  And

7    if you prove one, it's insufficient.  I think to prove one, I

8    think, is very dangerous and very prejudicial and very unfair

9    because then you would have linked in one count two separate

03:10 10   charges, plus, in one trial, the underlying mail fraud counts

11   with the underlying tax counts, which I think gives the

12   government a very unfair advantage in contravention of the

13   joinder and severance.

14        THE COURT:  If the jury is -- if we turn to your third

15   alternative, aren't you walking right into Mr. Zalkind's

16   argument?  Now you're saying, no, it really can't be that

17   prejudicial even though there's now going to be proof of both

18   alleged conspiracies so long as the jury is told that you have

19   to be convinced that both conspiracies, in fact, are proved

03:11 20   beyond a reasonable doubt.  I mean, what happens to the

21   prejudice argument then?

22        MR. DELINSKY:  Well, the prejudice argument, I think,

23   is mollified greatly under that remedy because the jury is

24   charged that they've got to prove both; whereas, if it's

25   either/or, the use of the evidence to effect the proof of the

1    other is much more extreme.  Whereas, the remedy to prove both,

2    it's mollified because they've got to prove both.  You can't

3    use it, one piece of evidence to prove something else.  So,

4    therefore, if the evidence is in and they don't feel that the

5    defraud clause has been proved, the whole indictment fails.  So

6    I think by having them to prove both, both beyond a reasonable

7    doubt, it mollifies the prejudice argument.

8         The additional motion that I filed, the motion to

9    sever some of the underlying counts, Judge, basically, that

03:12 10   motion flows from the Court granting relief on Count 1 through

11   a dismissal.  Now, if the government elected, I suppose, to

12   proceed on the -- under the defraud theory, I would ask that

13   the commit substantive indictments also be severed.  If the

14   government is going to be proceeding under both and having to

15   prove both, then I suppose all could go to trial.  Or if they

16   say no, then if the -- if the mail fraud -- I think what I'm

17   suggesting is, if the cases are separated, all the insurance

18   fraud cases -- counts should be tried together, the insurance

19   fraud conspiracy with the mail frauds, and then the Klein

03:12 20   conspiracy with all the tax -- with all the tax charges.

21   That's a relatively simple argument that I think is primarily

22   based upon the Court's decision in Count No. 1.  So I would

23   rest my argument on that.

24        THE COURT:  Do we want to -- I'm sorry.  I have so

25   many motions.  I'm trying to keep them straight here.

1          MR. DELINSKY:  That is the misjoinder of offenses.

2          THE COURT:  Right, misjoinder.  Different issue than

3     the challenge to the --

4          MR. DELINSKY:  Than the duplicity.  But the

5     misjoinder --

6          THE COURT:  And the mailings not being in furtherance

7     of the scheme to defraud?

8          MR. DELINSKY:  Well, the misjoinder is based upon the

9     following argument:  If the Court finds that the indictment is

03:13 10     duplicitous that requires it to be dismissed, consequently, the

11     substantive mail fraud and the substantive tax counts can't be

12     tried together.  That's the substance of that argument.

13     Whereas, if the government elected to go forward on one prong

14     under a duplicity analysis, the substantive counts that I

15     suggest the government could try with that would be only the

16     substantive counts connected to that prong.  Whereas, if the

17     government said, hey, we're going to prove both prongs of the

18     conspiracy beyond a reasonable doubt, we failed to prove one,

19     not guilty on Count 1, then I could see all counts being tried

03:14 20     together.  And as I read the remedies under duplicity, that

21     that's how the courts have done it, that you've got to prove

22     both.

23          THE COURT:  Okay.  Do we want to move to the motion to

24     suppress?

25          MR. DELINSKY:  Yes.  Now, the argument on the mail

1    fraud, as to the furtherance, I'm relying on my brief for that.

2    I don't propose to give any oral argument on that, your Honor.

3         MR. ZALKIND:  I join my brother on that myself, your

4    Honor.

5         MR. DELINSKY:  The motion to suppress is based upon

6    the following principle of search-and-seizure law that is quite

7    elemental; that is, a warrant application must demonstrate

8    probable cause to believe that a particular person has

9    committed a crime, i.e., the commission element, and the

03:15 10    enumerated evidence relevant to the probable criminality likely

11    is located at the place to be searched, the nexus element.

12         I contend that the search warrant in this case is

13    fatal under both counts, the commission element and the nexus

14    element.  It's fatal under the commission element primarily

15    because there's an abject failure of probable cause because of

16    the immense staleness of the affidavit.

17         In substance, the government has alleged that a former

18    employee of the defendants' from 1996 to 1998, observed the

19    conduct of the companies and what they were engaged in.  Gave

03:16 20    specific evidence, gave specific information to the government.

21    He ceased his employment in 1998, had no further contact with

22    the defendant, and then the defendants moved their location in

23    2000 to the current location where the search was executed in

24    2001.

25         So, therefore, the affidavit -- and I think Mr.

1   Levenson would agree -- absent Michael Powers, the averments

2   related to him, there would be absolutely no probable cause at

3   all.  Where we disagree is to the level of corroboration and

4   updating the information that Mr. Powers has provided and

5   underlying facts dealing with the credibility of Mr. Powers

6   that were excluded from the affidavit.

7        We have an individual supplying information that was

8   the basis of an affidavit, signed, and the warrant obtained in

9   June of 2001 when that informant's information ceased in May of

03:18 10  1998.  You're talking a three-year gap, three years.  Staleness

11   many times is discussed in terms of months, weeks.

12        THE COURT:  It depends on what you're looking for.

13   There are cases involving, for example, pornography collections

14   where 16 years has been thought not to be stale.

15        MR. DELINSKY:  Well, in the case -- in one of the

16   classic cases in this court, there was such a case, and they

17   did obtain a warrant.  And the Court of Appeals said that it

18   was violative of a lack of probable cause, and it didn't get

19   over the Leon good-faith requirement.  That was a case tried a

03:19 20  number of years ago.  It was a case decided in the 1980s, and I

21   have the cite of the opinion.  I believe it's cited in our

22   brief.

23        But what allows old probable cause to rise to the

24   level of sufficient probable cause for the issuance of a

25   warrant is to what degree has that information been brought

1    current?  The evidence that the government has put forward in

2    the affidavit, in the form of alleged corroboration, that the

3    scheme is ongoing, is remote at best.

4         The government cites the recent First Circuit case of

5    Greenburg that talks about corroboration of an informant.

6    Well, the important thing in the Greenburg case was that

7    informant's information was corroborated contemporaneously by

8    observations and actions that the United States took, and there

9    was no gap in obtaining the search warrant, not based upon

03:20 10   three years.

11        The other facts that the government cites -- and they

12   make an issue about this because I contend, taken in and of

13   themselves, it is evidence of innocent conduct -- the fact that

14   checks were cashed.  The government is not alleging any

15   violations of the money laundering statute.  There were proper

16   CTRs filed.  There was no attempt to hide.  They're not

17   alleging that that constituted a criminal act, the fact that

18   people were coming and going from this location.

19        But, most importantly, the government states that in

03:21 20   19 -- I believe 1994, the Department of Labor issued an

21   injunction against Aimee McElroy and on some counts -- some

22   parts to Dan McElroy.  But it's irrelevant as to how the

23   obligations under that injunction applied to one and not the

24   other.  So for purposes of my argument, the injunction

25   basically said that you can't pay your employees in cash.  You

1    have to file proper records, proper tax returns, and you have

2    to keep all of your records.

3          The government is saying that injunction is clear

4    evidence that they had to maintain all of these records in

5    their current location where the search and seizure was

6    effectuated even though the informant has no idea what was kept

7    in the new location because he left in 1998, three years

8    before.

9          THE COURT:  Wouldn't a better argument be -- since tax

03:22 10   fraud is really the object of the search that was authorized,

11    since the IRS requires you to keep three years of tax records

12    in the event of audits, even fraudulent tax records, wouldn't

13    it follow that assuming Powers was the only informant that

14    three years later it would be likely that the same tax

15    documents that you are looking for would be still in the

16    defendants' possession?

17          MR. DELINSKY:  No, not necessarily, because if the

18    government alleges that there were crimes being committed, in

19    fact, the opposite incentive would be to take place, because

03:23 20   the government has alleged that they were violating the

21    injunction for purposes of cash payroll, but at the same time,

22    they were maintaining the injunction by keeping all of their

23    required -- all of their required records.

24          I think something more is required, and that's where

25    we get into the nexus element.  The fact that you had probable

1  cause to say that in 1998 certain conduct was occurring, they

2  move.  There was no description as to where records were kept,

3  what records were being kept at the new location, who was

4  keeping the records, how their offices were laid out, all

5  information that Powers knew in 1998 about an old location.

6       The government, in its affidavit, also talked about an

7  off-storage location where records could be kept.  Well, they

8  never got -- they never executed any search warrant regarding

9  an off-storage -- off-site location that they knew the McElroys

03:24 10  had for storage of records.

11       The link between information in 1998 to information in

12  2001 that the fraud was ongoing and that the records would be

13  at this new location is a great leap of faith.  And when you

14  look at the separate elements that the affidavit sets forward

15  to show that this is ongoing, this is the evidence that it's

16  ongoing, take each act, taken in and of itself, does not prove

17  or does not rise to the level of refreshing probable cause and

18  making it contemporaneous with the application for the search

19  warrant.

03:25 20       Just to the contrary, the government has alleged that

21  in 1997 one of the companies that the accountant, Charles

22  Wallace, prepared tax returns for, one of the alleged sham

23  companies that the government has put forward, didn't pay

24  taxes, was subject to an IRS audit.  And on behalf of the

25  company, Mr. Wallace agreed to pay the back taxes and entered

1    into a partial payment agreement where, monthly, he paid the

2    taxes.  That doesn't prove a scheme to defraud.

3         The statement by Mr. Wallace in 1997 that some of the

4    employees only wanted to be paid in cash, that does not prove

5    that in 2001 that this same crime was occurring.

6         The other factor is, especially in light of the

7    reliance so heavily on information geared to 1996 and 1998, the

8    credibility of Powers is extremely important.  The affidavit

9    did not divulge important things about Mr. Powers; one, that he

03:26 10   came forward in 1999 to the state of Massachusetts because he

11   was under investigation for misconduct involving a company that

12   he had set up after he left the employ of the McElroys.

13        The government's argument is, well, we didn't find out

14   about that until 2002.  How did they not find out that he was

15   under investigation until 2002 when he came forward in 1999?

16   And the reason he came forward, according to his partner, was

17   that he was under investigation.  That's not disclosed.  It's

18   also not disclosed that at the time of the search warrant --

19        THE COURT:  But all you're arguing is that they were

03:27 20   negligent in not learning that he was under investigation by

21   another sovereign authority.  Negligence just doesn't make it

22   under Franks.

23        MR. DELINSKY:  I understand that negligence doesn't

24   make it under Franks.  I'm not arguing this is negligence.  I'm

25   saying there's no way they could not have known.  The agency

1   who they were working with, the Insurance Fraud Bureau, which

2   is a creation of the Massachusetts legislature, funded by the

3   private insurance industry, that agency was working with the

4   very -- with the very agency that was investigating Powers.  So

5   the Insurance Fraud Bureau, which became an agent of the United

6   States in this case, was the very agency working with the

7   underlying state agency.  Then, for the government to say,

8   well, we didn't find out about it until 2002 when Powers'

9   partner told us about it, and it was still pending, the

03:28 10   investigation, I think that that rises to the level of at least

11   an evidentiary inquiry under Franks as to whether a hearing

12   should be held.

13       THE COURT:  Perhaps.  Remember, this is the government

14   that didn't know a hurricane was headed for New Orleans.

15       MR. DELINSKY:  That's correct, or that they felt that

16   the -- that the levies were secure.

17       The argument also is that wasn't disclosed that Powers

18   had an agreement for pocket immunity with the United States at

19   the time of the affidavit; that -- and the Vigeant case, where

03:29 20   the First Circuit overturned a search warrant, saying that it

21   was a Leon violation when the affiant -- rather, when the

22   informant, the person providing the information, when it wasn't

23   disclosed of his ongoing criminal -- quasi-criminal issues with

24   the United States, which was relevant, where it was so

25   critical, his information, to the granting of probable cause in

1    the search warrant.  We cite that in our brief.

2          There was another -- there was another element -- and

3    I don't know how to deal with it because Mr. Levenson has dealt

4    with it.  In the plea agreement, it said that Powers is dealing

5    with separate criminal charges.  The government now has said,

6    well, that was a misprint even though the government signed the

7    letter, Mr. Powers signed the letter and his lawyer signed the

8    letter, that it was a misprint, that he wasn't under any

9    criminal charges, but he just signed a letter to that effect.

03:30 10    I don't know.  I'm not saying the government is misrepresenting

11    any fact.

12          THE COURT:  I don't think Mr. Levenson would

13    misrepresent that to you.  This is the evil of word processing.

14    I get pleadings from lawyers all the time that don't change the

15    name of the client from the last case.  These are things that,

16    unfortunately, technology makes it too easy for us in some

17    ways.

18          MR. DELINSKY:  I would hope before a defendant and his

19    lawyer would sign a letter with the United States that they

03:30 20    would read it.

21          THE COURT:  One would.

22          MR. DELINSKY:  Especially when it says that you're

23    under criminal charges for another crime.  But I take it for

24    what it is.

25          Under the Leon exception, the exclusion for Leon good

1    faith is when a magistrate was misled by information in an

2    affidavit that the affiant knew was false or would have known

3    was false except for his reckless disregard for the truth; 2,

4    where the issuing magistrate wholly abandoned his detached and

5    neutral role; 3, where the affidavit is so lacking in indicia

6    of probable cause as to render an official belief in its

7    existence entirely unreasonable; and then 4, where a warrant is

8    so factually deficient, i.e., in failing to particularize the

9    place to be searched or the things to be seized, that the

03:31 10    executing officers cannot reasonably presume it to be valid.

11          I suggest that for the search warrant, without dealing

12    with the Franks hearing on prong one, on whether or not the

13    affidavit should have disclosed more of the credibility issues

14    relating to Michael Powers because it's so -- in this case it

15    was so critical to the granting of that search warrant, is --

16    we're relying on prong three, where the affidavit is so lacking

17    in indicia of probable cause as to render an official belief in

18    its existence entirely unreasonable.  That is the staleness

19    argument.

03:32 20          The Franks argument, even though related to this, is a

21    separate issue relating to the lack of substantiating material

22    clearly available to the government that the magistrate should

23    have had in front of him to determine the credibility of

24    Michael Powers and his motive to lie.

25          So, one, we're contending that the affidavit is

1    fatally flawed because that the probable cause set forth is

2    stale; and two, and most importantly, under the nexus element,

3    because there was a change in location, there was nothing set

4    forth in the affidavit based upon any information as to anybody

5    having observed the new location, what was kept there, who

6    worked there, and what files would be present and where, that I

7    think that the nexus requirement that is required in a valid

8    search warrant was violated.  So there's both the staleness and

9    the nexus requirement.

03:33  10         And then, lastly, the lack of substantiation for the

11    failure to disclose serious credibility issues regarding

12    Michael Powers that the magistrate should have had, I think we

13    have met the burden under Franks for that, and there should be

14    an evidentiary hearing.

15         MR. ZALKIND:  Let me just add a remark.  You said

16    something before that's quite interesting.  You said that,

17    well, you're required to keep your records for taxes for three

18    years.  As a matter of fact, I'm working on a case right now,

19    your Honor, where there's a nursing home under investigation,

03:34  20    and they sold their nursing home so that there were two

21    different locations.  And what they did was what they should

22    have done here.  They issued a subpoena.  They issued a

23    subpoena, and it's taken almost a year and a half to put all

24    these records together.

25         So the government took a guess in this case, and they

1    guessed that since the business had moved from one place to the

2    other the records were there.  But as Mr. Delinsky says, there

3    is absolutely no evidence whatsoever that the records that they

4    were seeking were at this place, none whatsoever, Judge.  And

5    we had the same thing, as I'm saying, in this nursing home

6    case.  Because they had changed, the attorney general felt that

7    the search warrant wouldn't be proper because they would have

8    to guess that the records were there.  And if they had issued a

9    search warrant, P.S., they wouldn't have found them because

03:35 10    they were in a storage bin elsewhere.

11         So I really think that's a very, very strong argument

12    that Mr. Delinsky gives.  Even though the records are required

13    to be kept, it doesn't mean a damn thing.  They don't have to

14    be there at all, Judge.

15         THE COURT:  Mr. Levenson.

16         MR. LEVENSON:  I have to start -- I won't try and

17    respond to each point that's been raised, but I do have to

18    start with the first premise because I think it's wrong.  Mr.

19    Delinsky suggests that with absent Mr. Powers there's no

03:35 20    problem cause here.  I would suggest that Page 21 of the

21    warrant affidavit, the chart at the top of it, by itself, lies

22    somewhere between probable cause and proof beyond a reasonable

23    doubt, at least as to the fact of commission of the offense.

24         If I can take a second just to direct the Court to

25    what that is and what its significance is.  It's a chart.  At

1    the top it says, "Daily AK Labor, Inc."  The left-hand column

2    says, "DAK," Daily A. King, "audit dates," and shows the dates

3    on which insurance company auditors were in to look at what

4    they thought were the books of the company to find out what the

5    company's payroll was.

6           As you'll see, the most recent of those audits by an

7    insurance company auditor was October of 1999.  That tells us

8    two things:  one, we're talking about conduct later in date

9    than the period when Michael Powers worked there; and, two,

03:36 10  that quite apart from Mr. Powers, as we work forward, we look

11   at the time periods covered by the putative tax returns that

12   were disclosed to the insurance auditors on those dates.

13          The next column shows how much payroll was reported to

14   the insurance company; basically, 2 to $3 million a year for

15   each of the periods in question.  And in each period, the

16   auditors were shown Forms 941, what appeared to be tax forms

17   that appeared to corroborate those payroll figures that were

18   reported to the insurance companies.

19          The right-hand column is the kicker.  That's the IRS

03:37 20  tax records as actually maintained by the IRS.  And what this

21   shows -- or what this summarizes is the evidence showing that

22   the tax records shown to the insurance auditors were forgeries.

23   They simply were not the same records.  They were a forged

24   version of the 941s for the same time frame.

25          So we're talking here about evidence of -- direct, all

1    but uncontrovertible, evidence at least as to commission.  We

2    may get into issues about intent.  We may get into issues about

3    who directed what.  But as to the fact of commission and

4    commission at a later date, probable cause is amply shown in

5    the top of Page 21.

6         As for staleness, if we go to Page 25 of the

7    application -- or of the warrant affidavit, this is simply a

8    listing of CTRs.  How much green cash is this company getting

9    its hands on on an annualized basis?  And bearing in mind that

03:38 10    the affidavit is dated June of 2001, the 2001 entries now take

11    us up to the first six months of 2001.

12         So, crudely put, what this chart shows is roughly 40

13    million, 39-million-plus, in green cash between 1997 and 2001,

14    of which three million is from the first six months of 2001

15    alone, this from a company that was under a consent decree and

16    injunction saying we will not pay our workers in cash, and we

17    will keep records reflecting the hours worked, payments made

18    and the other employment information as part of the enforcement

19    of that consent decree.

03:39 20         So putting just that information into context, what

21    we're talking about is ample probable cause.  And I'm not

22    suggesting -- we all know that our currency says legal tender

23    for all debts, public and private.  There's no law per se

24    against obtaining cash, even if it's $39 million.  But when

25    you're under an injunction that says don't be paying your

1    workers cash and the same pattern continues of massive amounts

2    of cash being obtained on a weekly basis, through the people

3    who are the nominal owners, as described by Powers, we're

4    talking about an uninterrupted pattern.  When that, in turn, is

5    corroborated by surveillance in April of 2001 -- if we go to

6    Pages 31 and 32, you get a description of the April

7    surveillance specifically linking Xieu Van Son who -- Mr. Smith

8    actually represents Mr. Van Son -- describing Mr. Van Son's

9    vehicle being sighted, going to the bank, a CTR from the same

03:40 10    day from the bank and identifying Mr. Van Son as getting out

11    $107,000 as a transactor for Precision Temp Corporation, which

12    had been identified as one of the companies that the government

13    alleges are shell companies.  I understand the defense has a

14    more benign explanation of their role.

15        But when we're talking about a commonsense probable

16    cause determination, the premise that this is all Powers and

17    nothing else doesn't hold up.  The premise that this is all

18    Powers talking about events back before the end of 1998 doesn't

19    hold up.  And the premise that there's nothing linking the

03:41 20    current location, quite apart from the commonsense observations

21    of the agent, that if you're running a $40 million or, in this

22    case, roughly an $80 million temporary employment agency, 80

23    million being about 40 million paid legitimately by check, the

24    other 40 million under the table in the time period, it's not

25    an unreasonable proposition that if you're running an $80

1   million business you probably keep records, particularly if

2   you're under order and consent decree requiring you to keep

3   such records.

4          It certainly is not an unreasonable proposition, as

5   you've pointed out, that as to your tax records, you at least

6   keep the last three years.  And since we're talking about

7   conduct that continues well into that three-year window, given

8   the nature of the conduct, the consistency of the scheme, the

9   shear amount of currency involved, and the updating of the

03:42 10   probable cause, this just is -- this is not a close case.  This

11   is one where the probable cause was ample.

12          You know, I commend defendants' counsel in scouring

13   the early discovery that was provided and early Jencks to find

14   arguable inconsistencies or arguable claims.  I think they

15   strained the limits of creativity in saying that Powers says

16   when he left Mr. McElroy said, well, don't talk to my people,

17   and they say, well, clearly, he didn't talk after that, that

18   was a threat, I don't follow their logic.  But they clearly

19   have scoured for any arguable omissions from this affidavit.

03:43 20   And apart from my word processing dereliction, where I have to

21   admit probably not the only one in my career, they don't have

22   anything.

23          The information provided by Mr. Powers had been

24   provided before he got his immunity letter.  There's nothing

25   about the immunity letter, unlike the Vigeant case, where

1    you're talking about an unnamed, unidentified, confidential

2    informant as to whom there was a -- the First Circuit, at 176

3    F.3d 573, describing the failure to mention this unnamed,

4    unidentified confidential informant's long criminal history,

5    numerous aliases, recent plea agreement, meaning admission to

6    criminal conduct and other indicia of unreliability.

7          Here, to the -- the key factors that would underlie

8    any evaluation of Mr. Powers' credibility or motive are,

9    namely, a), he was involved in criminal conduct and clearly was

03:44 10    looking to point the finger at others; and, b), he was a

11    competitor.  Those facts are disclosed in the affidavit.  The

12    suggestion that the 40-page affidavit should have been longer,

13    to include everything in all of the 302s that were ultimately

14    turned over, I think, strains credibility on this one.

15          MR. DELINSKY:  Just a couple of points, Judge.

16    Vis-a-vis Mr. Powers, I have no statement in a 302 form

17    involving Mr. Powers that predates his immunity agreement with

18    the United States.  In fact, his cooperation began in 2000 with

19    the signing of that agreement.  Maybe he cooperated with

03:45 20    somebody else beforehand, but I have no statement, no

21    affidavit, no 302s from the FBI or IRS that predate that.  And

22    if he did, I haven't been given those copies of any statement.

23          And with respect to the tax returns, well, the

24    government didn't have any problem finding tax returns.  They

25    got them from the insurance companies.  It got them from the

1    Internal Revenue Service.  The allegation that somehow, because

2    the government has said that in 1999 they have evidence that

3    the insurance companies received tax returns different than

4    what was filed for the same entity for the IRS in 1999, somehow

5    proves that in 2001 evidence -- records evidencing a crime will

6    be present in a different location than Powers was in in 1998,

7    I think, is stretching the limits of staleness and the

8    requirements of the warrant requirement.

9         The Court before, earlier today, referred to a case

03:47 10    where, in an obscenity case, you can go 14 years.  The case is

11    United States vs. Ricciardelli.  It was decided by the First

12    Circuit Court of Appeals on June 22, 1993.  And in that case

13    the Court of Appeals overturned a search warrant post-Leon

14    where the information that was used to obtain an anticipatory

15    search warrant was 14 years old.

16         So, yes, they can go back and use old evidence, but

17    they have to also meet additional requirements under the Fourth

18    Amendment that requires affidavits to be based upon probable

19    cause and that there be a link between the probable cause and

03:48 20    the location to be searched and that important information

21    regarding the underlying believability or credibility of an

22    informant, where it so heavily and overwhelmingly relies upon

23    him, that is excluded from an affidavit, I think, coupled with

24    all that, at least requires an evidentiary hearing.  But I

25    think, on its face, the staleness argument has been met.

1          THE COURT:  We may be meandering off in the

2     pornography collections that aren't really quite relevant to

3     this case.  Ricciardelli, the real issue in that case was

4     whether the -- in an anticipatory warrant, the warrant has to

5     identify the triggering event.

6          MR. DELINSKY:  Correct.

7          THE COURT:  That gives the officer then the right to

8     serve the warrant.  That's an issue the Supreme Court is going

9     to be taking up quite shortly.

03:49 10          MR. LEVENSON:  Just on a factual matter, Mr. Delinsky

11     was talking about evidence of prior involvement of Powers

12     making statements before the first 302 that he's received.

13     That's set forth in the affidavit.  It's at Page 7, Paragraph

14     15, describing Powers' first coming forward to the Insurance

15     Fraud Bureau in 1999 and describing what he came forward with.

16     So that's where that can be found in the record.

17          And the other point that I think is important -- and I

18     understand how significant it is for the defendants to try and

19     show some discontinuity between activity at the time Powers was

03:49 20     involved and later activity.  The important point from our

21     perspective is the commonality, that the description of Charles

22     Wallace's involvement not only by Powers but by Ms. Bova, the

23     tax examiner, who met with Wallace and heard admissions from

24     Wallace about paying employees in cash, the fact that Wallace

25     is identified in the surveillance is shown to still be by all

1    appearances -- you know, obviously, there isn't a new informant

2    inside the organization.  These are the appearances one derives

3    from corroborating who's going to the bank, who's carrying the

4    satchel and how much money is being taken out of the bank, in

5    whose name, on what day.  But that's precisely the kind of

6    information that one always constructs probable cause from.

7    But the continuity of the act -- not merely the actions but the

8    actors -- is, I think, the important point.

9         MR. DELINSKY:  Again, just without belaboring, that

03:51 10   interview with Wallace, as I recall, as set forth in the

11   affidavit, occurred in 1997.

12        THE COURT:  Interesting issues to think about.

13   Pending the decisions that I reach on these motions, is the

14   case otherwise ready for trial?  Are we toward an ultimate

15   event or --

16        MR. DELINSKY:  Well, we have to work through -- and

17   I'm confident that Mr. Levenson and the defense counsel will be

18   able to work through some ongoing discovery matters to simplify

19   the trial.  But I would suspect -- maybe Mr. Levenson can

03:51 20   indicate one way or the other -- but looking at a March or

21   April trial date.

22        THE COURT:  So there is no pressure on me to turn

23   these around in the next week, in other words?

24        MR. DELINSKY:  No, no, absolutely not.

25        MR. LEVENSON:  To phrase it differently, other than

1    the 30-day limit the First Circuit imposes, but if we've got

2    the Speedy Trial -- if defendants' remarks are taken and can be

3    memorialized to reflect that the Speedy Trial Act is not a

4    problem, I agree wholeheartedly.

5         THE COURT:  At least not a problem until next March,

6    is the date you're looking for, right?

7         MR. DELINSKY:  I think Mr. Levenson and I -- I think

8    -- I'm just thinking practically of when the earliest time

9    would be when this case could be reached in order to resolve or

03:52 10   potential conferences with the Court.  Whether or not there

11   would be additional motion practice based upon discovery

12   issues, I anticipate not.  Hopefully, we can make agreements

13   regarding documents to make this case run smoothly.  I would

14   think that the earliest that this case would be ready for trial

15   would be sometime March.  You tell me, Mr. Levenson.

16        MR. LEVENSON:  I agree with Mr. Delinsky, that the

17   interests of justice and of efficiency support -- and Mr.

18   Delinsky is a very zealous advocate, but he's also a very

19   pragmatic man.  And as we have worked with discovery matters,

03:53 20   we have been able to reach agreements on a great deal.  We

21   reach agreements by the government agreeing to turn over things

22   that we otherwise wouldn't, but that's simply a credit for Mr.

23   Delinsky's advocacy.  The fact is, we get things done, and

24   we're able to bring the case to court in better shape for trial

25   on the true contested issues, I think, with the additional

1    time.

2         THE COURT:  I don't intend to be tardy, but the issues

3    are interesting enough that I'd rather not rush through them.

4         MR. DELINSKY:  I can't speak for Mr. Zalkind, but

5    there is -- to the degree it is necessary, in order to

6    facilitate the Court's thorough review, I am basically stating

7    that the time that the Court considers these motions be totally

8    excluded from any Speedy Trial calculation as excludable time.

9    I will so stipulate.

03:54 10         THE COURT:  All right.  If that's agreeable with

11    counsel, then, I think that's --

12         MR. ZALKIND:  No problem, your Honor.  I tried to save

13    the Court a lot of time.  Obviously, if Mr. Delinsky says

14    something and I don't agree with it, I'll stand right up.

15         THE COURT:  I believe you would.  It's agreeable to

16    you?

17         MR. SMITH:  Yes, your Honor.

18         THE COURT:  All right.  I'll take the matters under

19    advisement.  Thank you.  Interesting.

03:54 20    (Whereupon, at 3:52 p.m. the hearing concluded.)

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4           I, Cheryl Dahlstrom, RMR, and Official Reporter of the

5    United States District Court, do hereby certify that the

6    foregoing transcript, from Page 1 to Page 42, constitutes, to

7    the best of my skill and ability, a true and accurate

8    transcription of my stenotype notes taken in the matter of

9    Criminal Action No. 05-10019, The United States of America vs.

10   Daniel W. McElroy, et al.

11

12

13

14

15

16

17                            /s/ Cheryl Dahlstrom

18                            Cheryl Dahlstrom, RMR

19                            Official Court Reporter

20

21

22

23

24

25