UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Crim. No. 05-10019-RGS |
| | ) | |
| DANIEL W. McELROY and | ) | |
| AIMEE J. KING McELROY, | ) | |
| | ) | |
| Defendants. | ) | |

**UNITED STATES' SENTENCING MEMORANDUM REGARDING
DEFENDANT DANIEL W. MCELROY**

The United States submits this memorandum in advance of the sentencing hearing of

defendant Daniel W. McElroy ("McElroy"), who, along with his wife Aimee J. King McElroy

("King"), was convicted after trial of conspiracy and multiple counts of mail and tax fraud.[1]

The Court should impose a stern sentence on McElroy. His $66 million under-the-table

payroll scheme was by far the largest ever in the District of Massachusetts and among the largest

in the country. It enabled him to gain an enormous, illegal and downright unfair advantage in

the regional market for unskilled labor. And there is no mistaking that he knew exactly what he

was doing. For more than eight years he directly defied a federal court order that prohibited his

company from paying employees in cash and constructed an elaborate ruse involving straw

corporations to hide his cash payroll. To provide just punishment, promote respect for the law

generally and for orders of the District Court in particular, and to deter others who might seek to

---

[1]    In an abundance of caution, on May 29, 2008, the government filed a Notice of a
Need for an Evidentiary Hearing. In his Objections to the Probation Office, however, McElroy
did not challenge the methodology used in calculating the loss figures – rather, his objection
is based solely on whether he should have the benefit of the same loss attributed to Charles
Wallace after Wallace pled guilty to a single count of conspiracy in 2005. Accordingly, the
government contacted defense counsel to confirm that an evidentiary hearing would not be
necessary. At that time, defense counsel advised that he did dispute the loss calculations. Under
these circumstances, the government is prepared to proceed with three different witnesses at the
sentencing hearing if testimony is deemed necessary. In addition, the government anticipates
that at least one victim will speak, briefly, at the hearing.

cheat the tax and workers compensation insurance systems in the same way, the Court should sentence the defendant to a significant period of incarceration.

This memorandum presents (I) a summary of relevant facts; (ii) the government's guideline computations; (iii) a response to certain sentencing arguments that the defendant has made to the Probation Office; and (iv) the government's sentencing recommendation and a discussion of the relevant factors under 18 U.S.C. §3553(a).[2]

I.    **Relevant Facts**

The Probation Office's Presentence Report ("PSR") accurately summarizes the principal evidence that the government introduced at trial.  (PSR ¶¶ 2-47).  Rather than repeat that summary here, the government highlights four factual points that it believes are material to the Court's sentencing determination.[3]

A.    **McElroy Owned and Operated an Extensive Criminal Enterprise With Far Reaching Consequences**

McElroy and his wife, convicted co-conspirator King, owned and operated an extensive criminal enterprise.   Since 1991, they operated their temporary agency as the Dan Agency, the Daily Agency, Daily A. King Labor, Inc., Pro Temp Company and Precission (sic) Temp Corporation.  (Gov. Exhs. 16-18, 300).  They employed, and paid cash to, hundreds of temporary workers and maintained a large staff of office workers and "managers" to assist in their fraud. (Gov. Exhs. 313-318; Tr. 1/29 at 103-06, 114, 129, 135-36; Tr. 2/6 at 25-29; Tr. 2/7 at 2-15)

---

[2]        "Gov. Exh." references government exhibits introduced at trial.  Transcript cites are to the testimony of George Wallace, Charles Wallace, Marta Rodriguez, Lucia Raposa, Richard John DeMello, Richard Donovan and Meredith Scanlan as those are the only transcripts that have been reproduced at this time.  Finally, "Gov. App. Exh" references exhibits included in the Appendix submitted, under seal, in connection with this Sentencing Memorandum.

[3]        The government refers the Court to the PSR for a broader discussion of the evidence.

The office workers tracked the cash payroll on an off-the-books floppy disk system that was kept separate and apart from the automated check payroll system. (Tr. 1/29 at 105-06, 114, 135-36; Tr. 2/7 at 8-43). The managers – five of whom testified at trial – cashed checks at the bank, brought the checks back to the defendants' offices, helped to stuff envelopes with cash, and then distributed the cash-filled envelopes to the workers.[4] *Id.* Over the lifetime of their enterprise, the defendants paid out approximately $66 million in cash that they hid from the Internal Revenue Service, the Commonwealth of Massachusetts, and the business' workers compensation insurers, resulting in losses of approximately $15 million in federal payroll and income tax payments, $3 million in mandatory unemployment insurance payments, and $8 million in insurance premiums. *(Gov. App. Exhs., A-D).*

In addition to orchestrating this massive cash payroll system, the defendants flagrantly ignored a court order directing them not to pay cash. (Gov. Exh. 3 and Gov. App. Exh. H). They set up shell companies. They hired long-time cash employees to pose as straw owners of those shell companies. (Gov. Exh. 18; Tr. 1/29 at 126-129; Tr. 2/7 at 2-5). The system was elaborate. The defendants' entire business was run so that they could avoid paying payroll taxes, unemployment and insurance. By avoiding more than $25 million in these mandatory payments, the defendants lowered the cost of doing business and were able to undercut the competition. At the same time, they paid themselves a combined annual salary ranging from $300,000 to $450,000 per year and, as set forth further below, enjoyed profits from an otherwise highly competitive business. (Gov. Exhs. 206F, 207B, 207D).

_____

[4]    As set forth in the exhibits introduced at trial, the defendants employed at least eight managers who distributed cash to workers from Chelsea to New Bedford, including: Dich Trieu, Xieu Van Son, Marta Rodriguez, Marco Rodriguez, Candida Rodriguez, Sotha Khuth, George Wallace, and Hui Ly. (Gov. Exhs. 314A-H).

As explained in the letters submitted by Tom Jones of the Massachusetts Department of Labor, Roger Murphy of the Division of Unemployment Assistance, and E. Janney Wilson of Liberty Mutual Group, the McElroys' scheme harmed more than the Treasury and the insurers. By paying cash and failing to pay massive amounts of taxes and insurance premiums, they increased the costs for honest employers. (*See* Gov. App. Exhs. D-F). As a result of the McElroys' ten year fraud, other employers – if they could stay in business and compete – were forced to pay higher insurance premiums and unemployment contributions. The honest employers, essentially, subsidized the McElroys' business.

**B.      McElroy is Fully Culpable for the Loss Caused by His Criminal Conduct**

The losses caused by McElroy and King are massive. Every penny of the more than $25 million in loss to the IRS, the Division of Unemployment Assistance, and the insurance companies was a penny that stayed in the pockets of McElroy and King. Unlike a securities fraud where a single false statement may have consequences far beyond the benefit to the defendant, McElroy's criminal conduct directly benefitted him and caused real losses to his victims. In fact, as set forth above, the decade long criminal enterprise orchestrated by McElroy and King had other economic consequences effecting honest employers and workers that are not a part of the loss calculation.

The McElroys also enjoyed the fruits of their fraud. As set forth in the materials submitted herewith, they bought and remodeled a massive home and built the huge office building from which they operated their business, having paid $500,000 in cash for the land. (*See* Gov. App. Exhs., J-L). According to one loan application, in October 2000, McElroy and King had more than $16 million in assets. (Gov. App. Exh., M).

The McElroys' scheme caused the following quantifiable losses: $15,349,358.42 in federal payroll and income tax loss, $3,659,717 in unemployment contribution loss, and $8,354,410 in insurance fraud loss.[5]  McElroy is fully culpable for every aspect of that loss.

### C.    McElroy Continued His Scheme in Flagrant Violation of Two 1994 Orders Issued By The Honorable Rya Zobel

In 1994, McElroy was warned – in no uncertain terms – to stop paying cash. Specifically, in 1992, the Department of Labor filed a lawsuit against McElroy, King, the Dan Agency and the Daily Agency alleging violations of the Fair Labor Standards Act, Civil Action No. 92-12306 Z.  (Gov. App. Exh. G).  On February 24, 1994, the Honorable Rya Zobel issued an Order enjoining Dan McElroy and the Dan Agency from further violations of the Fair Labor Standards Act ("the February Order").  (Gov. App. Exh. I).  Among other things, the February Order required that McElroy and the Dan Agency maintain and preserve records of employees and their wages and hours.

On August 18, 1994, Judge Zobel issued another Order enjoining King, the Daily Agency and "their agents, servants, employees, and all persons acting or claiming to act in their behalf and interest" from further violations of the Fair Labor Standards Act and required, among other things, that the defendants maintain and preserve records of employees and their wages and hours ('the August Order").  (Gov. App. Exh. H).  The August Order also specifically prohibited the defendants from paying cash.  Specifically, the August Order provided:

> Defendants shall not pay any employees by means of cash payments, but shall make all payments by check or other paper instrument.

---

[5]    In preparing for the sentencing hearing, the government identified a minor error in its insurance fraud loss calculations.  The revised calculations have been provided to both the Probation Office and defense counsel.  The correct fraud loss is $8,354,410 and the restitution for AIG (formerly American Home Assurance) identified in the PSR should be increased by $4,125 for a total restitution to AIG of $1,454,906.

5

As those Orders were being negotiated and issued, however, McElroy and King continued to pay their workers in cash. (Gov. App. Exh. A (showing that, in the quarter ending September 30, 1994, the McElroys paid more than $700,000 in cash). Indeed, from August 1994 when the Order was issued, until they ceased operations in June 2002, the defendants paid their employees more than $58 million in cash. *Id.* McElroy's total disregard for the authority of the District Court is, frankly, appalling. As the Sentencing Guidelines recognize, McElroy's flagrant violations of Judge Zobel's Order demonstrates his "aggravated criminal intent." Application Note 6 to U.S.S.G. §2F1.1.

    **D.**    **McElroy Should Receive a Sentence That is Commensurate With Other Sentences Imposed in This District**

In order to avoid unwarranted sentencing disparity nationwide, as Section 3553(a) directs, the Court of course should rely on the Sentencing Guidelines as the only source of integrated information about sentencing practice nationwide. *See United States v. Jiminez-Beltre*, 440 F.3d 514, 519 (1st Cir. 2006). To the extent the Court wishes to consider sentences in similar cases in this District to inform its analysis in this case, the government submits that the Court look closely at the sentences imposed by Judge Saris last year in United States v. Tina Le et al., 05-10277-PBS. (Gov. App. Exh. O). Tina Le, along with her common law husband and daughter, were prosecuted for having run a temporary employment agency based in Dorchester that hid payroll from the IRS and its insurance carriers by paying employees in cash. The business operated during the same period as Daily A. King, and like Daily A. King, supplied workers to factories and warehouses in Eastern Massachusetts. Like the McElroys, Tina Le used straw corporations to conceal her cash payroll, which totaled $39 million, making it the second largest payroll case after this case. Unlike the McElroys, Tina Le did not defy a court order, and

she and her co-defendants pleaded guilty and received three-level downward adjustments for

accepting responsibility.  Based on this conduct, Judge Saris sentenced Tina Le to 97 months

incarceration, and sentenced her common law husband and daughter to 87 months and 63

months, respectively.  *Id.*

**II.    Sentencing Guidelines**

The applicable Guidelines Manual, which was the Manual in effect at the time of the

offense and is the most favorable to the defendant, is the November, 2000 edition.  Application

of this Manual yields the following Guidelines computations:

**Group 1 (Fraud)**

| | | |
|---|---|---|
| Base offense level | 6 | §2F1.1(a) |
| Adjustment for loss of more than $5 million and less than $10 million | 14 | §2F1.1(b)(1) |
| More than minimal planning | 2 | §2F1.1(b)(2)(A) |
| Violation of Prior Order | 2 | §2F1.1(b)(4)(C) |
| Sophisticated means | 2 | §2F1.1(b)(6)(C) |
| Organizer or leader of criminal activity that involved 5 or more participants or was otherwise extensive | 4 | §3B1.1 |
| Group 1 Total Offense Level | 30 | |

**Group 2 (Aiding, Assisting, Procuring, Counseling or Advising Tax Fraud)**

| | | |
|---|---|---|
| Base offense level for tax loss of more than $10 million and less than $20 million | 23 | §2T1.4(a)(1) |
| Sophisticated concealment (use of corporate shells) | 2 | §2T1.4(b)(2) |
| Organizer or leader of criminal activity that involved 5 or more participants or was otherwise extensive | 4 | §3B1.1 |
| Group 2 Total Offense Level | 29 | |
| **Combined Offense Level** | **32** | §3D1.4[6] |
| Guidelines Sentencing Range | 121-151 months | |
| Restitution | $27,363,485.42 | §5E1.1 |
| Applicable Fine | $17,500-$175,000 | §5E1.2 |

The Probation Office concurs with the foregoing computations.  (PSR ¶¶ 51-79).

McElroy disputes each of the enhancements as well as the loss amount.  As discussed below in Section III, his arguments are without merit.  A sentence within the Guidelines range set forth here, and computed by Probation, is appropriate.

---

[6]    Pursuant to §3D1.4, Group 1 and Group 2 are each assigned one unit, thus adding two levels to the highest offense level (30) for a Combined Offense Level of 32.

### III.    Response to Defendant's Sentencing Arguments

McElroy disputes virtually every aspect of the PSR.  Based on his submissions to the Probation Office, the government anticipates that he will raise the following arguments.  In the event that McElroy supplements the arguments he made to Probation with a formal departure motion or otherwise, the government requests the opportunity to file an Opposition.

### A.    The Loss Attributable to McElroy is Appropriate as McElroy and Wallace are Not Similarly Situated

McElroy's primary objection to the PSR was based on his contention that the loss figures contained therein demonstrate "illegal fact manipulation designed to harm Mr. McElroy" because the loss amounts are greater than the loss attributed to Charles Wallace.  (Objection Nos. 7-13, 18, 25).  Specifically, McElroy argued that, for sentencing purposes, he should be treated the same as Wallace.  But McElroy and Wallace are not similarly situated -- they played very different roles in the criminal activity and during the course of the government's investigation.  They also were convicted of different charges.  The calculation of the loss attributable to McElroy in the PSR is accurate and appropriate.

As established at trial, McElroy and his wife Aimee King McElroy were "the bosses" of the temporary employment agency.  McElroy's own employees – from the office workers to the cash runners or "managers" – testified that they all, including Wallace, reported to McElroy and King.  (Gov. Exh. 300; Tr. 1/29 at 126-29).  While Wallace assisted McElroy in defrauding the IRS and workers compensation insurers, McElroy and King were in charge of the operation.  And, as set forth above, it was McElroy and King who enjoyed the profits.

Wallace was cooperating with the government by October 2001.  In 2005, Wallace pled guilty to an Information charging him with a single count of conspiracy to defraud the United

States and to commit mail fraud. (Gov. App. Exh. N). That charge carries a statutory maximum sentence of five years imprisonment. *See* 18 U.S.C. §371. On March 30, 2005, in connection with Wallace's plea, the government calculated and provided loss figures to the Probation Office. The loss figures submitted by the government were based on the information currently available at that stage of the investigation. Even with a three level reduction for acceptance of responsibility, Wallace's guideline sentence exceeded the statutory maximum for the crime with which he was charged.[7]

In contrast, McElroy was not convicted until February 2008, following a three week trial. Unlike Wallace, he was convicted of 18 charges each of which carry statutory maximum penalties ranging from three to five years. In the three years since Wallace pled guilty, the government continued its investigation and prepared for trial. During that time, the government became aware of additional amounts and sources of loss resulting from McElroy's failure to report more than $66 million in payroll to the IRS, the Commonwealth of Massachusetts and his workers compensation insurers. There is nothing manipulative or inappropriate about the government continuing to investigate during the pendency of a criminal case. Indeed, that is to

---

[7]        After the three level downward adjustment for acceptance of responsibility, Wallace's total offense level was 27. Prior to Wallace's sentencing in November 2007 -- and also prior to Wallace's testimony at McElroy's trial -- the government filed a motion for downward departure based on his continued cooperation and substantial assistance with the investigation. At that time, the government asked Judge Lindsay to sentence Wallace to 57 months in prison. Judge Lindsay, however, was struck by the magnitude of the crime -- noting that the conspiracy lasted at least eight years and that, even the conservative estimate of the loss being attributed to Wallace, was large. Accordingly, Judge Lindsay sentenced Wallace to the statutory maximum sentence of 60 months. (Gov. App. Exh. N). Only after Wallace testified over the course of three days at McElroy's trial, did Wallace receive a reduced sentence of 40 months in prison.

be expected.[8]  (*See* Addendum to PSR, "Probation Officer's Response to Defendant's Objections 7-13).

In short, McElroy was the leader of the criminal conduct at issue -- Wallace was integral, but he was not "the boss."  More importantly, Wallace chose to plead guilty earlier in the investigation to a single charge that carried a maximum prison sentence that was lower than his guideline range.  Wallace and McElroy have never been, and are not now, similarly situated and there is no basis for McElroy's contention that the loss figures attributable to him must be the same as those attributable to Wallace.

### B.    McElroy Was a Leader and Organizer of Criminal Activity

At trial, McElroy's office employees testified about tracking the off-the-books cash payroll and multiple "managers" testified regarding their role in cashing massive checks, sorting the cash into envelopes, and delivering the cash to the workers.[9]  Nonetheless, McElroy still argued to Probation that he should not receive the four level enhancement under U.S.S.G. §3B1.1(a) for being a leader or organizer of the insurance fraud.  *See* Objection Nos. 16-17.

---

[8]    In its pre-trial filings, the government also notified both the defendant and the Court that, in order to avoid confusing and inflaming the jury, the government was presenting lower loss amounts than those actually caused by the McElroys' conduct.  (United States' Opposition to Defendants' Motion Regarding Government's Opening Statement, Dkt. #116 ("Opposition) at 2, n.2).  As the defendant acknowledged in seeking to exclude any evidence of loss at trial, loss was not an element of any of the crimes charged.  (Defendants' Motion Regarding Government's Opening Statement, Dkt. #113).  Loss was relevant, and thus admissible, but the government did not have to prove any aspect of the loss.  (Opposition at 2).

[9]    At trial, Dich Trieu, Xieu Van Son, Marta Rodriguez, Sotha Khuth and George Wallace all testified that they helped sort and deliver cash to the McElroys' employees when the company was called the Dan Agency, the Daily Agency, Daily A. King, Pro Temp and Precission Temp Corp.  Obviously, Charles Wallace also assisted the McElroys in procuring and distributing the cash.

McElroy seemed to suggest that his scheme did not involve five or more "criminally responsible" participants. The enhancement, however, applies to a leader or organizer of a criminal activity that involved "five or more [criminally responsible] participants *or was otherwise extensive.*" U.S.S.G. §3B1.1(a) (emphasis added). The First Circuit has held that, for the enhancement to apply to conduct that is "otherwise extensive" there must be at least *one* other criminally culpable participant -- but, obviously, there need not be five. *United States v. Dietz*, 950 F.2d 50 (1st Cir. 1991). Both prongs of the enhancement apply here.

First, there can be no dispute that McElroy orchestrated a massive under the table payroll scheme that necessarily involved multiple participants. McElroy's employees knew that they were involved in something that was wrong. In the words of Xieu Van Son, they knew that they were involved in "something dirty." They were criminally responsible and there were more than five of them under McElroy's employ.

McElroy tried to avoid the obvious application of the enhancement by suggesting to Probation that his insurance fraud was somehow separate and apart from the under-the-table cash payroll scheme since he not only hid the cash payroll from the insurance companies, but also hid some of his check payroll. According to McElroy only he, King, and Wallace were really involved in the insurance fraud. These arguments ignore the full scope of the scheme and the evidence at trial.

While it may have been possible for McElroy to defraud the insurers without paying cash -- he may have been able to simply fabricate the documents provided to the insurers while paying his workers by check -- that is not what he did. McElroy and King created an elaborate cash payroll system so that they could more easily hide their payroll from *both* the IRS and their insurers. Certainly, had McElroy paid employees by check, he would have created more of a

12

paper trail documenting his true payroll and would have increased the likelihood of detection by both the IRS and his insurers. Accordingly, for more than a decade, McElroy and King paid their workers more than $66 million in cash. The fact that McElroy and King went the extra step of hiding even more payroll from the insurers cannot shield them from this enhancement. (Gov. Exh. 455). McElroy and King orchestrated a single under-the-table scheme with the dual purposes of defrauding their insurers and the IRS. The first prong of the §3B1.1(a) enhancement applies.

The second prong of the enhancement also applies as McElroy's criminal enterprise was "extensive." The massive under-the-table payroll conspiracy extended over a decade and, as set forth above, involved everyone from the office workers to managers in the field. Moreover, even if McElroy was correct -- which he is not -- in suggesting that his insurance fraud was "separate" from his overall cash payroll scheme, even he does not dispute that there was at least one additional criminally culpable person involved. Both King and Wallace have been convicted of conspiring with McElroy to defraud their insurers. The insurance fraud aspect of the overall scheme was extensive in and of itself. McElroy and King, with Wallace's assistance, defrauded their insurers of more than $8 million over many years by creating false documentation and misleading insurance auditors in audit after audit. Regardless of the definition of the scheme, McElroy was a leader and organizer of the "extensive" insurance fraud and the four level enhancement applies.

### C.     McElroy Violated Judge Zobel's Orders

As set forth in the PSR, McElroy should receive a two level enhancement under U.S.S.G. §2F1.1(b)(4)(C) for his knowing violation of two Orders issued by the Honorable Rya Zobel in 1994.  McElroy argued to Probation that the enhancement is inapplicable because "The Court Order involving Mr. McElroy had nothing to do with his alleged conduct."  (Objection No. 1). McElroy's objection ignores the plain language of the Guideline, Application Note, and the relevant Court Orders.

U.S.S.G. §2F1.1(b)(4)(C) creates a two level enhancement where the "offense involved . . .a violation of any prior, specific judicial or administrative order, injunction, decree or process." As is clear from the Guideline, and explained further in the Application Note, this enhancement recognizes that a defendant who has been warned previously that he is engaged in unlawful conduct, but nonetheless continues to engage in that conduct, is more culpable than a defendant who did not receive such warning prior to being charged with the instant offense.  A defendant who does not comply with, or seeks to evade, a prior order "demonstrates aggravated criminal intent and deserves additional punishment."   Application Note 6 to U.S.S.G. §2F1.1.  McElroy's conduct falls squarely within the Guideline.

As set forth above, in 1992, the Department of Labor filed a lawsuit against McElroy, his wife and convicted co-conspirator King and their temporary employment agency -- then being operated under the names the Dan Agency and the Daily Agency.  (Gov. App. Exh. G).  At trial, Wallace specifically testified that McElroy and King controlled and ran the Daily Agency together.  (Tr. 2/6 at 25-29).

In February and August 1994, Judge Zobel entered two Orders that resolved the Department of Labor's lawsuit against McElroy, King and their temporary employment agency.

14

(Gov. App. Exhs. H, I).  Both Orders required that McElroy and King maintain records of their employees' wages and the August 1994 Order barred King, the Daily Agency and their "agents, servants, employees, and all persons acting or claiming to act in their behalf and interest" from paying their workers in cash.  To the extent there was any doubt before, by August 1994, McElroy and King both had received judicial notice that they could not operate their temporary employment agency by paying their workers cash.  But, as established at trial, over the course of the next eight years, both McElroy and King violated both the spirit and the letter of Judge Zobel's Orders by creating an elaborate off-the-books cash distribution system and continuing to pay their workers cash.[10]

McElroy did take steps to evade the Order by creating and operating the temporary employment agency as Daily A. King Labor, Pro Temp Company and Precission Temp Corp. and installing straw owners of those companies.  These nominally separate companies, however, were run as a single business, and, as the jury necessarily found, they were run by McElroy and King.  McElroy's attempt to evade the clear Order only further demonstrates the "aggravated criminal intent" described in the Application Note.  Indeed, if a defendant could avoid the application of this Guideline by setting up different corporate shells, then the Guideline and the enhancement would be meaningless.

McElroy and King controlled the temporary employment agency when it was operated as the Daily Agency, Daily A. King, Pro Temp and Precission Temp Corp.  *See* Application Note 6 ("If it is established that an entity that the defendant controlled was a party to the prior proceeding that resulted in the official judicial or administrative action, and the defendant had

---

[10]     As set forth above, the insurance fraud aspect of McElroy's scheme "involved" paying cash and thus §2F1.1, and the enhancement included in subsection (b)(4)(C) for violation of a specific order, apply here.

15

knowledge of that prior decree or order, this enhancement applies even if the defendant was not

a specifically named party in that prior case").  The Order prohibited McElroy's and King's

company from paying cash.  McElroy knew about the Order and he violated it.[11]  The two level

enhancement based on violation of a specific prior judicial order should be applied to McElroy.[12]


### D.    McElroy Should Receive Enhancements for Both More Than Minimal Planning and Sophisticated Means

As set forth above, McElroy and King orchestrated an elaborate scheme that extended

over a decade and included the use of corporate shells.  Accordingly, the Probation Office

correctly applied enhancements for both More than Minimal Planning and Sophisticated Means.

U.S.S.G. §§2F1.1(b)(2)(A) and (b)(6)(C).  McElroy disputes application of both enhancements

because, he contends, that they overlap as they both address the same conduct.  (Objection No.

15).  As grounds for this assertion, McElroy argues that, since the More than Minimal Planning

adjustment was removed from the 2001 Sentencing Guidelines, the Sentencing Commission

recognized this alleged overlap.

McElroy's "double counting" argument, however, ignores the language of the

Application Notes to the applicable 2000 Guidelines.  Specifically, Application Note 15 to

---

[11]    McElroy and King also violated the record keeping requirements of Judge Zobel's Orders by failing to maintain records of the massive cash payments.  While the check payroll was tracked on their automated system, the cash payroll was distributed in envelopes and was tracked haphazardly on floppy disks.

[12]    Even if McElroy himself did not violate the Orders -- which he did -- it is beyond dispute that his wife, King, did violate them.  The Guideline does not, in fact, require that the defendant personally violate an order.  Rather, it requires only that "the offense involve . . . *a* violation."  McElroy was convicted of conspiring with King to pay their employees cash and evade payroll taxes and insurance premiums, which offense involved her violating the plainly worded Order.  The enhancement applies under this analysis as well.

U.S.S.G. §2F1.1 provides "the enhancement for sophisticated means under subsection (b)(5)(A) requires conduct that is significantly more complex or intricate than the conduct that may form the basis for an enhancement for more than minimal planning under subsection (b)(2)(A)." Citing this language, the Eleventh Circuit flatly rejected any argument that the two enhancements overlap:

> As stated, Application note 15 implies that enhancements for more than minimal planning and sophisticated means are intended to be mutually exclusive. [citations omitted]. In other words, we conclude that sophisticated means involves more than minimal planning. More than minimal planning, however, does not necessarily involve sophisticated means. A defendant who uses sophisticated means will always receive, in addition, an enhancement for more than minimal planning.

*United States v. Humber*, 255 F.3d 1308, 1311-14 (11th Cir. 2001). More recently, and well after the 2001 revisions to the Guidelines, the Ninth Circuit agreed with the Eleventh. *See United States v. Garro*, 517 F.3d 1163, 1169-70 (9th Cir. 2008).

In addition, as the Probation Office noted in rejecting McElroy's claims of overlap, the More than Minimal Planning enhancement also applies where the offense involved a scheme to defraud more than one victim. *See* U.S.S.G. §2F1.1(b)(2)(B). It is beyond dispute that McElroy defrauded multiple insurance companies. The More than Minimal Planning enhancement applies under this prong of the enhancement as well – which is wholly separate and apart from the fact that McElroy used corporate shells, or "sophisticated means" to do it. *See* Application Note 18 to U.S.S.G. §2F1.1 ("sophisticated means" includes the use of "corporate shells").

Finally, McElroy's reliance on the revisions included in the 2001 Sentencing Guidelines is misplaced because the 2000 Guidelines applied here are much more favorable to him than the 2001 Guidelines. The 2001 revisions may have eliminated the More than Minimal Planning enhancement, but they also increased the penalties attributable to loss. Specifically, by applying

17

the 2000 Guidelines, McElroy's adjusted offense level for loss is 20 and he only receives a four

level increase when both the More than Minimal Planning and Sophisticated Means

enhancements are applied.  *See supra,* Section II.  If the 2001 Guidelines were applied,

McElroy's adjusted offense level for loss alone is 26 and 28 after application of the

Sophisticated Means enhancement, even before the application of the other adjustments.

McElroy's "double counting" argument fails as it is contrary to the Application Notes,

clear precedent and, frankly, his own self interest.

### E.     The Restitution Amount in the PSR is Accurate

McElroy objected to the restitution identified in the PSR, claiming that he should receive

credit for the $600,000 he paid to Liberty Mutual as settlement of a lawsuit brought by the

company.  (Objection No. 22).  The restitution apportioned to Liberty Mutual, however, does not

include that $600,000.

In 1997, Liberty Mutual filed suit against the McElroys for non-payment of premiums.

Specifically, Liberty Mutual sought recovery of $750,000 in unpaid premiums, which premiums

had been calculated on the payroll that the defendants reported to Liberty Mutual.  The McElroys

settled that lawsuit for $700,000.[13]  The insurance fraud loss calculations do not include the

$750,000 in unpaid premiums, or the $700,000 settlement, because the loss calculations are

based solely on the payroll that was not reported to the insurance companies.  In other words, the

loss calculations assume that the McElroys in fact paid all of the premiums for which they were

billed – even though, as is clear from the Liberty Mutual lawsuit, they did not.

---

[13]     In his Objections, McElroy claimed to have settled the lawsuit for $600,000.
According to the settlement documentation, however, the McElroys paid $700,000 to settle the
claim.  The settlement agreement includes a confidentiality clause and, for that reason, Liberty
Mutual is not disclosing it at this time.  A copy of the Agreement, however, will be available at
the hearing.

The restitution figures are conservative. McElroy is responsible for the full amount due to each victim.

### F.        There is No Basis for a Downward Departure or Non-Guidelines Sentence

McElroy has not provided any information to the Probation Office that justifies any departure from the GSR set forth above. (*See* PSR, ¶150). There is no explanation for why McElroy, in flagrant disregard for Judge Zobel's Orders, continued to operate his massive scheme to defraud, thereby causing the greatest under-the-table payroll loss that has ever been prosecuted in this District. Nor has he presented any personal or other special circumstances that warrant a non-Guidelines sentence. Indeed, to date, he has demonstrated nothing but contempt for the rule of law and the District Court in particular. As set forth below, the Sentencing Guidelines identify the appropriate sentence and there is no "compelling" reason to justify any variance from the Guidelines in this case. *See United States v. Gall*, 128 S.Ct. 586, 596 (2007) (any deviation from the Guidelines must be supported by a sufficiently  "compelling" justification).

### IV.        Sentencing Recommendation and Discussion of Section 3553(a) Factors

The government recommends a sentence of 135 months incarceration, which falls in the middle of the applicable range, together with five years supervised release, a special assessment of $1,800, restitution in the amount of $27,363,485.42 and a fine of $7,500. This sentence is appropriate and necessary under the factors set forth in 18 U.S.C. § 3553(a).

While Section 3553(a) identifies a number of relevant sentencing considerations, those that are most relevant here include: the nature and circumstance of the offense and the character of the defendant, the seriousness of the offense, and the need to deter these types of schemes. First, without repeating the discussion above, McElroy's conduct was egregious and the harm

inflicted severe.  McElroy deliberately defied Judge Zobel's 1994 Orders and orchestrated the largest under-the-table payroll scheme that this District has ever seen.  As the Guidelines recognize, McElroy demonstrated aggravate criminal intent by disregarding a judicial warning that his conduct was unacceptable and unlawful.  He took steps to evade the plain language of the Orders by creating shell companies and continuing to pay more than $66 million in cash.  Both the character of this defendant and the nature of the offense mandate the government's recommended sentence.

Second, the offense was massive.  McElroy inflicted enormous losses upon the IRS, the Commonwealth of Massachusetts and multiple insurers.  He benefitted from every penny of the more than $25 million in losses that he caused over his decade long criminal enterprise.  But even this massive quantifiable loss does not capture the larger economic harm caused by McElroy's conduct.  The harm to the honest businesses and workers who subsidized McElroy's business and struggled to compete is not reflected in the loss figures that drive the Guideline calculation.  Nonetheless, that damage is done and it is severe.  The seriousness of the offense, likewise, mandates a stern sentence.

Finally, McElroy's sentence must "afford adequate deterrence" to this type of tax and insurance fraud.  During these difficult economic times, every business is looking to cut costs in order to compete.  Cheating on payroll taxes and insurance premiums, payments that constitute a major portion of the costs of doing business, is tempting.  Indeed, the McElroys were unwilling to put an end to their scheme, even after Judge Zobel ordered them to stop.  The only way to deter these crimes is to impose significant sentences.  The principles of general deterrence, as annunciated in Section 3553(a), also support the government's recommended sentence.

**CONCLUSION**

For the foregoing reasons, the government respectfully requests that the Court impose a sentence of 135 months incarceration, which falls in the middle of the applicable range, together with five years supervised release, a special assessment of $1,800, restitution in the amount of $27,363,485.42 and a fine of $7,500.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

Dated: June 16, 2008

By: */s/ Sarah E. Walters*
JONATHAN F. MITCHELL
SARAH E. WALTERS
Assistant U.S. Attorneys
John Joseph Moakley United States Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3100

**CERTIFICATE OF SERVICE**

I hereby certify that this document, filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and that paper copies will be sent to those indicated as non registered participants on this date.

Dated: June 16, 2008

*/s/ Sarah E. Walters*
SARAH E. WALTERS