UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO. 05-10019-RGS |
| | ) | |
| DANIEL W. McELROY, | ) | |
| AIMEE J. KING McELROY. | ) | |
| | ) | |

## DEFENDANT, DANIEL W. MCELROY'S SENTENCING MEMORANDUM

### A.    INTRODUCTION

Defendant, Daniel W. McElroy ("Mr. McElroy") has stated in detail his objections to the Pre-Sentence Report. The following Memorandum will discuss why the Sentencing Guildeline calculation of the Probation Department is incorrect and the reasons that the Court should depart from the guidelines. In addition, and most importantly the Memorandum will discuss that an analysis of the sentencing factors in 18 U.S.C. §3553(a)(2) justifies an additional variance.

### B.    THE LOSS CALCULATIONS ARE INVALID

The government claims it just recently discovered the increased tax and insurance losses. Their misstatements are shocking. In October, 2007, two to three months before the McElroy trial the government submitted to the Probation Department the Prosecution Version of Offense Conduct for Charles Wallace, attached as "Exhibit 1."

The loss figures the government provided the Probation Department for Wallace reflect a combined tax loss of $9,151,864 and a combined insurance loss of $4,603.490. The conspiracy Information filed against Wallace tracks in an identical fashion the conspiracy count against Daniel McElroy. The government had an obligation in October of 2007 to report all of Charles Wallace's relevant conduct. Furthermore, if they learned additional facts before his sentencing they were obligated to inform the Court of these new facts.

The government's arguments about the losses in this case have no foundation. Mr. McElroy strongly objected to the loss figures in his objections to the Presentence Report. Objection #8 stated "Also, the calculation of this [tax] loss relies on facts not introduced at trial and the Defendant does not accept them as valid." Objection #9 stated, "In addition, Mr. McElroy disagrees with the assumptions in this larger tax loss." And in objection #11 Mr. McElroy objected to the inclusion of the state tax loss. Further in objection #13 he objected "to the calculation of the fraud loss."

The Court should make the government elect going forward with either the losses introduced at trial or the losses they stated in the October 2007 Wallace probation submittal. The Defendant suggests further argument on this point will demonstrate the government has manipulated the guidelines to shield Charles Wallace and illegally punish Mr. McElroy. For example, the government never brought to the Probation Department's attention Mr. Wallace's prior conviction for tax fraud and that he was on federal probation when his offense conduct occurred. Only through the Probation Department was the Court informed that Mr. Wallace had a criminal history Level III and not a Level I as the government proposed.

The government's new loss figures have not been proven and Mr. McElroy does not accept them or their methodology.

## C.    THE FRAUD OFFENSE DID NOT INVOLVE A VIOLATION OF ANY PRIOR COURT ORDER

The Probation Department contends that a two level increase is justified for Mr. McElroy because he violated court orders. This guideline requires that a false statement be made in violation of a specific court order. Also, the offense must involve a violation of a specific court order. The fraud offense did not involve any court orders. The commission of the fraud offenses conduct did not involve cash payments to workers. In other words the fraud offense conduct could have been perpetrated even if all the employees were paid by checks, because the fraud involved providing false income tax returns to insurance auditors. These false income tax returns were used by the

insurance auditors to determine the appropriate insurance premium.  These fake income tax returns had nothing to do with the court orders.

> D.    **THE SOPHISTICATED MEANS ENHANCEMENTS FOR THE TAX AND FRAUD OFFENSE CONDUCT ARE NOT JUSTIFIED**

In the fraud offense conduct there was no hiding of assets or transactions through corporate shells to complete the offense.  The offense conduct simply involved providing false tax returns to insurance auditors that they relied upon to set insurance rates.  This conduct, as the guidelines state, is not "significantly more complex or intricate than the conduct that may form the basis for an enhancement for more than minimal planning."

In order to have sophisticated concealment for the tax conduct "especially complex or especially intricate offense conduct in which deliberate steps are taken to make the offense, or its extent, difficult to detect" is required.  In this offense conduct there was no hiding of assets through the use of shell companies.  The tax conduct involved paying workers in cash.  There was no evidence that the conduct was disguised to allow Mr. McElroy to receive any of the cash that was generated.  In fact, absolutely no evidence was presented at trial that any cash in the accounts of Pro Temp or Precision Temp was given to Mr. McElroy.  This was not a case that involved hiding of assets through corporate shells or the use of especially intricate offense conduct to make the behavior difficult to detect.

Also, it is incredible that this adjustment was not sought by the government for Charles Wallace even though it was crystal clear from Wallace's own statements he was a co-architect of the tax offense conduct and the architect of the fraud offense conduct.

The Sentencing Commission recognized in 2001 the serious potential of double counting when there are adjustments for both sophisticated means and more than minimal planning.  Consequently, the enhancement for more than minimal planning was deleted in 2001.

Is this case the double counting is obvious because the definition of more than minimal planning in the 2000 Guideline book at §1B1.1(f) reads "more than minimal planning means more planning than is typical for commission of the offense in a simple form. . . also exists if significant affirmative steps were later to conceal the offense other than obstruction of justice." The 2000 guidelines book provided the following example of more than minimal planning in an embezzlement case: "creating purchase orders to, and invoices from, a dummy corporation for merchandise that was never delivered would constitute more than minimal planning, or would several instances of taking money, each accompanied by false entries." It is clear the sophisticated means enhancement sought by the government relies upon the use of straw or dummy corporations. To sort out the differences between more than minimal planning and sophisticated means in this case the Court would have to engage in the evil of judicial fact finding that the 2001 amendment recognized and corrected.

The position argued above is supported by case law. Impermissible double counting occurs when a district court imposes two or more upward adjustments within the guideline range, when both are premised on the same conduct. In other words, double counting occurs when identical conduct is described in two different ways so that two different adjustments apply. United States v. v. Haynes, 32 F.3d 290, 293 (7th Cir. 1994). That is, the same conduct cannot be described in two different ways to justify two different enhancements when each leads to a separate upward adjustment. United States v. White, 222 F.3d 363, 375-76 (7th Cir. 2000).

### E.  MR. McELROY'S CONDUCT DOES NOT WARRANT THE FULL LEADER OR ORGANIZER ENHANCEMENTS

It is clear from the testimony that the fraud offense conduct only involved Charles Wallace, Mr. McElroy and Mrs. McElroy. Also, as Charles Wallace's testimony demonstrates he was the

instigator and creator of the fraud conduct. As described herein this conduct consisted of Wallace

preparing false tax returns for insurance auditors.

The tax offense conduct did involve five or more people, but Mr. McElroy's conduct did not

consist of the management of criminal actors as is required for the enhancement in this circuit. U.S.

v. Romos-Paulino, 488 F.3d 459 (2007). At best, Mr. McElroy's conduct involved the management

of criminal activities. The court is aware of the evidence and can easily make this determination

that the full enhancement is not rectified.

F.    **THE DEFENDANT IS ENTITLED TO A DOWNWARD DEPARTURE**
**BECAUSE THE LOSSES OVERSTATE THE SERIOUSNESS OF THE OFFENSE**

The vast amounts of money alleged for the losses in this case pervert the guidelines into an

unfair punishment for the crimes of conviction. There is no evidence Mr. McElroy diverted any of

the cash into his own pockets. If there was, the government would have introduced the evidence. It

appears that the cash was used to pay employee wages. No allegation has been made that any

wages or overtime were not paid to the cash workers. The government has contended that in order

for the businesses to be competitive they charged lesser rates and by so doing the proper amounts of

withholdings were not paid over to the government. While this is serious conduct it is very

different from denying employees their wages. Also, there is no evidence that any employee was

denied proper workers compensation coverage as a result of accidents on the job. In fact, there was

evidence presented that the McElroys paid directly for the treatment of minor injuries at various

clinics.

The government's allegation, in their brief, that Mr. McElroy reported in 2000 to a Bank a

personal net worth of over $16,000,000 to show his vast wealth from the employment business is

very misleading. The financial statement indicates that Mr. McElroy, at the time, evaluated his

solely owned business Power-It as having a value over $15,000,000. This was based on his

projections that the product would be sold by many stores, including Wal-Mart. The business plan

never came to fruition and after much work and tireless effort the business today is near worthless. Also, Mr. McElroy invested significant monies into Power-It and never received a salary or any dividends from the business.

The facts of this care demonstrate that when the loss figures are added to the herein described other adjustments it terribly distorts Mr. McElroy's guideline score. In U.S. v. Lauersen, 348 F.3d 329, (2003), the Second Circuit in a similar fraud case stated, "Nevertheless, we think that the cumulation of such substantially overlapping enhancements when imposed upon a defendant whose adjusted offense level translates to a high sentencing range, presents a circumstance that is present `to a degree' not adequately considered by the Commission, and therefore permits a sentencing judge to make a downward departure." At page 339.

For these reasons, Mr. McElroy's guideline score also reflects multiple enhancements coupled with a large loss figure that justifies a downward departure to mitigate the guideline.

## G.    MR. McELROY IS ENTITLED TO A VARIANCE PURSUANT TO 18 U.S.C. 3553

1.    The nature and circumstances of the offense and the history and characteristics of the Defendant justify a variance.

The loss calculations attributed to the tax loss do not accurately reflect the harm alleged. However, this argument does not justify paying employees in cash and not paying the appropriate taxes. It must be recognized, nevertheless, that a significant number of temporary employment agencies in order to be competitive engaged in these practices. Also, a large number of the temporary employees only wanted to be paid in cash. In order for society to function fairly, proper taxes must be paid by all citizens. It is important to repeat that the cash aspect of the business did not result in the McElroys receiving any of these cash proceeds.

The alleged insurance loss is not reflective of the insurance companies' actual losses. In U.S. v. Pimental, 367 F.Supp.2d 143 (D.Mass 2005), the defendant was convicted of mail fraud

arising from his underpayment of workers compensation insurance premiums.  Judge Gertner

rejected the government's loss calculation, noting that there were no claims paid and, therefore, "no

actual loss resulted from the defendant's misrepresentation."

Mr. McElroy contends that the insurance companies in this matter made a combined

profit, even with the alleged underpaid premiums.  In essence, Mr. McElroy should not be forced to

endure a far lengthier jail sentence because insurance companies failed to realize larger profits.  The

Defendant respectfully suggests that the Court utilize the logic of the <u>Pimental</u> decision to balance

the guidelines score with a 18 U.S.C. 3553 variance.

Mr. McElroy, as the sentencing letters demonstrate, has worked hard his whole life.

His childhood was fraught with hardship and extreme deprivation.  Yet, Mr. McElroy always

maintained a positive and helping attitude.  The letters reflect a man that is a central figure in his

family.  His extended family all describe how he has placed the interests of family members before

himself.  The letters are replete with examples of his kindness, compassion and good works.  This is

a fifty-seven year old man with no criminal record whose personal character should be considered

along with the offense conduct.

Finally, the government urges a lengthy sentence because a similar case also resulted

in lengthy sentence.  The Defendant contends the government has not told the court the whole story

of these cases.  Attached hereto as Exhibit 2 is the Information in <u>U.S. v. Gomez and Gildea</u>.

Criminal No. 05-1022, a similar tax and insurance case.  The plea agreements reflect a lengthy

guideline sentence and are attached as Exhibits 3A and 3B.  Judge O'Toole sentenced the

defendants to one year sentences when the guideline range was 46-57 months imprisonment.  The

Statement of Reasons of Judge O'Toole are also attached as Exhibits 4A and 4B.

2.      The need for the sentence imposed  A) to reflect the seriousness of the offense, to

promote respect for the law and to provide just punishment for this offense; B) to afford adequate

deliverance to criminal conduct; C) to protect the public from further crimes of the defendant; and D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner would all but be served by a sentence of no greater than forty-eight months imprisonment.

To warehouse a first offender for a non-violent crime for over eleven years does not achieve any of these goals. At Mr. McElroy's age the likelihood of him committing further crimes is near zero. A forty-eight month sentence is a substantial deterrence for this offense conduct.

3.    There is the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

The sentence disparity between the sentence Charles Wallace received and the sentence sought for Mr. McElroy is an unwarranted sentence disparity. United States v. Smart, 518 F.3d 800 (10th Cir. 2008). Mr. Wallace was given a capped plea deal of no more than sixty months despite a guideline score of a much greater length. This Court heard Mr. Wallace's testimony and observed a previous convicted tax offender who utilized his special skills as an accountant to commit these crimes. The two companies he operated, Pro Temp and Precision Temp were more in his control than the McElroys. He controlled the money and the checkbooks. Charles Wallace was the direct beneficiary of the collapse of Daily A. King. His own temporary agency has captured the McElroys' clients. The Court heard how Wallace really owns the business, but has maneuvered to hide his ownership. The Court also saw how Wallace prepared phony tax returns in response to a defense subpoena and court order. Yet, Charles Wallace received a 5K departure for his cooperation in this case, notwithstanding his capped plea deal. Wallace was a primary actor in the frauds and his sentence of forty months is unwarranted when compared to what the government seeks for Mr. McElroy. A sentence of forty-eight months for Mr. McElroy would balance this disparity.

4.      There is a need to provide restitution to the victims of these offenses.  Restitution would not be achieved if Mr. McElroy is in prison for a decade or more.  Recognizing his age, the only hope of him making restitution is having productive working years ahead of him after leaving prison.  Again, a sentence of forty-eight months would far better achieve the goal of restitution than the sentence the government seeks.

H.      **CONCLUSION**

For the reasons set forth herein, Mr. McElroy requests a sentence of forty-eight months.

Respectfully submitted:

Daniel W. McElroy
By His Attorney,

_____
Stephen R. Delinsky (BBO# 119120)
Eckert Seamans Cherin & Mellott, LLC
One International Place
Boston, MA 02110
Telephone:  617.342.6800
Facsimile:  617.439.3950

DATED:  July 14, 2008

CERTIFICATE OF SERVICE
I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on
By:_____

# EXHIBIT 1

# Memorandum

United States Attorney
District of Massachusetts

| Subject | Date |
|---|---|
| PROSECUTION VERSION OF OFFENSE CONDUCT<br>United States v. Charles J. Wallace, Dich Trieu,<br>Criminal No. 05-cr-10020 RCL | October 30, 2007 |

| To | From |
|---|---|
| John Bocon, Chief, United States Probation Office | Paul G. Levenson |

cc.

John F. Palmer, Esq.              Gregory G. Nazarian, Esq.
24 School Street                     1063 N. Main Street
Boston, MA 02108                  Brockton, MA 02301

On March 23, 2005, Charles Wallace pled guilty to Count 1 of an Information charging

him with Conspiracy to defraud the United States and to commit mail fraud, in violation of Title

18, United States Code, Section 371.  On that date, Dich Trieu pled guilty to Count 2 of the

Information, which charged Trieu with Willful Failure to Keep Tax Records and to Supply Tax

Information, in violation of Title 26, United States Code, Section 7203.

1.    Offense Conduct

a.    Overview

The charges in this case arise from the defendants' respective roles in helping to operate

a large-scale "under the table" cash payroll scheme through a temporary employment agency

business owned and operated by Daniel McElroy and his wife, Aimee King McElroy.  [McElroy

and King have been charged separately, in an Indictment currently pending before Judge Stearns,

United States v. McElroy et al., Crim. No. 05-10019-RGS.]

Although nominally separate companies, with different separate straw owners,  Daily A.

King Labor, Inc., Pro Temp. Company, PTC, and Precission Temp. Corp. were run as a single

business, controlled by McElroy and King, with Wallace as their right-hand man.  The business

supplied hundreds of low-wage workers, mostly from ethnic communities in Southeastern

Massachusetts, Chelsea and Lowell, to various manufacturing and food-processing businesses.

The gist of the charge against Wallace is that he provided McElroy with day-to-day

assistance in evading millions of dollars in workers compensation insurance premiums and

payroll taxes by paying workers in unreported cash, "under the table." Between 1997 and 2000,

the temporary agencies operated by McElroy paid employees approximately $39,227,000 in

unreported cash (in addition to approximately $37,647,000 in paychecks that were recorded and

reported to the IRS). In addition, to mislead insurance auditors, Wallace fabricated fake payroll

records and tax documents that showed even smaller payroll amounts than the tax returns that

Wallace had actually filed for the companies (even though the genuine tax returns themselves

grossly understated the payroll by omitting the cash payments to employees).

Dich Trieu was among the straw owners, who appeared – on paper – as owners of

companies through which McElroy and King operated their business. As the nominal owner of

Pro Temp. Company, Dich Trieu was held out to insurers and tax authorities as the operator of

the business. In actuality, other than signing papers and obtaining large quantities of cash (up to

$200,000 per week), as directed by McElroy and Wallace, Trieu had no real duties or authority

in the operation of the business. Trieu was, however, responsible for hiring employees from a

branch office of the McElroy business, located in Lowell, Massachusetts. Trieu hired up to 50

workers of the temporary employment business, many of whom were provided to him by van

drivers active in the area. Although he was aware that identifying information, such as a social

security number, would be required in order to file proper tax records with respect to these

employees, Trieu did not not gather such information for many of these employees, meaning that

the off-the-books cash payments to these workers would not be reported to the IRS.

2

b.    Background Information

i.    Temporary Employment Services (Generally)

The term "temporary employment agency" refers to a business that provides client companies with workers, ordinarily on a short-term basis.    Typically, the agency handles the administrative and accounting tasks associated with the hiring and employment process, while the client company directs the day-to-day work activities of the temporary employees.

In temporary employment agency arrangements, the agency is ordinarily responsible for issuing paychecks to the employees, for paying state and federal employment taxes, and for processing payroll deductions for taxes, social security obligations, health care benefits and/or union dues.   The agency is also responsible for meeting certain other fiduciary responsibilities of employers, including maintaining workers compensation insurance for the employees.   For these services, client companies pay fees to the agency.

Fees paid to temporary employment agencies may be calculated in various ways. Commonly, fees are calculated based on a fixed hourly rate.   For example, the agency might charge a client company $10.00 per hour for the services of each temporary employee.   Included in that rate would be the actual wages paid to the worker, additional expenses such as employment taxes, unemployment insurance and workers compensation insurance (sometimes referred to as "fringes"), as well as any profit margin for the temporary employment agency.

ii.    Federal Employment (Payroll) Taxes

Under Federal tax laws, employers, including temporary employment agencies, are required to file Form 941, Employers Federal Quarterly Tax Return, in order to report and pay all Federal employment taxes withheld from employees.   Employers must file a Form 941 for each quarter ending March 31st; June 30th; September 30th; and December 31st every year.

3

Federal employment taxes consist of Social Security Tax (12.4%) and Medicare Tax (2.9%). Thus the total Federal Insurance Contributions Act (F.I.C.A.) tax rate is 15.3 % of an employee's wages. Employees are liable for half of this 15.3%, or 7.65%. Employers are liable for the other half. Employers are required by federal tax law to withhold the employees' share of federal employment taxes from their employees' pay and to pay the total amount (15.3%) to the IRS. These employment taxes are reported on the employers' quarterly tax returns, Form 941.

Under federal law, employers are also required to withhold taxes from employees' wages to be credited toward the employees' federal income tax obligations.

iii.    The Workers Compensation Insurance System in Massachusetts

Massachusetts law requires employers to obtain workers compensation insurance coverage so that employees who suffer work-related injuries will be compensated in accordance state workers compensation rules.

As with other forms of insurance, employers obtaining workers compensation insurance pay fees, known as premiums, to the insurance companies that provide the insurance policies. Ordinarily, workers compensation insurance is obtained for a one-year policy term.

Premiums for workers compensation insurance are based on factors related to the degree of risk the insurance company is assuming. The actual calculation of the premium is ordinarily based on: (1) total wages of the covered employees ("payroll"); (2) the covered employees' work activities ("job classification"); and (3) the employer's past history of work-related injuries.

In some cases, insurance companies and employers may agree to a method of pricing workers compensation insurance, known as Retrospective Rating, whereby the insurance premium is determined after the policy term has ended, based in part on the actual losses (i.e. amounts paid to workers injured while working for the employer) during the policy term. Even

4

when such pricing agreements are in place, the employer's total payroll is ordinarily used in calculating maximum and minimum premium limits. For example, a Retrospective Rating policy may require an employer to pay a premium of not less than 10% and not more than 200% of a base premium determined by multiplying the employer's payroll by a standard rate, although the ultimate amount charged will be based on actual losses during the policy term.

At the beginning of a policy term, an employer is required to provide its workers compensation insurance company with estimates of its anticipated payroll during the upcoming policy term, as well as information regarding the job classifications of its employees. These payroll estimates are used to determine an estimated premium, which the employer is usually required to pay before or during the policy term.

At the close of a policy term, the insurance company providing workers compensation insurance commonly conducts an "audit" of the employer's actual payroll during the policy term. Interim audits may also be conducted, during the policy term, to check the accuracy of the employer's payroll estimates and, if necessary, to adjust the amount of any installment payments being paid. Year end policy audits may be highly informal--such as obtaining information through a telephone call--or they may involve a more detailed review of records. During such audits, the employer is required to report to the insurance company its actual payroll during the policy term. The employer may also be required to furnish records, such as employment tax withholding records, to verify its payroll figures.

iv.    Daily A. King Labor, Inc. Insurance Coverage

The largest of the companies associated with the McElroy temporary employment agency business was Daily A. King Labor, Inc. Insurance for Daily A. King Labor, Inc. was purchased from the following companies:

| Dates of Coverage | Insurance Carrier |
|---|---|
| 2/17/1993 - 7/26/1996 | Liberty Mutual Insurance Group |
| 7/26/1996 - 7/26/2000 | Reliance Group Holdings Company |
| 7/26/1996 - 7/26/2001 | A.I.M. Mutual Insurance Company |

Premiums for the insurance coverage from Reliance were based upon a retrospective rating plan. For each of three one-year policy terms, the insurance agreements with Reliance provided for minimum and maximum premiums, which were calculated based on a percentage of Daily A. King Labor, Inc.'s payroll.

>    v.    Pro Temp. and Precission Temp. Corp. Insurance Coverage

Beginning around 1993, McElroy also operated his temporary employment service business under the names Dich Trieu (as a sole proprietor) and Pro Temp.

Insurance for Pro Temp. and Dich Trieu was purchased from the following companies:

| Dates of Coverage | Insurance Carrier |
|---|---|
| 9/14/1993 - 9/14/1996 | American Policyholders' Insurance Company |
| 9/14/1996 - 9/14/1997 | Aim Mutual Insurance Company |
| 9/14/1997 - 11/15/1997 | Granite State Insurance Company |
| 11/15/1997 - 11/15/1998 | American Home Assurance Company |
| 1/22/1999 - 1/22/2000 | Reliance National Indemnity Company, |
| 1/22/2000 - 1/22/2001 | Gulf Insurance Company |

During the year 2000, McElroy began to use yet another company name, Precission Temp. Corp., in operating his temporary employment agency. In May 2000, Precission Temp. Corp. was added as an additional insured on the insurance policy then in force issued to Pro Temp. by Gulf Insurance Company.

c.     Operation of the Conspiracy

i.     Off-The-Books Cash Payments to Employees

As noted above, the primary means used to evade employment taxes and workers compensation premiums for the McElroy temporary insurance businesses was to pay workers in cash, without keeping appropriate records of the employees' social security numbers and other information necessary for reporting such cash payments to the Internal Revenue Service or to the workers compensation insurers for their business.

On a day to day basis, Wallace helped McElroy and King administer the office procedures of the temporary employment agency business so that records of cash payments to employees were not maintained in the computerized books and ledgers that were used to record and calculate payroll data for purposes of federal tax reporting and payment.

ii.     Setting up Separate Business Entities

From late-1994 through May 2000, McElroy and Wallace arranged for Dich Trieu, to be listed as the nominal owner of an entity they called Pro Temp. Co. for purposes of hiring employees and submitting tax returns, in order to create the appearance that Pro Temp. Co. was a separate and independent business.   Previously, Trieu had worked for the business in the branch office in Lowell, where workers were hired and their pay (including both paychecks and under-the-table cash) were distributed.   Trieu was paid approximately $100 extra per week after he allowed his name to be used for the business entity involved.   He also received year end bonuses of a couple of thousand dollars during the period when his name was listed as a company owner.

Around May 2000, McElroy and Wallace arranged for Dich Trieu's colleague in the Lowell office, Xieu Van Son, to hold himself out as president of Precission Temp. Corp.  As with Pro Temp., Wallace, McElroy and King attempted to to create the appearance that

7

Precission Temp. Corp. was a separate and independent business. Indeed, McElroy and Wallace went so far as to lease office space in the name of Precission Temp. Corp. Wallace was ordinarily responsible for picking up the mail that was delivered to that office address. At the same time, employees in the main office of the temporary employment business (in Easton, Massachusetts) were told to answer the office telephone "Daily A. King" and to deny any connection to Pro Temp. Co. and Precission Temp. Corp. The phone number given for those businesses was a cell phone, held by Wallace, who worked in the same Easton office.

In actuality, McElroy and Wallace completely controlled the operations of both Pro Temp. Co. and Precission Temp. Corp. The nominal owners, Dich Trieu and Xieu Van Son, did not even have access to the companies' checkbooks. In virtually all respects, the operations of Daily A. King, Inc., Pro Temp. and Precission Temp. Corp. were intermingled. For example, the cash used to meet the under-the-table payroll of the business was obtained from whichever corporate bank account had available funds and there was no inter-company accounting to trace which company's employees were paid with funds from which account.

iii.    Administering the Cash Payroll

On a weekly basis, Wallace was responsible for calculating the total amount of cash needed for the off-the-books cash payments to employees of the temporary employment agency business. During the course of each week, McElroy, Wallace, King, Dich Trieu and others obtained cash, in amounts ranging from $200,000 to $300,000 per week, in order to meet the off-the-books payroll. The total amount of cash obtained for this purpose from 1997 through the first quarter of 2001 was approximately $40,000,000.

To get the cash, Wallace would prepare checks, for signature by King, transferring money from Daily A. King Labor, Inc. to Dich Trieu, Pro Temp. Co. and Precission Temp. Corp.

8

Then Wallace would prepare checks from Dich Trieu, Pro Temp. Co. and Precission Temp.

Corp., payable to cash and would accompanying Trieu and Van Son to the bank to cash those

checks.

Wallace then brought the cash back to the Daily A. King offices where he and McElroy

(and occasionally King) counted the cash out into individual pay envelopes for delivery to the

workers.

iv.    Filing False Tax Returns

As part of his duties Wallace prepared and filed employment tax returns, including Form

941, Employers Federal Quarterly Tax Return, for Daily A. King Labor, Inc., Pro Temp. Co. and

Precission Temp. Corp. As noted above, all of the tax returns were false and fraudulent in that

the failed to report any of the under-the-table cash paid to the workers employed by those

businesses.

The tax fraud loss calculation for McElroy and King includes all employment taxes

(F.I.C.A.) that would be due on the under-the-table cash payroll, including both the employer's

share and the employee's share (which the employer is responsible for withholding and paying

over to the IRS). These employment taxes include Social Security tax (12.4%) and medicare tax

(2.9%), for a total rate of 15.3%. The tax loss calculation in this case does not include any

Massachusetts state taxes, such as Unemployment Insurance, that were evaded through the

under-the-table payroll scheme. Based on total unreported cash payroll of $39,226,515.00 times

the 15.3% federal employment tax rate, this yields a tax loss of $6,001,657.

In addition to employment taxes, employers are obligated to withhold income taxes from

their employees' paychecks. However, the amount of such withholding can vary greatly and,

ultimately, the payment of the taxes is the responsibility of the employees. In this case, virtually

9

all of the employees were low-wage workers whose tax liabilities would have been low to non-existent. Indeed, depending on the size of the workers' families, many may have qualified for an earned-income credit. While some withholding would doubtless have been warranted, the percentage amount is subject to serious debate. IRS-CI Special Agent Demeo has prepared a realistic assessment of the tax loss[1] based on the average withholding rates applied to the payroll that Daily A. King reported to the IRS. Applying these average withholding rate to the under-the-table cash payroll yields a total withholding tax loss figure of $3,150,207.43.

Combining the Employment Tax loss ($6,001,657) and the Withholding Tax loss ($3,150,207), yields a total tax loss of $9,151,864.

v.    Defrauding Workers Compensation Insurers

In reporting payroll (both estimates and year-end audit amounts) to the workers compensation insurers for the various McElroy companies, Wallace fraudulently reported (and fabricated fake tax documents and other records) only a small fraction (roughly ¼) of the actual payroll. In other words, the forged documents that Wallace prepared reflected roughly half as much payroll as was shown on the tax forms that were actually filed with the IRS (which already concealed approximately ½ the payroll by excluding under-the-table cash payments).

Wallace prepared, and provided insurance auditors, with forged tax forms, which purported to be copies of Forms 941, for both Daily A. King Labor, Inc. and Pro Temp. Co. These forged returns were used by the auditors to "verify" the false payroll figures that Wallace had provided them.

---

[1]    If the withholding rate were calculated at a presumptive rate of 28% or 20%, the total tax loss in this case would exceed $10,000,000 and an additional guideline "level" would be added under the tax table. See U.S.S.G. §2T4.1.

With respect to the fraud loss for the insurers, we have attempted to calculate the difference between the premiums that would have been charged, had Wallace and McElroy provided accurate payroll information to the various insurance companies that supplied workers compensation insurance to the temporary employment business, and the premiums that were actually paid. This calculation is complicated by several factors. First, at various times, the McElroy entities used different insurers, including both "assigned risk pool" carriers and "voluntary market" carriers.[2] The method of calculating premiums in the "assigned risk pool" is straightforward (we have used a weighted-average of the rates that were actually charged and have multiplied it by the dollar amount of the payroll that was fraudulently concealed). For the "voluntary market" carrier, however, things more complicated. For a number of years, Daily A. King Labor, Inc. (the largest of the McElroy entities) obtained "retrospective" coverage from the Reliance Insurance Group. Premiums for "retro" policies include "maximum" and minimum" amounts that are a multiple of the payroll (and, therefore, are affected by fraudulently understated payroll figures), as well as a calculation of actual charges and rebates based on the actual history of claims paid during the coverage period. This "retrospective" portion of the premium is not based upon the amount of payroll, but on the costs associated with work injuries.

---

[2]        Workers compensation insurance operates, in many respects, like a tax system. Coverage is mandatory; all employers are required to carry workers compensation insurance to cover the costs of workers compensation awarded to injured workers. Employers can shop for the most economical insurance packages and insurance companies are free to compete for that business. This is the so-called "voluntary market." Commonly, however, employers are unable to find an insurance company that will insure them at a mutually agreed rate. In that case, the employer is assigned to an insurance carrier through the "assigned risk pool," which is operated in Massachusetts through the Workers Compensation Rating and Inspection Bureau. This state-regulated body assigns insurance carriers to provide coverage to employers who are unable to obtain coverage in the open market. All carriers in the assigned risk pool charge the same state-approved rates, which are calculated through actuarially derived  formulas that take into account: (1)  the dollar amount of the payroll for the covered workers; (2) the accident history of the employer; and (3) the risk associated with the particular occupation(s) covered.

11

We have treated as "loss" for purposes of the guidelines the difference between the "minimum" premiums that would have been charged if payroll had been accurately disclosed and the actual premiums that were billed (after taking into account rebates and surcharges for actual claims paid).

The following is the best calculation we have been able to produce (a binder containing the back-up for these figures is available for review). The calculation gives the defendants a "benefit of the doubt" in that it does not attribute any insurance fraud losses to years in which there was no completed insurance audit. While there were deceptive "predictions" made at the inception of each insurance term, the key falsehoods on which the insurers relied for the ultimate calculation of the bill were made in the year-end audits. These were the falsehoods for which McElroy and Wallace prepared phony payroll and tax records in order to fool the auditors. The net losses, by year, are as follows:

INSURANCE PREMIUM FRAUD LOSS

| Policy Year | Carrier | Reported Payroll | Actual Payroll | Hidden Payroll | Fraud Loss |
|---|---|---|---|---|---|
| 2/17/93-2/17/94 | Liberty | $649,918 | $2,087,481 | $ 1,437,563 | $ 162,566 |
| 2/17/94-2/17/95 | Liberty | $ 868,415 | $ 4,892,016 | $ 4,023,601 | $ 478,886 |
| 2/17/95-2/17/96 | Liberty | $ 2,747.242 | $ 9,539,347 | $ 6,792,105 | $ 569,301 |
| 2/17/96-7/26/96 | Liberty | -- | $ 4,384,706 | -- | -- |
| 7/26/96-7/26/97 | Reliance | $ 2,534,254 | $ 13,333,539 | $ 10,799,285 | $ 1,053,207 |
| 7/26/97-7/26/98 | Reliance | $ 2,328,873 | $ 13,637,579 | $ 11,308,706 | $ 677,931 |

| 7/26/98-7/26/99 | Reliance | $ 3,008,181 | $ 9,222,368 | $ 6,214,187 | $ 273,134 |
|---|---|---|---|---|---|
| 7/26/99-7/26/00 | Reliance | | $ 12,049,032 | – | -- |

| Pro-Temp | | | | | |
|---|---|---|---|---|---|
| 11/15/97-11/15/98 | AIG | $ 953,580 | $ 8,954,992 | $ 8,001,412 | $ 684,921 |
| 1/22/99-1/22/00 | Reliance | $ 632,432 | $ 11,117,432 | $ 10,485,000 | $ 703,544 |
| | | | | | |
| TOTAL INSURANCE FRAUD LOSS | | | | | $4,603,490 |

2.    Guideline Calculations

a.    Charles Wallace

It is the United States' position that the applicable version of the United States

Sentencing Guidelines includes amendments effective Nov. 1, 1999, and the following are the

applicable guideline calculations with respect to Charles J. Wallace:

*GROUP 1 (Fraudulent or False Tax Returns)*

*§2T1.1  (a)(1)  Level from §2T4.1 (Tax Table) corresponding to the tax loss*
*(>$5,000,000 and <$10,000,000)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *22*

*(b)(2)  If the offense involved sophisticated means [use of corporate*
*shells], increase by 2 levels* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *2*

*§3B1.1:    Manager of supervisor of a criminal activity that involved five or*
*more participants* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *3*

*Group 1 total offense level* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *27*

*GROUP 2 (Fraud)*

*§2F1.1(a):    Base offense level* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *6*

*§2F1.1(b)(1)(c):  Adjustment for loss (>$2,500,000, <$5,000,000)* . . . . . . . . . . . . . . . *13*

*§2F1.1(b)(2)(A): More than minimal planning* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *2*

*§3B1.1:    Manager of supervisor of a criminal activity that involved five or*
*more participants* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *3*

*Group 2 total offense level*                                                    *24*

*COMBINED OFFENSE LEVEL*
*§3D1.4        Number of Units:*
*              Group 1        1 unit*
*              Group 2        1 unit*
*              total          2  units*

*              Level 27 plus 2* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *29*

*U.S.S.G. §3E1.1:        Acceptance of responsibility and early notice of plea* . . . . . . . . . *-3*

*ADJUSTED OFFENSE LEVEL* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *26*

*STATUTORY "CAP" ON GUIDELINE SENTENCE*

*§5G1.1(a)        Where the statutorily authorized maximum sentence is less than the*
*                 minimum of the applicable guideline range, the statutorily authorized*
*                 maximum sentence shall be the guideline sentence.*

        b.    <u>Dich Trieu</u>

        It is the United States' position that the applicable version of the United States

Sentencing Guidelines includes amendments effective Nov. 1, 1999, and the following are the

applicable guideline calculations with respect to Dich Trieu:

        Fraudulent or False Tax Returns

        §2T1.1  (a)(1) Level from §2T4.1 (Tax Table) corresponding to the tax loss
                       (>$5,000,000 and <$10,000,000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

                (b)(2) If the offense involved sophisticated means [use of corporate
                       shells], increase by 2 levels . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        U.S.S.G. §3E1.1:        Acceptance of responsibility and early notice of plea . . . . . . . . . -3

        ADJUSTED OFFENSE LEVEL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

        STATUTORY "CAP" ON GUIDELINE SENTENCE

        §5G1.1(a)        Where the statutorily authorized maximum sentence is less than the
                         minimum of the applicable guideline range, the statutorily authorized
                         maximum sentence shall be the guideline sentence.

3.    Victim List

a.    United States: Internal Revenue Service
att'n:  Special Agent Thomas Demeo IRS-CI
1 Montvale Avenue, Room 205
Stoneham, MA  02180
781 835-4179

b.    Liberty Mutual Insurance Group
(att'n Neil Johnson, Assistant Vice President – SIU)
175 Berkeley Street
Boston, MA 02117
(617) 357-9500 (x43304)

Estimated Amount of Victim Loss: $ 1,210,753

c.    AIG  (att'n Tito Medeiros)
P.O. Box 231
Taunton, MA 02780
508-884-8886

Estimated Amount of Victim Loss: $ 684,921

d.    Reliance Insurance Group (att'n:  Ed Brace)
Premium Accounting
3 Parkway
Philadelphia, PA 19102
215-864-4985

Estimated Amount of Victim Loss: $ 2,707,816

# EXHIBIT 2

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

————————————— )
                                            )    CRIMINAL NO.  **05** CR **10022** GAO
UNITED STATES OF AMERICA   )
                                            )    VIOLATIONS:
            v.                              )    18 U.S.C. §371 (conspiracy to defraud United States
                                            )            and to commit offenses)
CARLOS GOMEZ  and              )    18 U.S.C. §1341 (Mail Fraud)
MARY GILDEA,                        )    18 U.S.C. §1027 (ERISA false statement)
                                            )    26 U.S.C. §7206(1) (subscribing false tax return)
            defendants.                   )
————————————— )

INFORMATION

The United States Attorney Charges that:

## ALLEGATIONS COMMON TO ALL COUNTS

### The Defendants

1.      At times pertinent to this Information, defendant CARLOS GOMEZ ("GOMEZ")
was an individual who resided in North Reading in the District of Massachusetts.  At times
pertinent to this Information, GOMEZ owned and operated Lanco Scaffolding, Inc.

2.      At times pertinent to this Information, defendant MARY GILDEA ("GILDEA")
was an individual who resided in North Reading in the District of Massachusetts.  At times
pertinent to this Information, GILDEA was married to defendant GOMEZ and helped operate
Lanco Scaffolding, Inc.

3.      At times pertinent to this Information, Lanco Scaffolding, Inc. ("Lanco")
maintained business offices at 33 Earle Street, Somerville, Massachusetts.

4.      At times pertinent to this Information,  Lanco was in the business of supplying,
erecting and dismantling scaffolding, primarily for use in construction projects.

5.    At times pertinent to this Information, Lanco employed 20 or more persons to provide services in connection with the scaffolding business.

**The Federal Employment/Payroll Tax System**

6.    At all times pertinent to this Information, Federal tax laws have required employers to file Form 941, Employer's Quarterly Federal Tax Return, in order to report and pay all federal employment taxes, as well as income taxes withheld from employees' paychecks. Employers must file Form 941 for each quarter ending March 31st; June 30th; September 30th; and December 31st, every year.

7.    At all times pertinent to this Information, Federal employment taxes have consisted of Social Security Tax and Medicare Tax.  The Federal employment tax rate is 15.3 % of an employee's wages.  Employers are liable for half (½) of this 15.3% (i.e., 7.65%), while each employee is responsible for the remaining half (i.e., an additional 7.65%).  Employers are required by Federal law to withhold employees' share of Federal employment taxes.  In connection with the filing of their Forms 941, employers are responsible for reporting and paying to the United States Internal Revenue Service (IRS) both the employers' and the employees' share of employment taxes.

8.    At all times pertinent to this Information, on an annual basis, employers have also been required to file Forms W-2 for each of their employees.  On the W-2, the employer reports to each employee and to the IRS all wages paid to the employee and all taxes that have been withheld from those wages.  One copy of the form W-2 is provided to the employee and another is filed with the IRS.  A separate form W-2 is required for each employee for each tax year.

2

**The Workers Compensation Insurance System In Massachusetts**

9.     At times pertinent to this Information, the laws of the Commonwealth of Massachusetts have required all employers in Massachusetts to obtain workers compensation insurance coverage in order to ensure that employees who suffer work-related injuries will be compensated in accordance with the workers compensation laws of the Commonwealth.

10.     As with other forms of insurance, employers obtain workers compensation insurance by paying a fee, known as a "premium," to an insurance company, in exchange for which the insurance company agrees to assume the employer's "liability" or risk of loss.

11.     For most employers, the fees that insurance companies may charge for workers compensation insurance are established by law and regulation.

12.     As with other forms of insurance, premiums for workers compensation insurance are based in part on factors related to the degree of risk the insurance company is assuming.  The following factors are used in calculating a particular employer's workers compensation insurance premium: (1) the total wages of the employees to be covered (known as "payroll"); (2) the nature of the employees' work activities (known as "classification"); and (3) the employer's past history of work-related injuries (known as "experience modification").

13.     Job classification codes are established by the Massachusetts Workers Compensation Rating and Inspection Bureau.  Insurance rates for different classifications are designed to reflect the degree of risk associated with different jobs.  For example, workers compensation coverage for an office worker (with a relatively low risk of serious on-the-job injury) costs less than coverage for a scaffolding worker (with a much higher risk of serious on-the-job injury).

3

14. In construction and related industries, each job or trade is assigned a classification code specifically describing that trade. Each classification, in turn, is assigned an insurance rate, based upon historical data reflecting losses from injuries to workers in that classification.

15. Ordinarily, at the beginning of a period of insurance coverage, an employer is required to provide its insurance company with estimates of its anticipated payroll, as well as the job classifications of its employees. These estimates provide a basis for determining an estimated premium, some or all of which the insurer may require the employer to pay at the beginning of the period.

16. At the close of a period of insurance coverage, the insurance company conducts an "audit" of the employer's payroll during the period. In the audit, the employer supplies the insurance provider with records showing the employer's payroll and employee classifications during the period. If an employer's actual payroll turns out to be higher than its original estimate, the employer may have to pay an additional premium. If an employer's actual payroll turns out to be lower than the estimate, the employer may receive a credit or refund. Under the insurance agreement, the employer is ordinarily required to allow the insurance company access to any books and records necessary to verify the employer's payroll, including copies of employment tax filings.

**The Insurers**

17. For the period beginning on or about April 1, 1996, and continuing until on or after March 29, 2000, Lanco purchased its workers compensation insurance policies from Eastern Casualty Insurance Company ("Eastern Casualty").

4

18.    For the period beginning on or about March 29, 2000, and continuing until on or after October 31, 2003, Lanco purchased its workers compensation insurance policies from Liberty Mutual Insurance Company ("Liberty Mutual").

19.    At times pertinent to this Information, Eastern Casualty maintained a place of business at Marlborough, in the District of Massachusetts.

20.    At times pertinent to this Information, Liberty Mutual maintained a place of business at Boston, in the District of Massachusetts.

21.    At times pertinent to this Information, it was the regular business practice of Eastern Casualty to send various items relating to pricing and billing for insurance policies by the U.S. Postal Service, including notices reflecting interim and final bill amounts and invoices for payment.

22.    At times pertinent to this Information, it was the regular business practice of Liberty Mutual to send various items relating to pricing and billing for insurance policies by the U.S. Postal Service, including notices reflecting interim and final bill amounts and invoices for payment.

**The Union Health and Welfare Trust Funds**

a.    The Laborers' Trust Funds

23.    At all times pertinent to this Information, the Massachusetts Laborers' District Council of the Laborers' International Union of North America (the "Laborers' Union") was a labor organization headquartered in the District of Massachusetts. The Laborers' Union's membership included scaffolding workers.

5

24. At all times pertinent to this Information, Lanco was an employer of scaffolding workers and was a signatory to, and was bound by, collective bargaining agreements with the Laborers' Union.

25. At all times pertinent to this Information, under the terms of its collective bargaining agreement with the Laborers' Union, Lanco was required to make payments to various trust funds that operated employee benefit plans, including but not limited to: Massachusetts Laborers' Health and Welfare Fund; Massachusetts Laborers' Health and Safety Fund; Massachusetts Laborers' Pension Fund; and Massachusetts Laborers' Annuity Fund (collectively referred to as the "Laborers' Trust Funds").

26. At all times pertinent to this Information, the collective bargaining agreements between Lanco and the Laborers' Union required that Lanco pay particular amounts to the appropriate Laborers' Trust Funds each month on behalf of employees covered by those collective bargaining agreements. Such required payments were based upon the number of hours worked each month by each employee whose duties were covered by the Laborers' Union collective bargaining agreements.

27. To facilitate the calculation and collection of payments and benefits, Lanco was provided with a monthly form, entitled "Employer's Remittance Report," on which to report all hours worked by laborers, identifying each individual performing laborer's work for Lanco, together with the number of hours worked each month. The "Employer's Remittance Report" provided appropriate spaces to calculate and declare the amount of the employer's contribution to the Laborers' Trust Funds.

28.    At times pertinent to this Information, the Employer's Remittance Report included an express warning that "Any false statement or misrepresentation made in reporting on this form may subject you to prosecution under 18 USC section 1027 . . . ."

29.    At all times pertinent to this Information, the Laborers' Trust Funds referenced above were employee benefit plans subject to Title 1 of the Employee Retirement Income Security Act of 1974 ("ERISA"), Title 29, United States Code, Sections 1001 et seq., a federal law enacted to protect employee pension and welfare benefit plans and their participants and beneficiaries by establishing requirements for reporting, record keeping, disclosure and other matters affecting the operation of such plans.

30.    Under ERISA, each of the Laborers' Trust Funds was required to publish and file annual financial reports, known as Form 5500 Reports, with the United States Secretary of Labor. ERISA also required the Laborers' Trust Funds to keep and maintain all documents necessary to verify, explain, clarify and check for accuracy the completeness the annual Form 5500 Reports that each of the Laborers' Trust Funds was required to file.

31.    Pursuant to the provisions of ERISA, the Laborers' Trust Funds were required to keep and maintain the Employer's Remittance Reports that Lanco submitted each month, together with all other reports of employers' contributions, in order to verify, explain, clarify and check for accuracy the completeness of each fund's annual Form 5500 Report. Specifically, the information set forth in the Employer's Remittance Reports regarding the number of laborers employed by Lanco, the hours they worked, and the employer's contributions on behalf of those laborers were facts the accurate disclosure of which was necessary to verify, explain, clarify and check for accuracy and completeness the Form 5500 Reports that each of the Laborers' Trust Funds was required to file.

7

b.    The Carpenters' Trust Funds

32.    At all times pertinent to this Information, the New England Regional Council of Carpenters of the United Brotherhood of Carpenters and Joiners of America (the "Carpenters' Union") was a labor organization headquartered in the District of Massachusetts. The Carpenters' Union's membership included certain carpenters who worked on scaffolding.

33.    At all times pertinent to this Information, Lanco was an employer of carpenters who worked on scaffolding and was a signatory to, and was bound by, collective bargaining agreements with the Carpenters' Union.

34.    At all times pertinent to this Information, under the terms of its collective bargaining agreement with the Carpenters' Union, Lanco was required to make payments to various trust funds that operated employee benefit plans, including but not limited to: Massachusetts State Carpenters Pension Fund; Massachusetts State Carpenters Guaranteed Annuity Fund; and Massachusetts State Carpenters Health Benefits Fund (collectively referred to as the "Carpenters' Trust Funds"). Collection of employer contributions to all of the Carpenters' Trust Funds was handled through the Massachusetts Carpenters Central Collection Agency.

35.    At all times pertinent to this Information, the collective bargaining agreements between Lanco and the Carpenters Union required that Lanco pay particular amounts to the appropriate Carpenters' Trust Funds each month on behalf of employees covered by those collective bargaining agreements. Such required payments were based upon the number of hours worked each month by each employee covered by the Carpenters Union collective bargaining agreements.

36.    To facilitate the calculation and collection of payments and benefits, Lanco was provided with a monthly form, entitled "Employer's Monthly Remittance Report," which reported

8

all hours worked by carpenters, identifying each individual carpenter working for Lanco, together with the number of hours worked each month. This report provided appropriate spaces to calculate and declare the amount of the employer's contribution to the Carpenters' Trust Funds.

37.     At times pertinent to this Information, the Employer's Monthly Remittance Report included an express warning that "Any false statement or representation made in reporting on this form may subject you to prosecution under 18 USC section 1027 . . . ."

38.     At all times pertinent to this Information, the Carpenters' Trust Funds referenced above were employee benefit plans subject to ERISA.

39.     Under ERISA, each of the Carpenters' Trust Funds was required to publish and file annual financial reports, known as Form 5500 Reports, with the United States Secretary of Labor. ERISA also required the Carpenters' Trust Funds to keep and maintain all documents necessary to verify, explain, clarify and check for accuracy the completeness the annual Form 5500 Reports that each of the Carpenters' Trust Funds was required to file.

40.     Pursuant to the provisions of ERISA, the Carpenters' Trust Funds were required to keep and maintain the Employer's Remittance Reports that Lanco submitted each month, together with all other reports of employers' contributions, in order to verify, explain, clarify and check for accuracy the completeness of each fund's annual Form 5500 Report. Specifically, the information set forth in the Employer's Remittance Reports regarding the number of carpenters employed by Lanco, the hours they worked, and the employer's contributions on behalf of those carpenters were facts the accurate disclosure of which was necessary to verify, explain, clarify and check for accuracy and completeness the Form 5500 Reports that each of the Carpenters' Trust Funds was required to file.

9

c.    Auditing Union Trust Fund Contributions

41.    At times pertinent to this Information, it was the practice of both of the Laborers' Union and the Carpenters Union to conduct periodic audits of employers' payroll records in order to confirm the accuracy of the employers' representations in monthly remittance reports. In the course of such audits, it was the usual practice to compare copies of the Employer's Quarterly Federal Tax Returns (Form 941) with the payroll records provided, in order to verify the accuracy of the information provided.

**"Under-the-Table" Payroll Schemes (Background)**

42.    A common method by which employers evade employment taxes and workers compensation insurance premiums is to pay employees in cash or check, without withholding taxes and without reporting that payroll to the workers compensation insurance company.

43.    Paying employees in a manner that results in failing to withhold or pay over payroll taxes is commonly referred to as paying "under-the-table."

44.    Under-the-table payments commonly are made from an account other than the employer's regular payroll bank account. The employer omits these under-the-table payments from the gross wages reported on its quarterly tax returns (Form 941) and from any forms W-2 provided to its employees. The employer also omits these under-the-table payments from any payroll records provided to the insurance company in any end of term audit.

45.    By paying employees under-the-table, an employer evades its share of the employees' employment taxes, or 7.65% of the employees' wages and effectively causes its employees to evade their share of the employment taxes as well.

46.    By paying employees under-the-table, an employer also evades its workers compensation insurance premiums.

10

47.    By paying employees under-the-table, an employer may also evade its obligations to pay funds to health and pension benefit plans pursuant to the terms of the employer's contracts with the unions representing some or all or its employees.

## COUNT ONE

## CONSPIRACY (18 U.S.C. §371)

48.   The United States Attorney realleges and incorporates by reference paragraphs 1-47 of this Information, and further charges that:

49.   Beginning some time prior to April 1, 1996, and continuing until in or about December 2003, at Somerville and North Reading in the District of Massachusetts and elsewhere,

CARLOS GOMEZ

and

MARY GILDEA

defendants herein, together with others known and unknown to the United States Attorney, knowingly and unlawfully conspired and agreed with each other:

to defraud the United States by impeding, impairing, obstructing and defeating the lawful government functions of the Internal Revenue Service of the Treasury Department in the ascertainment, computation, assessment and collection of the revenue; to wit, employment and income taxes; and

to commit offenses against the United States, specifically:

Having devised and intending to devise a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses and representations, and for the purpose of executing such scheme and artifice and attempting to do so, to place and cause to be placed in a post office and authorized depository for mail matter, things to be sent and delivered by the Postal Service or by private or commercial interstate carrier, in violation of Title 18, United States Code, Section 1341; and

12

In documents required by title 1 of the Employee Retirement Income Security Act of 1974 (ERISA), as amended, to be published or kept as part of the records of employee welfare benefit plans and employee pension benefit plans, and certified to the administrators of such plans, to make and cause to be made false statements and representations of fact, knowing them to be false, and knowingly to conceal, cover up and fail to disclose facts, the disclosure of which was necessary to verify, explain, clarify and check for accuracy and completeness reports that were required to be published and information required to be certified, by ERISA, in violation of Title 18, United States Code, Section 1027.

All in violation of Title 18, United States Code, Section 371.

## OBJECTIVES OF THE CONSPIRACY

50.     A major purpose and objective of the conspiracy was to enable GOMEZ, GILDEA and Lanco fraudulently to avoid paying a portion of the federal employment taxes that were owed in connection with the operation of their scaffolding business.

51.     A second major purpose and objective of the conspiracy was to enable GOMEZ, GILDEA and Lanco to fraudulently reduce the premiums for workers compensation insurance that were owed in connection with the operation of their scaffolding business.

52.     A third major purpose and objective of the conspiracy was to enable GOMEZ, GILDEA and Lanco to under-report and under-pay contributions that were required to be paid, on a monthly basis, to the Laborers' Trust Funds and the Carpenters' Trust Funds.

53.     A further purpose and objective of the conspiracy was to enable GOMEZ, GILDEA and Lanco to avoid collecting and paying to the IRS income tax withholding amounts for employees of their scaffolding business.

13

## MANNER AND MEANS OF THE CONSPIRACY

The manner and means by which the conspirators accomplished the goals of the conspiracy included, among others, the following:

54.     As detailed below, during the period beginning in or about March 1, 1996 and continuing through October 2003, GOMEZ, GILDEA and Lanco defrauded the IRS, two insurance companies, the Laborers' Trust Funds and the Carpenters' Trust Funds, by intentionally understating the amounts that Lanco paid to its workers, the number of workers Lanco employed, and the number of hours worked by Lanco's workers, thereby evading a significant portion of Lanco's employment taxes, workers' compensation insurance premiums, and employee benefit contributions.

55.     As detailed below, GOMEZ, GILDEA and Lanco executed the fraud scheme: (1) by paying employees cash "under-the-table," which payroll was not reported to either the IRS or to the workers compensation insurance companies; (2) by providing forged and fraudulent payroll records, together with forged and fraudulent "copies" of their quarterly tax returns (Forms 941) to insurance auditors, thereby reporting an even lower payroll figure to Lanco's insurers than the already fraudulent payroll figures that had been reported to the IRS; and (3) by providing false remittance reports each month to the administrators of the Laborers' Trust Funds and the Carpenters' Trust Funds and by providing forged and fraudulent "copies" of their quarterly tax returns (Forms 941) to auditors for those trust funds.

### Under-the-Table Payments to Employees

56.     It was part of the conspiracy that GOMEZ and GILDEA would and did arrange to pay Lanco employees in cash, and by check, without reporting such payments to the IRS or to

14

Lanco's workers compensation insurer. From October 1997 through September 2003, GOMEZ and GILDEA paid Lanco workers at least $2,900,000 in unreported cash.

57.     It was part of the conspiracy that GILDEA administered Lanco's office procedures in such a way that records of under-the-table cash and check payments to employees were not maintained in the computerized books and ledgers that were used to record and calculate Lanco's payroll data for purposes of federal tax reporting and payment.

### Administering the Cash Payroll

58.     It was part of the conspiracy that GILDEA calculated, on a weekly basis, the total amount of cash and checks needed for under-the-table cash payments to Lanco employees.

59.     It was part of the conspiracy that, at some times pertinent to this Information, GOMEZ and GILDEA would and did obtain cash on a weekly basis, in amounts ranging as high as $7,800 per week, in order to meet Lanco's under-the-table payroll.

60.     It was part of the conspiracy that GOMEZ and others would and did distribute cash and checks to Lanco employees.

61.     It was part of the conspiracy that some Lanco employees were paid solely under-the-table while others received a portion of their pay under-the-table and another portion through a properly recorded payroll check.  In addition, a few employees received most or all of their compensation through properly recorded payroll checks.

### Filing False Tax Returns and Willful Failure to File Returns

62.     It was part of the conspiracy that GILDEA would and did prepare and file employment tax returns, including Form 941, Employer's Federal Quarterly Tax Return, for Lanco, which returns were false in that they failed to include under-the-table cash payments to employees of the business.

15

**Defrauding Workers Compensation Insurers**

63.    It was part of the conspiracy that GILDEA would and did provide auditors from Lanco's workers compensation insurers with forged and fraudulent payroll records which reflected payments only to approximately five employees.

64.    In actuality, as GILDEA well knew, Lanco employed many more workers and its total payroll substantially exceeded the figures provided to Lanco's workers compensation insurers.

65.    It was part of the conspiracy that GILDEA told auditors for Lanco's workers compensation insurers that Lanco ordinarily employed approximately five employees.  In actuality, as GILDEA and GOMEZ well knew, Lanco routinely employed more than twenty persons.

66.    For the periods March 1996 through March 2003, GILDEA and GOMEZ reported payroll totaling approximately $2,261,068 to Lanco's workers compensation insurers.  In actuality, Lanco's payroll during that period exceeded $7,500,000.

67.    It was part of the conspiracy that, in order to mislead insurance company auditors, GILDEA and GOMEZ prepared, signed and arranged to provide the auditors with false and forged tax forms, which purported to be copies of Lanco's Form 941, Employer's Quarterly Federal Tax Return.  These false and forged tax returns were designed to "verify" the false payroll figures that GILDEA had provided to the insurance companies.  These false and forged tax returns reflected lower payroll figures than the tax returns that were actually filed with the IRS on behalf of Lanco, even though, as noted above, the Lanco employment tax returns filed with the IRS were themselves fraudulently understated due to the failure to report under-the-table cash payroll.

16

68.    It was part of the conspiracy that, for the purpose of executing the scheme to defraud Lanco's workers compensation insurers, GILDEA and GOMEZ caused various documents to be sent and delivered by the Postal Service, to wit: insurance documents that reflected fraudulently reduced premium calculations, which were based upon false representations regarding Lanco's payroll.

**Defrauding Union Trust Funds**

a.    Laborers' Trust Funds

69.    It was part of the conspiracy that GILDEA and GOMEZ would and did provide false monthly remittance reports to the Laborers' Trust Funds. In those reports GILDEA and GOMEZ listed between four (during 1998) and eight (during 2003) individual laborers. During some periods, the reports reflected that each listed laborer had worked approximately 20 hours per week. The reported 20 hours of work per week were the minimum that would entitle the named laborers to the health and welfare benefits provided by the Laborers' Trust Funds.

70.    In actuality, as GILDEA and GOMEZ well knew, Lanco routinely employed 15 or more laborers, who customarily worked 40 hours or more per week. By concealing both the true number of laborers employed, and the number of hours worked by each, GILDEA and GOMEZ defrauded the Laborers' Trust Funds by causing Lanco to pay only a small fraction of the benefit contributions required under Lanco's collective bargaining agreement with the Laborers' Union.

71.    It was part of the conspiracy that, for the purpose of executing the scheme to defraud the Laborers' Trust Funds, GILDEA and GOMEZ caused various documents to be sent and delivered by the Postal Service, including Employer's Remittance Reports mailed to the

Massachusetts Laborers' Benefit Funds, which fraudulently understated the number of laborers employed by Lanco and the hours worked by those laborers.

    a.   <u>Carpenters' Trust Funds</u>

72.    It was part of the conspiracy that GILDEA and GOMEZ would and did provide false monthly remittance reports to the Carpenters' Trust Funds. In those reports GILDEA and GOMEZ routinely listed three individual carpenters, each working approximately 40 hours per week.

73.    In actuality, as GILDEA and GOMEZ well knew, Lanco routinely employed five carpenters, who frequently worked more than 40 hours per week. By concealing both the true number of carpenters employed, and the number of hours worked by each, GILDEA and GOMEZ defrauded the Carpenters' Trust Funds by causing Lanco to pay only portion of the benefit contributions required under Lanco's collective bargaining agreement with the Carpenters' Union.

74.    It was further part of the conspiracy that, in order to mislead auditors for the Carpenters' Trust Funds, GILDEA and GOMEZ prepared, signed and arranged to provide those auditors with false and forged tax forms, which purported to be copies of Lanco's Form 941, Employer's Federal Quarterly Tax Returns. These false and forged tax returns were designed to "verify" the false payroll figures that GILDEA and GOMEZ had provided to the Carpenters' Trust Funds in monthly remittance reports. These false and forged tax returns reflected lower payroll figures than the tax returns that were actually filed with the IRS on behalf of Lanco, even though, as noted above, the Lanco employment tax returns filed with the IRS were themselves fraudulently understated due to the failure to report under-the-table cash payroll. The false and forged tax returns that were provided to auditors for the Carpenters' Trust Funds differed from

| | | |
|---|---|---|
| 2d | quarter 1998 | $ 144,706.39 |
| 3d | quarter 1998 | $ 149,390.61 |
| 4th | quarter 1998 | $ 160,977.10 |
| 1st | quarter 1999 | $ 143,679.10 |
| 2d | quarter 1999 | $ 158,679.25 |
| 3d | quarter 1999 | $ 160,841.85 |
| 4th | quarter 1999 | $ 168,722.17 |
| 1st | quarter 2000 | $ 145,018.85 |
| 2d | quarter 2000 | $ 156,362.85 |
| 3d | quarter 2000 | $ 161,829.45 |
| 4th | quarter 2000 | $ 166,851.05 |
| 1st | quarter 2001 | $ 164,376.45 |
| 2d | quarter 2001 | $ 224,640.20 |
| 3d | quarter 2001 | $ 229,229.00 |
| 4th | quarter 2001 | $ 230,429.00 |
| 1st | quarter 2002 | $ 149,227.00 |
| 2d | quarter 2002 | $ 158,751.70 |
| 3d | quarter 2002 | $ 168,823.15 |
| 4th | quarter 2002 | $ 190,786.25 |
| 1st | quarter 2003 | $ 162,816.40 |
| 2d | quarter 2003 | $ 187,305.50 |
| 3d | quarter 2003 | $ 188,488.75 |

79.    On or about the following dates, GILDEA provided an auditor from Eastern

Casualty with forged and fraudulent payroll journals:

| Date Provided to Eastern Casualty Auditor | Policy Period | Reported Number of Employees | Reported Payroll For Scaffolding Employees |
|---|---|---|---|
| 3/26/1997 | 3/29/96-3/28/97 | "at least 4" | $ 37,068 |
| 8/06/1998 | 3/29/97-3/29/98 | 5 | $ 58,889 |
| 5/19/1999 | 3/29/98-3/29/99 | 5 | $ 91,643 |
| 6/14/2000 | 3/29/99-3/29/00 | 6 | $ 167,527 |

80.    On or about the following dates, in connection with final (policy year end) audits of Lanco by Eastern Casualty, GILDEA provided the auditor with forged and fraudulent "copies" of Lanco's Form 941's, purporting to verify the falsified payroll figures.

| Date Provided to Eastern Casualty Auditor | Reported Period | Reported Wages and Compensation |
|---|---|---|
| 3/26/1997 | 2d quarter 1996 | $ 22,578 |
| " | 3d quarter 1996 | $ 23,645 |
| " | 4th quarter 1996 | $ 24,103 |
| " | 1st quarter 1997 | $ 24,172 |
| 8/06/1998 | 2d quarter 1997 | $ 48,211 |
| " | 3d quarter 1997 | $ 55,422 |
| " | 4th quarter 1997 | $ 63,395 |
| " | 1st quarter 1998 | $ 57,026 |
| 5/19/1999 | 2d quarter 1998 | $ 61,105 |
| " | 3d quarter 1998 | $ 61,605 |
| " | 4th quarter 1998 | $ 65,650 |
| " | 1st quarter 1999 | $ 61,254 |
| 6/14/2000 | 2d quarter 1999 | $ 59,941 |
| " | 3d quarter 1999 | $ 66,291 |
| " | 4th quarter 1999 | $ 71,799 |
| " | 1st quarter 2000 | $ 65,717 |

81.     On or about the following dates, GILDEA provided an auditor from Liberty
Mutual with forged and fraudulent payroll journals:

| Date Provided to Liberty Mutual Auditor | Policy Period | Reported Number of Employees | Reported Payroll For Scaffolding Employees |
|---|---|---|---|
| 5/11/2001 | 3/29/00- 3/29/01 | 6  (3 scaffolding) | $ 120,221 |
| May 2008 | 3/29/01- 3/29/02 | 6  (3 scaffolding) | $ 134,689 |

82.     On or about the following dates, in connection with final (policy year end) audits
of Lanco by Liberty Mutual,  GILDEA provided the auditor with forged and fraudulent "copies"
of Lanco's Form 941's, purporting to verify the falsified payroll figures.

| Date Provided to Liberty Mutual Auditor | Reported  Period | Reported Number of Employees | Reported Wages and Compensation |
|---|---|---|---|
| 5/11/2001 | 2d  quarter  2000 | 6 | $ 65,091.85 |
| " | 3d  quarter  2000 | 6 | $ 69,442.85 |
| " | 4th  quarter  2000 | 5 | $ 75,609.25 |
| " | 1st  quarter  2001 | 5 | $ 75,205.65 |
| 5/21/2002 | 2d  quarter  2001 | 5 | $ 137,061.80 |
| " | 3d  quarter  2001 | 5 | $ 131,996.80 |
| " | 4th  quarter  2001 | 5 | $ 132,956.80 |
| " | 1st  quarter  2002 | 4 | $  45,533.80 |

83.     On multiple dates between June 2000 and June 2003, GILDEA falsely told
Liberty Mutual's auditor that Lanco had employed the same four to five employees during the
past ten years.  In actuality, as GILDEA well knew, Lanco routinely employed more than 20
workers.

84.    On or about November 1, 2003, GILDEA sent an email to Liberty Mutual's auditor with an attached spreadsheet that purported to list all employees and payroll that had previously been concealed from the auditor. In actuality, as GILDEA well knew, while the November 1 spreadsheet disclosed more payroll than had previously been reported to the auditor, that spreadsheet falsely and fraudulently understated the number of persons employed by Lanco during the period reflected in the spreadsheet.

85.    On or about the following dates, GILDEA and GOMEZ provided false monthly forms, labeled "Employer's Remittance Report" to the Massachusetts Laborers' Benefit Funds, which listed individual laborers employed by Lanco, and their hours of work, as follows:

| Date of Employer's Remittance Report | Reported Period | Reported Number of Laborers | Reported Total Laborers' Hours |
|---|---|---|---|
| 3/3/1998 | February 1998 | 4 | 320 |
| 9/20/1999 | August 1999 | 5 | 400 |
| 12/31/1999 | December 1999 | 5 | 500 |
| 12/8/2000 | November 2000 | 5 | 480 |
| 1/14/2001 | December 2000 | 8 | 840 |
| 8/20/2001 | July 2001 | 7 | 600 |
| 11/20/2002 | October 2002 | 8 | 1,280 |
| 1/20/2003 | December 2002 | 8 | 1,280 |
| 8/10/03 | July 2003 | 8 | 1,280 |
| 11/20/2003 | October 2003 | 8 | 1,600 |

86.    On or about the following dates, GILDEA and GOMEZ provided false monthly

forms, labeled "Employer's Monthly Remittance Report" to the Massachusetts Carpenters

Central Collection Agency, which listed individual carpenters employed by Lanco, and their hours

of work, as follows:

| Date of Employer's Monthly Remittance Report | Reported Period | Reported Number of Carpenters | Reported Total Carpenters' Hours |
|---|---|---|---|
| 6/8/1998 | May 1998 | 4 | 412 |
| 12/31/1998 | December 1998 | 3 | 400 |
| 9/20/1999 | August 1999 | 3 | 320 |
| 6/10/2000 | May 2000 | 3 | 320 |
| 1/15/2001 | December 2000 | 3 | 500 |
| 6/13/2001 | May 2001 | 3 | 400 |
| 11/5/2001 | October 2001 | 3 | 400 |
| 10/30/2002 | September 2002 | 4 | 480 |
| 4/30/2003 | March 2003 | 3 | 480 |
| 12/10/03 | November 2003 | 3 | 480 |

87.    On or about the following dates, in connection with audits of Lanco's submissions

to the Carpenters' Trust Funds, GILDEA provided the auditors with forged and fraudulent

"copies" of Lanco's Form 941's, purporting to corroborate falsified Employer's Monthly

Remittance Reports:

| Date Provided to Carpenters' Trust Funds Auditor | Reported Period | Reported Total Number of Employees | Reported Wages and Compensation |
|---|---|---|---|
| Feb. - Mar  2002 | 1st quarter  1999 | 9 | $ 83,562.05 |
| " | 2d   quarter   1999 | 9 | $ 80,585.40 |
| " | 3d   quarter   1999 | 9 | $ 88,655.85 |

| Date Provided to Carpenters' Trust Funds Auditor | Reported Period | | | Reported Total Number of Employees | Reported Wages and Compensation |
|---|---|---|---|---|---|
| " | 4th | quarter | 1999 | 9 | $ 95,888.17 |
| " | 1st | quarter | 2000 | 9 | $ 81,358.85 |
| " | 2d | quarter | 2000 | 9 | $ 86,498.85 |
| " | 3d | quarter | 2000 | 9 | $ 92,923.45 |
| " | 4th | quarter | 2000 | 9 | $ 99,169.05 |
| " | 1st | quarter | 2001 | 9 | $ 97,726.45 |
| " | 2d | quarter | 2001 | 9 | $ 160,150.20 |
| " | 3d | quarter | 2001 | 9 | $ 161,499.00 |
| " | 4th | quarter | 2001 | 9 | $ 162,699.20 |

All in violation of Title 18, United States Code, Section 371.

<u>COUNTS TWO - FOUR</u>

MAIL FRAUD (18 U.S.C. §1341)

(Defrauding Workers Compensation Insurers)

88.     The United States Attorney realleges and incorporates by reference paragraphs 1-22, 42-47, 50-68 and 76-84 of this Information, and further charges that:

89.     On or about the dates set forth below, at Somerville and North Reading in the District of Massachusetts and elsewhere,

CARLOS GOMEZ and

MARY GILDEA

defendants herein, having devised and intending to devise a scheme and artifice to defraud and to obtain money and property by means of material false and fraudulent pretenses and representations, including false representations regarding the payroll of Lanco Scaffolding, Inc., and for the purpose of executing such scheme and artifice and attempting to do so, caused to be placed in a post office and authorized depository for mail matter, things to be sent and delivered by the Postal Service, to wit: insurance documents mailed to Lanco Scaffolding, Inc., which documents reflected premium calculations that were based upon false and fraudulent representations by the defendants regarding the payroll of Lanco Scaffolding, Inc.:

| Count | Mailing Date | Item Mailed |
|-------|--------------|-------------|
| 2 | 9/29/2000 | Eastern Casualty Audit Endorsement for Policy Term 3/29/99 -3/29/00 |
| 3 | 5/30/2001 | Liberty Mutual Final Audit Exhibit for Policy Term 3/29/00 -3/29/01 |
| 4 | 6/10/2002 | Liberty Mutual Final Audit Exhibit for Policy Term 3/29/01 -3/29/02 |

All in violation of Title 18, United States Code, Sections 1341 and 2.

26

COUNTS FIVE - EIGHT

MAIL FRAUD (18 U.S.C. §1341)

(Defrauding Laborers' Trust Funds)

90.    The United States Attorney realleges and incorporates by reference paragraphs 1-8, 23-47, 50-62, 69-78 and 85-87 of this Information, and further charges that:

91.    On or about the dates set forth below, at Somerville and North Reading in the District of Massachusetts and elsewhere,

CARLOS GOMEZ and

MARY GILDEA

defendants herein, having devised and intending to devise a scheme and artifice to defraud and to obtain money and property by means of material false and fraudulent pretenses and representations, and for the purpose of executing such scheme and artifice and attempting to do so, caused to be placed in a post office and authorized depository for mail matter, things to be sent and delivered by the Postal Service, to wit: Employer's Remittance Reports mailed to the Massachusetts Laborers' Benefit Funds, which documents reflected false and fraudulent representations regarding the number of laborers employed by Lanco Scaffolding, Inc. and the number of hours worked by such laborers:

| Count | Date Received | Signature Date | Item Mailed |
|---|---|---|---|
| 5 | 1/24/2000 | 12/31/1999 | Employer's Remittance Report, December 1999 |
| 6 | 2/16/2001 | 1/14/2001 | Employer's Remittance Report, December 2000 |
| 7 | 2/20/2002 | 1/20/2002 | Employer's Remittance Report, December 2001 |
| 8 | 12/22/2003 | 11/20/2003 | Employer's Remittance Report, October 2003 |

All in violation of Title 18, United States Code, Sections 1341 and 2.

27

COUNTS NINE - TWELVE

MAIL FRAUD (18 U.S.C. §1341)

(Defrauding Carpenters' Trust Funds)

92.    The United States Attorney realleges and incorporates by reference paragraphs 1-8, 23-47, 50-62, 69-78 and 85-87 of this Information, and further charges that:

93.    On or about the dates set forth below, at Somerville and North Reading in the District of Massachusetts and elsewhere,

CARLOS GOMEZ and

MARY GILDEA

defendants herein, having devised and intending to devise a scheme and artifice to defraud and to obtain money and property by means of material false and fraudulent pretenses and representations, and for the purpose of executing such scheme and artifice and attempting to do so, caused to be placed in a post office and authorized depository for mail matter, things to be sent and delivered by the Postal Service, to wit: Employer's Monthly Remittance Reports mailed to Massachusetts Carpenters Central Collection Agency, which documents reflected false and fraudulent representations regarding the number of carpenters employed by Lanco Scaffolding, Inc. and the number of hours worked by such carpenters:

| Count | Date Received | Signature Date | Item Mailed |
|---|---|---|---|
| 9 | 6/27/2000 | 6/10/2000 | Employer's Monthly Remittance Report, May 2000 |
| 10 | 12/14/2001 | 11/5/2001 | Employer's Monthly Remittance Report, October 2001 |
| 11 | 11/18/2002 | 10/30/2002 | Employer's Monthly Remittance Report, September 2002 |
| 12 | 12/23/2003 | 12/10/2003 | Employer's Monthly Remittance Report, November 2003 |

All in violation of Title 18, United States Code, Sections 1341 and 2.

28

COUNTS THIRTEEN - SEVENTEEN

ERISA FALSE STATEMENT (18 U.S.C. §1027)

94.     The United States Attorney realleges and incorporates by reference paragraphs 1-8, 23-47, 50-62, 69-78 and 85-87 of this Information, and further charges that:

95.     On or about the dates set forth below, at Somerville and North Reading in the District of Massachusetts and elsewhere,

CARLOS GOMEZ and

MARY GILDEA

defendants herein, in documents required by title I of the Employee Retirement Income Security Act of 1974 (ERISA), as amended, to be published or kept as part of the records of employee welfare benefit plans and employee pension benefit plans, and certified to the administrators of such plans, to make and cause to be made false statements and representations of fact, knowing them to be false, and knowingly to conceal, cover up and fail to disclose facts the disclosure of which was necessary to verify, explain, clarify and check for accuracy and completeness reports that were required to be published and information required to be certified by ERISA, namely Form 5500 Reports of Laborers' Trust Funds and Carpenters' Trust Funds, by submitting remittance reports which defendants knew falsely reported the identifies and numbers of covered employees working for Lanco Scaffolding, Inc. and the hours worked by such employees, on whose behalf Lanco Scaffolding, Inc. was required to make payments to trust funds, and which they knew falsely reported the amounts of money due and owing to such trust funds, as follows:

| Count | Date | Document Submitted | Published Report Affected |
|---|---|---|---|
| 13 | 6/10/2000 | Employer's Monthly Remittance Report, May 2000 | Form 5500 Report: Massachusetts State Carpenters Pension Fund for plan year ending 12/31/2000 |

29

| Count | Date | Document Submitted | Published Report Affected |
|-------|------|--------------------|---------------------------|
| 14 | 1/14/2001 | Employer's Remittance Report, December 2000 | Form 5500 Report: Massachusetts Laborers' Health and Welfare Fund for plan year ending 6/30/2001 |
| 15 | 11/5/2001 | Employer's Monthly Remittance Report, October 2001 | Form 5500 Report: Massachusetts State Carpenters Guaranteed Annuity Fund for plan year ending 12/31/2001 |
| 16 | 1/20/2002 | Employer's Remittance Report, December 2001 | Form 5500 Report: Massachusetts Laborers' Pension Fund for plan year ending 6/30/2002 |
| 17 | 9/1/2002 | Employer's Remittance Report, August 2002 | Form 5500 Report: Massachusetts Laborers' Annuity Fund for plan year ending 6/30/2003 |

All in violation of Title 18, United States Code, Sections 1027 and 2.

COUNTS EIGHTEEN – TWENTY-THREE

SUBSCRIBING FALSE TAX RETURNS (26 U.S.C. §7206(1))

96.    The United States Attorney realleges and incorporates by reference paragraphs 1-8, 42-47, 50-62 and 76-78 of this Information, and further charges that:

97.    On or about the dates set forth below, at Somerville and North Reading in the District of Massachusetts and elsewhere,

MARY GILDEA,

defendant herein, did willfully make and subscribe Federal employment tax returns Form 941, Employer's Quarterly Federal Tax Return, for Lanco Scaffolding, Inc., for the periods set forth below, which were verified by written declarations that they were made under the penalties of perjury and were filed with the Director, Internal Revenue Service Center at Andover, Massachusetts, which said tax returns she did not believe to be true and correct as to every material matter in that on line 2 of each said tax return, total wages and tips plus other compensation were reported in the amounts listed, whereas, as she then and there well knew and believed, total wages and tips plus other compensation for each of the periods substantially exceeded the amounts reported:

| Count | Date | Reported Period | Wages and Compensation Reported on Line 2 |
|-------|------|-----------------|-------------------------------------------|
| 18 | 4/2/00 | 1st quarter 2000 | $ 145,018.85 |
| 19 | 7/17/00 | 2d quarter 2000 | $ 156,362.85 |
| 20 | 1/10/02 | 4th quarter 2001 | $ 230,429.00 |
| 21 | 4/15/02 | 1st quarter 2002 | $ 149,227.00 |
| 22 | 4/30/03 | 1st quarter 2003 | $ 162,816.40 |
| 23 | 7/8/03 | 2d quarter 2003 | $ 187,305.50 |

All in violation of Title 26, United States Code, Section 7206(1).

31

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

dated: February 2, 2005

By: _____
PAUL G. LEVENSON
Assistant U.S. Attorney
John Joseph Moakley United States Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3147

32

# EXHIBIT 3A



**RECEIVED**

U.S. Department of Justice

NOV 2 4 2004

*Michael J. Sullivan*
*United States Attorney*
*District of Massachusetts*

**CMJ**

Main Reception: (617) 748-3100

*John Joseph Moakley United States Courthouse*
*1 Courthouse Way*
*Suite 9200*
*Boston, Massachusetts 02210*

October 29, 2004

Harry L. Manion III
Christopher J. Cunio
Cooley Manion Jones
21 Custom House Street
Boston, MA 02110-3536

re:    <u>Carlos Gomez</u>

Dear Messrs. Manion and Cunio:

This letter sets forth the Agreement between the United States Attorney for the District of Massachusetts ("the U.S. Attorney") and your client, Carlos Gomez ("Defendant"), in the above-captioned case. The Agreement is as follows:

1.    <u>Change of Plea</u>

At the earliest practicable date, Defendant shall waive indictment and plead guilty to Count 1 (Conspiracy, 18 U.S.C. §371); Counts 2-12 (Mail Fraud, 18 U.S.C. §1341); and Counts 13-17 (ERISA False Statement, 18 U.S.C. §1027) of an Information in substantially the form attached. Defendant expressly and unequivocally admits that he in fact knowingly, intentionally and willfully committed the crimes charged in Counts 1-17 of the attached Information, and is in fact guilty of those offenses.

Defendant acknowledges that the U.S. Attorney's offer to enter into this agreement is interdependent with the U.S. Attorney's offer to Defendant's spouse, Mary Gildea, to enter into a separate agreement regarding her plea to criminal charges against her.

2.    <u>Penalties</u>

Defendant faces the following maximum penalties on each of the following counts:

Count 1 (Conspiracy):
        5 years imprisonment
        $250,000 fine (or twice the gross gain from the offense)
        3 years supervised release
        $100 special assessment

Counts 2-7, 9-10 (Mail Fraud):
    5 years imprisonment
    $250,000 fine (or twice the gross gain from the offense)
    3 years supervised release
    $100 special assessment

Counts 8, 11-12 (Mail Fraud):
    20 years imprisonment
    $250,000 fine (or twice the gross gain from the offense)
    3 years supervised release
    $100 special assessment

Counts 13-17 (ERISA False Statement):
    5 years imprisonment
    $250,000 fine (or twice the gross gain from the offense)
    3 years supervised release
    $100 special assessment

3.    Sentencing Guidelines

(a)    Defendant reserves the right to take the position that the United States Sentencing Guidelines are unconstitutional and cannot properly be applied in this case. Alternatively, defendant reserves the right to take the position that the United States Sentencing Guidelines may serve as a guide to the Court but cannot constitutionally be deemed to bind the Court's sentencing determination.

(b)    The U.S. Attorney reserves the right to take the position that the United States Sentencing Guidelines are constitutional and govern this case.

(c)    To the extent that sentencing in this case is, or may be, controlled or guided by the United States Sentencing Guidelines, the parties agree jointly to take the following positions:

i.    The applicable version of the United States Sentencing Guidelines includes amendments effective November 1, 2003, and the following provisions for calculating Defendant's offense level apply:

GROUP 1 (Offenses Involving Fraud or Deceit)

§2B1.1(a):    Base offense level . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

§2F1.1(b)(1)(c):  Adjustment for loss (>$2,500,000, <$7,000,000) . . . . . . . . . . . . . . . 18

Group 1 total offense level                                          25

GROUP 2 (Fraudulent or False Tax Returns)

§2T1.1 (a)(1) Level from §2T4.1 (Tax Table) corresponding to the tax loss
(>$400,000 and <$1,000,000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

Group 2 total offense level . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

COMBINED OFFENSE LEVEL
§3D1.4        Number of Units:
              Group 1        1 unit
              Group 2        ½ unit
              total          1½ units

Based upon the information currently known to the U.S. Attorney, Defendant is in Criminal History Category I.

(d)      The U.S. Attorney reserves his right to fully inform the Court and the Probation Office with regard to any and all allegations of misconduct by Defendant, including conduct not charged in the Information.

(e)      Based on Defendant's prompt acceptance of personal responsibility for the offenses of conviction in this case, and information known to the U.S. Attorney at this time, the U.S. Attorney agrees to recommend that the Court reduce by three levels Defendant's Adjusted Offense Level under U.S.S.G. § 3E1.1.

The U.S. Attorney specifically reserves the right not to recommend a reduction under U.S.S.G. § 3E1.1 if, at any time between his execution of this Agreement and sentencing Defendant:

(i)      Fails to admit a complete factual basis for the plea;

(ii)     Fails to truthfully admit his conduct in the offenses of conviction;

(iii)    Falsely denies, or frivolously contests, relevant conduct for which Defendant is accountable under U.S.S.G. § 1B1.3;

(iv)     Fails to provide truthful information about his financial status;

(v)      Gives false or misleading testimony in any proceeding relating to the criminal conduct charged in this case and any relevant conduct for which Defendant is accountable under U.S.S.G. § 1B1.3;

(vi)     Engages in acts which form a basis for finding that Defendant has obstructed or impeded the administration of justice under U.S.S.G. § 3C1.1;

(vii)    Intentionally fails to appear in Court or violates any condition of release;

    (viii)   Commits a crime;

    (ix)    Transfers any asset protected under any provision of this Agreement; and/or

    (x)    Attempts to withdraw his guilty plea.

    (f)    Defendant expressly understands that he may not withdraw his plea of guilty if, for any of the reasons listed above, the U.S. Attorney does not recommend that he receive a reduction in Offense Level for acceptance of responsibility.

    (g)    Defendant expressly understands that, in addition to declining to recommend an acceptance-of-responsibility adjustment, the Government may seek an upward adjustment pursuant to U.S.S.G. § 3C1.1 if Defendant obstructs justice after date of this Agreement.

    (h)    The U.S. Attorney and Defendant agree that there is no basis for a departure from the sentencing range established by the United States Sentencing Guidelines, except as explicitly reserved below. Accordingly, neither the U.S. Attorney nor Defendant will seek a departure on any ground from the Sentencing Guidelines, except under the conditions explicitly set forth below:

    (i)    Defendant reserves the right to seek a downward departure, on one or more of the following grounds, separately or in combination, and no others. Defendant reserves the right to argue that:

Pursuant to U.S.S.G. §§5K2.0(a)(1) & (2), incarceration of the defendant will cause Lanco Scaffolding, Inc. to fail and cause more than 25 innocent employees to lose their jobs. United States v. Olbres, 99 F.3d 28 (1st Cir.1996).

Pursuant to U.S.S.G. §2B1.1, n.18 (C), the offense level substantially overstates the seriousness of the offense; accord §§5K2.0(a)(2)(B) & (a)(3) (application of 18 year old certificate of acceptance yields anomalous results); §5K2.0(a)(2)(A)(public benefit).

Pursuant to U.S.S.G. §5K2.0(a)(4): U.S.S.G. §5H1.2 (Education and Vocational Skills) alone and in conjunction with U.S.S.G. §5H1.5 (Employment Record); U.S.S.G. §5H1.6 (Family Ties and Responsibilities, and Community Ties); U.S.S.G. §5H1.11 (Civic, Charitable, Public Service Employment-related contributions and Record of Prior Good Works).

Pursuant to U.S.S.G §5K2.0(c), departure based on a combination of two or more offender characteristics or other circumstances listed above. Taken together, these permissible factors are present to substantial degree. Accord §5K2.0(a)(2)(A).

Pursuant to U.S.S.G. §§5K2.0(a)(1) & (2) a downward departure is warranted because this case is outside the heartland for prior incarceration for a crime Carlos

4

Gomez did not commit.

(ii)    Defendant agrees that any brief or motion in support of any departure shall be filed not later than four weeks before sentencing is completed. Defendant further agrees, not later than four weeks prior to sentencing, to provide the U.S. Attorney with all records, supporting affidavits and other evidentiary materials (including a detailed description of any anticipated testimony and/or expert opinion) upon which he intends to rely in support of any departure motion.

(iii)   Defendant agrees that failure to comply with the notice requirements set forth in paragraph 4(c)(ii) of this agreement shall operate as a waiver of any ground for departure for which full notice was not supplied.

(iv)    The U.S. Attorney reserves the right to oppose any downward departure.

(i)    In the event of an appeal from, or collateral challenge to, Defendant's sentence, the U.S. Attorney reserves his right to argue the correctness of Defendant's sentence and the manner in which the District Court determines it.

4.    <u>Sentence Recommendation</u>

(a)    The U.S. Attorney and the defendant each reserve the right to recommend such sentence as they may deem appropriate.

(b)    The U.S. Attorney and the defendant agree jointly to recommend that any sentence in this case include a term of supervised release, subject to the following conditions:

During the period of supervised release, Defendant must, within six months of sentencing or release from custody, whichever is later:

(i)    Cooperate with the Examination and Collection Divisions of the Internal Revenue Service;

(ii)   Provide to the Examination Division all financial information necessary to determine Defendant's prior tax liabilities;

(iii)  Provide to the Collection Division all financial information necessary to determine Defendant's ability to pay;

(iv)   File accurate and complete tax returns for those years for which inaccurate returns were filed; and

(v)    Make a good faith effort to pay all delinquent and/or additional taxes, interest and penalties.

5

5.     Payment of Mandatory Special Assessment

Defendant agrees to pay the mandatory special assessment to the Clerk of the Court on or before the date of sentencing, unless Defendant establishes to the satisfaction of the Court that Defendant is financially unable to do so.

6.     Protection of Assets for Payment of Restitution and Fine

Defendant agrees not to transfer, or authorize the transfer of any other asset in which he has an interest without prior express written consent of the U.S. Attorney, except for:

   (1)     Assets subject to superior, secured interests of innocent third parties, in which Defendant has an equity interest of less than $10,000;

   (2)     Ordinary living expenses necessary to house, clothe, transport and feed Defendant and those to whom he owes a legal duty of support, so long as such assets do not exceed $5,000 per month; and

   (3)     Attorney's fees incurred in connection with this criminal case and related civil matters.

This prohibition shall be effective as of the date of Defendant's execution of this Agreement and continue until the fine, forfeiture and/or restitution ordered by the Court at sentencing and any tax liability incurred as a result of the conduct charged in the Information are satisfied in full.

Defendant further agrees that, prior to sentencing, he will truthfully and accurately complete the sworn financial statement enclosed with this Agreement.

7.     Court Not Bound By Agreement

The sentencing recommendations made by the parties and their respective calculations under the Sentencing Guidelines are not binding upon the U.S. Probation Office or the sentencing judge. Within the maximum sentence which Defendant faces under the applicable law, the sentence to be imposed is within the sole discretion of the sentencing judge. Defendant's plea will be tendered pursuant to Fed. R. Crim. P. 11(c)(1)(B). Defendant may not withdraw his plea of guilty regardless of what sentence is imposed. Nor may Defendant withdraw his plea because the U.S. Probation Office or the sentencing judge declines to follow the Sentencing Guidelines calculations or recommendations of the parties. In the event that the sentencing judge declines to follow the Sentencing Guidelines calculations or recommendations of the U.S. Attorney, the U.S. Attorney reserves the right to defend the sentencing judge's calculations and sentence in any subsequent appeal or collateral challenge.

6

8.    Information For Presentence Report

Defendant agrees to provide all information requested by the U.S. Probation Office concerning his assets.

9.    Civil Liability

By entering into this Agreement, the U.S. Attorney does not compromise any civil liability, including but not limited to any tax liability, which Defendant may have incurred or may incur as a result of his conduct and his plea of guilty to the charges specified in paragraph one of this Agreement.

Defendant agrees to cooperate with employees of the IRS, the Civil Division of the U.S. Attorney's Office, and law enforcement agents working with attorneys in the Civil Division of the U.S. Attorney's Office, in making an assessment of his civil liabilities. Defendant specifically authorizes release by the FBI, IRS and the Insurance Fraud Bureau of Massachusetts to the aforementioned agencies and their representatives of information for purposes of making that assessment. Defendant further agrees to assent to the filing and allowance of a motion under Rule 6(e) of the Federal Rules of Criminal Procedure, to permit the disclosure of matters occurring before the grand jury for this purpose.

10.    Rejection of Plea By Court

Should Defendant's guilty plea not be accepted by the Court for whatever reason, or later be withdrawn on motion of Defendant, this Agreement shall be null and void at the option of the U.S. Attorney.

11.    Breach of Agreement

If the U.S. Attorney determines that Defendant has failed to comply with any provision of this Agreement, has violated any condition of his pretrial release, or has committed any crime following his execution of this Agreement, the U.S. Attorney may, at his sole option, be released from his commitments under this Agreement in their entirety by notifying Defendant, through counsel or otherwise, in writing. The U.S. Attorney may also pursue all remedies available to him under the law, irrespective of whether he elects to be released from his commitments under this Agreement. Further, the U.S. Attorney may pursue any and all charges which have been, or are to be, dismissed pursuant to this Agreement. Defendant recognizes that no such breach by him of an obligation under this Agreement shall give rise to grounds for withdrawal of his guilty plea. Defendant understands that, should he breach any provision of this agreement, the U.S. Attorney will have the right to use against Defendant before any grand jury, at any trial or hearing, or for sentencing purposes, any statements which may be made by him, and any information, materials, documents or objects which may be provided by him to the government subsequent to this Agreement, without any limitation. In this regard, Defendant hereby waives any defense to any charges which he might otherwise have under any statute of limitations or the Speedy Trial Act.

12.    <u>Who Is Bound By Agreement</u>

This Agreement is limited to the U.S. Attorney for the District of Massachusetts, and cannot and does not bind the Attorney General of the United States or any other federal, state or local prosecutive authorities.

13.    <u>Complete Agreement</u>

This letter contains the complete agreement between the parties relating to the disposition of this case. No promises, representations or agreements have been made other than those set forth in this letter. This Agreement supersedes prior understandings, if any, of the parties, whether written or oral. This Agreement can be modified or supplemented only in a written memorandum signed by the parties or on the record in court.

If this letter accurately reflects the Agreement between the U.S. Attorney and Defendant, please have Defendant sign the Acknowledgment of Agreement below. Please also sign below as Witness. Return the original of this letter to Assistant U.S. Attorney Paul G. Levenson.

Very truly yours,

MICHAEL J. SULLIVAN
United States Attorney

By:

JAMES B. FARMER
Assistant U.S. Attorney
Chief, Criminal Division

STEPHEN P. HEYMANN
Assistant U.S. Attorney
Deputy Chief, Criminal Division

PAUL G. LEVENSON
Assistant U.S. Attorney

## ACKNOWLEDGMENT OF PLEA AGREEMENT

I have read this letter in its entirety and have read a translation of this letter in my native language and have discussed it with my attorney. I hereby acknowledge that it fully sets forth my agreement with the United States Attorney's Office for the District of Massachusetts. I further state that no additional promises or representations have been made to me by any official of the United States in connection with this matter. I understand the crimes to which I have agreed to plead guilty, the maximum penalties for those offenses and Sentencing Guideline penalties

8

potentially applicable to them. I am satisfied with the legal representation provided to me by my attorney. We have had sufficient time to meet and discuss my case. We have discussed the charges against me, possible defenses I might have, the terms of this Plea Agreement and whether I should go to trial. I am entering into this Agreement freely, voluntarily, and knowingly because I am guilty of the offenses to which I am pleading guilty and I believe this Agreement is in my best interest.

_____
CARLOS GOMEZ, Defendant

Date: ___12 / 13 / 04___

        I certify that Carlos Gomez has read this Agreement and has read a translation in his native language and that we have discussed its meaning. I believe he understands the Agreement and is entering into the Agreement freely, voluntarily and knowingly.

_____
HARRY L. MANION, III ESQ.
Attorney for Carlos Gomez

Date: ___12 / 13 / 04___

9

# EXHIBIT 3B



**U.S. Department of Justice**

*Michael J. Sullivan*
*United States Attorney*
*District of Massachusetts*

---

*Main Reception: (617) 748-3100*

*John Joseph Moakley United States Courthouse*
*1 Courthouse Way*
*Suite 9200*
*Boston, Massachusetts 02210*

October 29, 2004

Joseph F. Savage, Jr., Esq.
Kevin J. Cloherty, Esq.
Testa, Hurwitz & Thibeault, LLP
125 High Street
Boston, MA 02110

   re: <u>Mary Gildea</u>

Dear  Messrs. Savage and Cloherty:

  This letter sets forth the Agreement between the United States Attorney for the District of Massachusetts ("the U.S. Attorney") and your client, Mary Gildea  ("Defendant"), in the above-captioned case.  The Agreement is as follows:

  1. <u>Change of Plea</u>

  At the earliest practicable date, Defendant shall waive indictment and plead guilty to Count 1 (Conspiracy, 18 U.S.C. §371); Counts 2-12 (Mail Fraud, 18 U.S.C. §1341); Counts 13-17 (ERISA False Statement, 18 U.S.C. §1027); and Counts 18-23 (Subscribing False Tax Returns (26 U.S.C. §7206(1)) of an Information in substantially the form attached.  Defendant expressly and unequivocally admits that she in fact knowingly, intentionally and willfully committed the crimes charged in Counts 1-23 of the attached Information, and is in fact guilty of those offenses.

  Defendant acknowledges that the U.S. Attorney's offer to enter into this agreement is interdependent with the U.S. Attorney's offer to Defendant's spouse, Carlos Gomez, to enter into a separate agreement regarding his plea to criminal charges against him.

  2. <u>Penalties</u>

Defendant faces the following maximum penalties on each of the following counts:

Count 1 (Conspiracy):
   5 years imprisonment
   $250,000 fine (or twice the gross gain from the offense)
   3 years supervised release
   $100 special assessment

Counts 2-7, 9-10 (Mail Fraud):
    5 years imprisonment
    $250,000 fine (or twice the gross gain from the offense)
    3 years supervised release
    $100 special assessment

Counts 8, 11-12 (Mail Fraud):
    20 years imprisonment
    $250,000 fine (or twice the gross gain from the offense)
    3 years supervised release
    $100 special assessment

Counts 13-17 (ERISA False Statement):
    5 years imprisonment
    $250,000 fine (or twice the gross gain from the offense)
    3 years supervised release
    $100 special assessment

Counts 18-23 (Subscribing False Tax Returns)
    3 years imprisonment
    $250,000 fine (or twice the gross gain from the offense)
    1 year supervised release
    $100 special assessment

3.    <u>Sentencing Guidelines</u>

(a)    Defendant reserves the right to take the position that the United States Sentencing Guidelines are unconstitutional and cannot properly be applied in this case. Alternatively, defendant reserves the right to take the position that the United States Sentencing Guidelines may serve as a guide to the Court but cannot constitutionally be deemed to bind the Court's sentencing determination.

(b)    The U.S. Attorney reserves the right to take the position that the United States Sentencing Guidelines are constitutional and govern this case.

(c)    To the extent that sentencing in this case is, or may be, controlled or guided by the United States Sentencing Guidelines, the parties agree jointly to take the following positions:

i.    The applicable version of the United States Sentencing Guidelines includes amendments effective November 1, 2003, and the following provisions for calculating Defendant's offense level apply:

*GROUP 1 (Offenses Involving Fraud or Deceit)*

*§2B1.1(a):    Base offense level* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*§2F1.1(b)(1)(c):  Adjustment for loss (>$2,500,000, <$7,000,000)* . . . . . . . . . . . . . . 18

*Group 1 total offense level*      25

*GROUP 2 (Fraudulent or False Tax Returns)*

*§2T1.1 (a)(1) Level from §2T4.1 (Tax Table) corresponding to the tax loss*
      *(>$400,000 and <$1,000,000)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Group 2 total offense level* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*COMBINED OFFENSE LEVEL*
*§3D1.4    Number of Units:*
      *Group 1    1 unit*
      *Group 2    ½ unit*
      *total      1½ units   add 1 level* . . . . . . . . . . . . . . . . . . . . . . _1_
                                                               26

    (d)    The U.S. Attorney reserves his right to fully inform the Court and the Probation Office with regard to any and all allegations of misconduct by Defendant, including conduct not charged in the Information.

    (e)    Based on Defendant's prompt acceptance of personal responsibility for the offenses of conviction in this case, and information known to the U.S. Attorney at this time, the U.S. Attorney agrees to recommend that the Court reduce by three levels Defendant's Adjusted Offense Level under U.S.S.G. § 3E1.1.

    The U.S. Attorney specifically reserves the right not to recommend a reduction under U.S.S.G. § 3E1.1 if, at any time between her execution of this Agreement and sentencing Defendant:

    (i)    Fails to admit a complete factual basis for the plea;

    (ii)    Fails to truthfully admit her conduct in the offenses of conviction;

    (iii)    Falsely denies, or frivolously contests, relevant conduct for which Defendant is accountable under U.S.S.G. § 1B1.3;

    (iv)    Fails to provide truthful information about her financial status;

    (v)    Gives false or misleading testimony in any proceeding relating to the criminal conduct charged in this case and any relevant conduct for which Defendant is accountable under U.S.S.G. § 1B1.3;

3

    (vi)     Engages in acts which form a basis for finding that Defendant has obstructed or impeded the administration of justice under U.S.S.G. § 3C1.1;

    (vii)    Intentionally fails to appear in Court or violates any condition of release;

    (viii)   Commits a crime;

    (ix)     Transfers any asset protected under any provision of this Agreement; and/or

    (x)     Attempts to withdraw her guilty plea.

    (f)    Defendant expressly understands that she may not withdraw her plea of guilty if, for any of the reasons listed above, the U.S. Attorney does not recommend that she receive a reduction in Offense Level for acceptance of responsibility.

    (g)    Defendant expressly understands that, in addition to declining to recommend an acceptance-of-responsibility adjustment, the Government may seek an upward adjustment pursuant to U.S.S.G. § 3C1.1 if Defendant obstructs justice after date of this Agreement.

    (h)    The U.S. Attorney and Defendant agree that there is no basis for a departure from the sentencing range established by the United States Sentencing Guidelines, except as explicitly reserved below. Accordingly, neither the U.S. Attorney nor Defendant will seek a departure on any ground from the Sentencing Guidelines, except under the conditions explicitly set forth below:

    (i)    Defendant reserves the right to seek a downward departure, on one or more of the following grounds, separately or in combination, and no others. Defendant reserves the right to argue that:

Pursuant to U.S.S.G. §§5K2.0(a)(1) & (2), incarceration of the defendant will cause Lanco Scaffolding, Inc. to fail and cause more than 25 innocent employees to lose their jobs. United States v. Olbres, 99 F.3d 28 (1st Cir. 1996).

Pursuant to U.S.S.G. §2B1.1, n.18 (C), the offense level substantially overstates the seriousness of the offense; accord §§5K2.0(a)(2)(B) & (a)(3) (application of 18 year old certificate of acceptance yields anomalous results); §5K2.0(a)(2)(A)(public benefit).

Pursuant to U.S.S.G. §5K2.0(a)(4): U.S.S.G. §5H1.2 (Education and Vocational Skills) alone and in conjunction with U.S.S.G. §5H1.5 (Employment Record); U.S.S.G. §5H1.6 (Family Ties and Responsibilities, and Community Ties); U.S.S.G. §5H1.11 (Civic, Charitable, Public Service Employment-related contributions and Record of Prior Good Works).

Pursuant to U.S.S.G §5K2.0(c), departure based on a combination of two or more offender characteristics or other circumstances listed above. Taken together, these permissible factors are present to substantial degree. Accord §5K2.0(a)(2)(A).

Defendant believes that her criminal history is Category I. However, Defendant reserves the right to seek a departure, pursuant U.S.S.G. §4A1.3, if Defendant's criminal history is greater than Category I, on the grounds that Defendant's criminal history substantially over-represents the seriousness of the Defendant's criminal history or the likelihood that the defendant will commit other crimes.

(ii)    Defendant agrees that any brief or motion in support of any departure shall be filed not later than four weeks before sentencing is completed. Defendant further agrees, not later than four weeks prior to sentencing, to provide the U.S. Attorney with any records, supporting affidavits or other evidentiary materials (including a description of any anticipated testimony and/or expert opinion) upon which she intends to rely in support of any departure motion.

(iii)    Defendant agrees that failure to comply with the notice requirements set forth in paragraph 4(c)(ii) of this agreement shall operate as a waiver of any ground for departure for which full notice was not supplied.

(iv)    The U.S. Attorney reserves the right to oppose any downward departure.

(i)    In the event of an appeal from, or collateral challenge to, Defendant's sentence, the U.S. Attorney reserves his right to argue the correctness of Defendant's sentence and the manner in which the District Court determines it.

4.    <u>Sentence Recommendation</u>

(a)    The U.S. Attorney and the defendant each reserve the right to recommend such sentence as they may deem appropriate..

(b)    Provided that Defendant's spouse, Carlos Gomez, pleads guilty to charges against him, as set forth in the attached Information, and provided that the Court imposes terms of imprisonment for both Defendant and her spouse, the U.S. Attorney will not oppose a request by Defendant that the Court order a date for reporting to the custody of the Bureau of Prisons not later than one month after the completion of the term of imprisonment served by Defendant's spouse.

(c)     The U.S. Attorney and the defendant agree jointly to recommend that any sentence in this case include a term of supervised release, subject to the following conditions:

During the period of supervised release, Defendant must, within six months of sentencing or release from custody, whichever is later:

    (i)     Cooperate with the Examination and Collection Divisions of the Internal Revenue Service;

    (ii)    Provide to the Examination Division all financial information necessary to determine Defendant's prior tax liabilities;

    (iii)   Provide to the Collection Division all financial information necessary to determine Defendant's ability to pay;

    (iv)    File accurate and complete tax returns for those years for which  inaccurate returns were filed; and

    (v)     Make a good faith effort to pay all delinquent and/or additional taxes, interest and penalties.

5.     Payment of Mandatory Special Assessment

Defendant agrees to pay the mandatory special assessment to the Clerk of the Court on or before the date of sentencing, unless Defendant establishes to the satisfaction of the Court that Defendant is financially unable to do so.

6.     Protection of Assets for Payment of Restitution and Fine

Defendant agrees not to transfer, or authorize the transfer of any other asset in which she has an interest without prior express written consent of the U.S. Attorney, except for:

    (1)     Assets subject to superior, secured interests of innocent third parties, in which Defendant has an equity interest of less than $10,000;

    (2)     Ordinary living expenses necessary to house, clothe, transport and feed Defendant and those to whom she owes a legal duty of support, so long as such assets do not exceed $5,000 per month; and

    (3)     Attorney's fees incurred in connection with this criminal case and related civil matters.

This prohibition shall be effective as of the date of Defendant's execution of this Agreement and continue until the fine, forfeiture and/or restitution ordered by the Court at

sentencing and any tax liability incurred as a result of the conduct charged in the Information are satisfied in full.

Defendant further agrees that, prior to sentencing, she will truthfully and accurately complete the sworn financial statement enclosed with this Agreement.

7.     Court Not Bound By Agreement

The sentencing recommendations made by the parties and their respective calculations under the Sentencing Guidelines are not binding upon the U.S. Probation Office or the sentencing judge.  Within the maximum sentence which Defendant faces under the applicable law, the sentence to be imposed is within the sole discretion of the sentencing judge.  Defendant's plea will be tendered pursuant to Fed. R. Crim. P. 11(c)(1)(B).  Defendant may not withdraw her plea of guilty regardless of what sentence is imposed.  Nor may Defendant withdraw her plea because the U.S. Probation Office or the sentencing judge declines to follow the Sentencing Guidelines calculations or recommendations of the parties.  In the event that the sentencing judge declines to follow the Sentencing Guidelines calculations or recommendations of the U.S. Attorney, the U.S. Attorney reserves the right to defend the sentencing judge's calculations and sentence in any subsequent appeal or collateral challenge.

8.     Information For Presentence Report

Defendant agrees to provide all information requested by the U.S. Probation Office concerning her assets.

9.     Civil Liability

By entering into this Agreement, the U.S. Attorney does not compromise any civil liability, including but not limited to any tax liability, which Defendant may have incurred or may incur as a result of her conduct and her plea of guilty to the charges specified in paragraph one of this Agreement.

Defendant agrees to cooperate with employees of the IRS, the Civil Division of the U.S. Attorney's Office, and law enforcement agents working with attorneys in the Civil Division of the U.S. Attorney's Office, in making an assessment of her civil liabilities.  Defendant specifically authorizes release by the FBI, IRS and the Insurance Fraud Bureau of Massachusetts to the aforementioned agencies and their representatives of information for purposes of making that assessment.  Defendant further agrees to assent to the filing and allowance of a motion under Rule 6(e) of the Federal Rules of Criminal Procedure, to permit the disclosure of matters occurring before the grand jury for this purpose.

10.    Rejection of Plea By Court

Should Defendant's guilty plea not be accepted by the Court for whatever reason, or later be withdrawn on motion of Defendant, this Agreement shall be null and void at the option of the U.S. Attorney.

11.    Breach of Agreement

If the U.S. Attorney determines that Defendant has failed to comply with any provision of this Agreement, has violated any condition of her pretrial release, or has committed any crime following her execution of this Agreement, the U.S. Attorney may, at his sole option, be released from his commitments under this Agreement in their entirety by notifying Defendant, through counsel or otherwise, in writing. The U.S. Attorney may also pursue all remedies available to him under the law, irrespective of whether he elects to be released from his commitments under this Agreement. Further, the U.S. Attorney may pursue any and all charges which have been, or are to be, dismissed pursuant to this Agreement. Defendant recognizes that no such breach by him of an obligation under this Agreement shall give rise to grounds for withdrawal of her guilty plea. Defendant understands that, should she breach any provision of this agreement, the U.S. Attorney will have the right to use against Defendant before any grand jury, at any trial or hearing, or for sentencing purposes, any statements which may be made by him, and any information, materials, documents or objects which may be provided by him to the government subsequent to this Agreement, without any limitation. In this regard, Defendant hereby waives any defense to any charges which she might otherwise have under any statute of limitations or the Speedy Trial Act.

12.    Who Is Bound By Agreement

This Agreement is limited to the U.S. Attorney for the District of Massachusetts, and cannot and does not bind the Attorney General of the United States or any other federal, state or local prosecutive authorities.

13.    Complete Agreement

This letter contains the complete agreement between the parties relating to the disposition of this case. No promises, representations or agreements have been made other than those set forth in this letter. This Agreement supersedes prior understandings, if any, of the parties, whether written or oral. This Agreement can be modified or supplemented only in a written memorandum signed by the parties or on the record in court.

8

If this letter accurately reflects the Agreement between the U.S. Attorney and Defendant, please have Defendant sign the Acknowledgment of Agreement below. Please also sign below as Witness. Return the original of this letter to Assistant U.S. Attorney Paul G. Levenson.

Very truly yours,

MICHAEL J. SULLIVAN
United States Attorney

By:

JAMES B. FARMER
Assistant U.S. Attorney
Chief, Criminal Division

STEPHEN P. HEYMANN
Assistant U.S. Attorney
Deputy Chief, Criminal Division

PAUL G. LEVENSON
Assistant U.S. Attorney

## ACKNOWLEDGMENT OF PLEA AGREEMENT

I have read this letter in its entirety and discussed it with my attorney. I hereby acknowledge that it fully sets forth my agreement with the United States Attorney's Office for the District of Massachusetts. I further state that no additional promises or representations have been made to me by any official of the United States in connection with this matter. I understand the crimes to which I have agreed to plead guilty, the maximum penalties for those offenses and Sentencing Guideline penalties potentially applicable to them. I am satisfied with the legal representation provided to me by my attorney. We have had sufficient time to meet and discuss my case. We have discussed the charges against me, possible defenses I might have, the terms of

9

this Plea Agreement and whether I should go to trial. I am entering into this Agreement freely, voluntarily, and knowingly because I am guilty of the offenses to which I am pleading guilty and I believe this Agreement is in my best interest.

MARY GILDEA, Defendant

Date: 12/8/04

I certify that Mary Gildea has read this Agreement and that we have discussed its meaning. I believe she understands the Agreement and is entering into the Agreement freely, voluntarily and knowingly.

KEVIN J. CLOHERTY, ESQ.
Attorney for Mary Gildea

Date: 12/8/04

10

# EXHIBIT 4A

AO 245B    Judgment in a Criminal Case - D. Massachusetts
Statement of Reasons - Sheet 1

# UNITED STATES DISTRICT COURT
### District of Massachusetts

UNITED STATES OF AMERICA                         **STATEMENT OF REASONS**
### V.

CARLOS GOMEZ                        Case Number: **1: 05 CR 10022   - 001 - GAO**

                                       **HARRY L. MANION, III**
                                       Defendant's Attorney

[×]  The court adopts the factual findings and guideline application in the presentence report.

                         **OR**

[ ]  The court adopts the factual findings and guideline application in the presentence report, except (see attachment, if necessary):

                                                          [ ]  See Continuation Page

**Guideline Range Determined by the Court:**

| | | |
|---|---|---|
| Total Offense Level: | 23 | |
| Criminal History Category: | I | |
| Imprisonment Range: | 46  to 57 | months |
| Supervised Release Range: | 2  to 3 | years |
| Fine Range: | $ $10,000.00  to $ $9,540,198.00 | |

Defendant's Soc. Sec. No.:  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

Defendant's Date of Birth:  00-00-1952

Defendant's USM No.:  N/A

Defendant's Residence Address:

14 Darrell Drive
North Reading, MA  02864

10/18/05
Date of Imposition of Judgment

/s/ George A. O'Toole, Jr
Signature of Judicial Officer

The Honorable George A. O'Toole

Judge, U.S. District Court
Name and Title of Judicial Officer

October 19, 2005
Date

Defendant's Mailing Address:

same as Above

AO 245B     Judgment in a Criminal Case - D. Massachusetts
            Statement of Reasons - Sheet 2

DEFENDANT:      CARLOS GOMEZ                                    Statement of Reasons - Page ___2___ of ___2___
CASE NUMBER:  **1: 05  CR  10022   - 001 - GAO**

# STATEMENT OF REASONS

☐ Fine waived or below the guideline range because of inability to pay.

Total Amount of Restitution:     $ _____

☐ Discretionary restitution is not ordered because the complication and prolongation of the sentencing process resulting from the fashioning of a restitution order outweighs the need to provide restitution to any victims, pursuant to 18 U.S.C. § 3663(a)(B)(ii) (or in offenses committed before April 23, 1996, pursuant to 18 U.S.C. § 3663(d)).

☐ Restitution pursuant to the mandatory victim restitution provisions is not ordered in this title 18 property offense because the number of identifiable victims is so large as to make restitution impracticable, pursuant to 18 U.S.C. § 3663A(c)(3)(A).

☐ Restitution pursuant to the mandatory victim restitution provisions is not ordered in this title 18 property offense because determining complex issues of fact and related to the cause of amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process, pursuant to 18 U.S.C. § 3663A(c)(3)(B).

☐ For offenses committed on or after September 13, 1994 but before April 23, 1996 that require the total amount of loss to be stated, pursuant to Chapters 109A, 110, 110A, and 113A of Title 18, restitution is not ordered because the economic circumstances of the defendant do not allow for the payment of any amount of a restitution order, and do not allow for the payment of any or some portion of a restitution order in the foreseeable future under any reasonable schedule of payments.

☐ Partial restitution is ordered, pursuant to 18 U.S.C. § 3553(c),  for the following reason(s):

AO 245B    Judgment in a Criminal Case - D. Massachusetts
Statement of Reasons - Sheet 3

Statement of Reasons - Page ___2___ of ___2___

DEFENDANT:    CARLOS GOMEZ
CASE NUMBER:  **1: 05 CR 10022  - 001 - GAO**

# STATEMENT OF REASONS

☐ The sentence is within the guideline range, that range does not exceed 24 months, and the court finds no reason to depart from the sentence called for by the application of the guidelines.

## OR

☐ The sentence is within the guideline range, that range exceeds 24 months, and the sentence is imposed for the following reasons:

## OR

☒ The sentence departs from the guideline range:

  ☐ upon motion of the government, as a result of a defendant's substantial assistance, or

  ☒ for the following specific reason(s):

  Pursuant to USSG section 5K2.0 because the combined circumstances of the likely loss of employment to numerous innocent employees( see United States v. Olbres, 99 F.3d 28 (1st Cir. 1996), and serious deleterious impact on innocent minor childern (see United States v. Rivera, 994 F.2d 992 (1st Cir.1993) and United States v. Scalmo, 997 F.2d 970 (1st Cir. 1993) in the event of a sentence within guideline range, all for the reasons states on the record in open court.  A copy of the relevant portion of the transcript is attached

☐ See Continuation Page

AO 245B    Judgment in a Criminal Case - D. Massachusetts
           Statement of Reasons - Sheet 4

Statemennt of Reasons - Page   4   of   2

DEFENDANT:    CARLOS GOMEZ
CASE NUMBER:  **1: 05 CR 10022  - 001 - GAO**

## ADDITIONAL FINDINGS AND GUIDELINES APPLICATIONS EXCEPTION

## ADDITIONAL REASONS FOR DEPARTURE FROM THE GUIDELINE RANGE

1

1          UNITED STATES DISTRICT COURT

2         FOR THE DISTRICT OF MASSACHUSETTS

3                Criminal No. 05-CR-10022-GAO-1

4

5    * * * * * * * * * * * * * * * * * * * * * * * * * * * *
                                  *
6    UNITED STATES OF AMERICA     *
                                  *
7                                 *
     vs.                          *    SENTENCING EXCERPT
8                                 *
                                  *
9    CARLOS GOMEZ and MARY GILDEA *
                                  *
10   * * * * * * * * * * * * * * * * * * * * * * * * * * * *

11

12

13

14        BEFORE:   The Honorable George A. O'Toole
                         District Judge
15

16

17

18

19

20

21

22                        Richard H. Romanow
23                        Official Court Reporter
                          1 Courthouse Way
24                        Boston, Massachusetts

25                        October 18, 2005

1        Now before turning to the departure issues, let me just

2    turn back to the other factors in the statute as I think they

3    may apply to this case.

4        The nature and circumstances of the offense.  This is

5    Subsection 1.  The need for the sentence as imposed to reflect

6    the seriousness of the offense, to promote respect for the law,

7    and to provide just punishment for the offense.  And this is

8    Subsection 02.  I don't think there's any doubt that the

9    offenses of conviction are serious offenses.  The codification

10   in dollar terms of the scope of the fraud establishes the

11   seriousness and the manner in which the offenses were

12   committed, I think, underscores it.  As the Government points

13   out, the crimes were deliberately planned and carried out over

14   an extended period.  And had they not been detected, as they

15   ultimately were, they would likely have continued indefinitely

16   until detected.  So the net effect of these considerations, it

17   seems to me, is that there's no mitigation to be found in the

18   nature and circumstances of the offenses.

19       Another factor, in Subsection 1, is the history and

20   characteristics of the defendant.  In each case, the defendant

21   has a very minor criminal history and in each case, as I said

22   before, I think it's appropriately scored in the lowest

23   category, Category I.  So the guidelines, I think, adequately

24   account for that.

25       The need for the sentence imposed to afford adequate

1     deterrence to criminal conduct and to protect the public from

2     further crimes by the defendant is in Subsection 2 of the

3     statute.  The need for what we call specific deterrence, that

4     is, aimed specifically is, I think, relatively low.  From all

5     the information provided, it seems to be a low risk that the

6     defendants will recidivate.  On the other hand, a need for a

7     general deterrence aimed at warning other potential defendants

8     away from similar conduct is relatively high.  These occasions

9     or opportunities, um, for fraud of the kind that's outlined

10    here are not uncommon.  And I think any consideration of the --

11    what the sentence ought to be, including any sentence that

12    might be imposed after departure, must take account of the

13    possibility that the sentence must be understood as having some

14    value for lessening the prospect of -- it should not be

15    understood as lessening the prospect of serious punishment for

16    future offenses.  And I think this is a theme that underscores

17    the guidelines as a whole and the congressional dissatisfaction

18    with preguideline sentencing.  We have to be aware of a concern

19    that economic and white collar crimes are not treated in a

20    separate category and on a different scale from other offenses.

21         Now, the last factor that I think needs to be

22    recognized -- well, there's two, really.  One is restitution,

23    but we'll come back to that, but the other one is the need to

24    avoid unwarranted sentencing disparities among defendants with

25    similar records found guilty of similar conduct.  I've already

1    addressed that in terms of the principles that I apply to the

2    consultation of the guidelines.  I'm particularly concerned

3    about its application in this kind of circumstance because I'm

4    aware of other cases, both before me and other judges of the

5    court, where considerations of the kinds that we've principally

6    focused on here have been relied on as a basis for departure.

7    In fact, I'm made aware of a case in which another judge in

8    this court, just a month ago, departed on these grounds with

9    rather similar confluence of impact on a small business and

10   impact on children of a joint husband and wife conviction.

11        Um, the question is which rule becomes the standard and

12   which becomes the outlier?  I think it's a problem that is not

13   easily resolved.  As I said in the outline of principles that

14   apply, I think any given judge has to be conscious of what his

15   fellows are doing conscientiously in applying the principles in

16   the statute and in the case law and in the guidelines.

17        For the reasons I've already mentioned, the request for

18   departure, I think, has to be faced as a, what I call an

19   orthodox departure under the guidelines and not as an end run

20   around them.  The so-called Olbres departure is a ground that

21   has been recognized by the Circuit as possible, as family

22   circumstances have.  In both cases, I think the Court of

23   Appeals admonishes that the application of those principles to

24   effect a departure should be rare and exceptional.  Those words

25   can't be applied, again, without some consciousness of what

1    else is going on and the real concerns that I have is how

2    slippery the slopes are.  Just as we have an obligation to try

3    to be consistent with what others do, the more consistent we

4    are, the less rare we are.

5         Um, there's no need to reiterate all the facts of the

6    case.  I do accept that Mr. Gomez's skills and experience and

7    what might be called his accumulation of business goodwill has

8    some value, probably significant value.  I think there's

9    probably a difference between being valuable and being

10   indispensable, but it's impossible to try to express that on

11   any place on the scale with any precision.  As Mr. Levenson for

12   the Government points out, and as I've said too many times, one

13   of the saddest but most common facts of sentencing is that

14   innocent family members suffer when another family member,

15   commonly a parent, is punished by incarceration.

16        Um, so my resolution is that either ground is

17   insufficient in itself, but that taken together, I think they

18   make the circumstance of this case exceptional enough that some

19   relief from the guideline range is appropriate to impose a just

20   sentence.  But I do continue to believe that it is important

21   that the punishment be significant enough both as punishment

22   and, after all, that's the primary function, not simply a

23   deterrent value to others or the -- to create a landmark of

24   rehabilitation, but to impose punishment.  I think that the

25   reality still has to be accounted for that the community be not

1    further harmed by the punishment the community imposes.  So

2    in -- so where the balance is, people will reasonably differ.

3         A period of incarceration is warranted in each case.

4    Um, I think -- and I think the Government made the suggestion,

5    particularly to mitigate the impact on the children, that the

6    service of these periods may be staggered, I think was the

7    Government's word, where I call it sequential.  And I think in

8    trying to accomplish all the goals that review an appropriate

9    sentence, I don't think there's any reason to have a different

10   sentence in this case.  The sentence should be the same.  And I

11   believe it should be the custody of the Bureau of Prisons for a

12   period of 12 months followed by a period of supervised release

13   for a period of four years with the condition that the first 12

14   months be spent in home confinement.  A 50,000 dollar fine in

15   each case.  And full restitution can be determined in

16   accordance with 3664(d)(5).

17        I think in light of the restitution amount, I think the

18   Government's request for a fine is high.  It should be more

19   than minimal, though, I think in part because I think it

20   provides an additional quantum of punishment that might

21   substitute for some lesser deserved punishment from the

22   incarceration.

23        So I think that rather than impose the sentence, since

24   it's identical twice, if you would each stand.

25             MR. SAVAGE:  Your Honor, can I be heard?

7

```
 1              THE COURT:  Yes, you can.  But let me just ask.  I
 2    suggested sequential service, but I leave it to you to decide
 3    the order.  It doesn't matter.  Because it's largely due to
 4    mitigate the harm to the children and not for any business
 5    reason.  I leave it with you to make that choice.
 6              MR. SAVAGE:  Your Honor, I wonder if the Court
 7    would be inclined to entertain increasing the sentence to a
 8    year and a day, so that he could have the opportunity to earn
 9    the good time.
10              THE COURT:  I thought about that, but I chose 12
11    months deliberately.
12              MR. SAVAGE:  After you impose sentence, we would
13    request for the location.
14              THE COURT:  Do you have a --
15              MR. SAVAGE:  We prefer Danbury because --
16              THE COURT:  No, no, I mean as a sequence, because I
17    should say it.  Do you want to talk for a minute?
18              (Off the record discussion.)
19              MR. MANION:  Yes, Mr. Gomez will serve the sentence
20    first, your Honor.
21              THE COURT:  All right.  Miss Gildea, would you
22    stand as well.
23         Carlos Gomez, Mary Gildea, on your conviction of these
24    offenses and pursuant to the Sentencing Reform Act of 1984, it
25    is the judgment of the Court that you be and you hereby are
```

8

```
 1    committed to the custody of the Bureau of Prisons to be
 2    imprisoned for a term of 12 months.  That consists of equal
 3    terms of 12 months on each of the counts of conviction all to
 4    be served concurrently.  Upon your release from imprisonment,
 5    you should be placed on supervised release for a term of four
 6    years, to consist of terms of two years -- I'm sorry.  To
 7    consist of equal terms on all the counts of conviction to be
 8    served concurrently.  Within 72 hours of your release from the
 9    custody of the Bureau of Prisons, you shall report in person to
10    the district to which you have been released.
11         You shall make restitution to the following as may be
12    ordered by the Court after hearing within 90 days pursuant to
13    Section 3664 of Title 18, the Internal Revenue Service, Liberty
14    Mutual, The Insurance Group Eastern Casualty Insurance Company,
15    the Carpenters Benefit Fund, The Massachusetts Labor
16    Representative, the amount shall be determined and appropriate
17    credit is to be given for any payments already made.  Payments
18    of restitution will be made to the Clerk of the United States
19    District Court for the transfer to the appropriate person.  You
20    shall notify the United States Attorney for this district
21    within 30 days of any change of your mailing or residential
22    address that occurs while any portion of the restitution
23    remains unpaid.  In addition, a fine in the sum of 50,000 is
24    imposed with the same condition with respect to notifying the
25    United States Attorney of any change in your address applies
```

1     while any portion of the fine remains unpaid.

2          It is a condition of your supervised release that the

3     first 12 months be spent in home confinement with an electronic

4     monitor on conditions that can be agreed upon with the

5     Probation Office or, in the absence of agreement, can be

6     determined by the Court.  While you're on supervised release,

7     you should not commit any other Federal, state or local crime.

8     I think that neither PSR indicates any involvement with illegal

9     drugs other than the alcoholism that we heard about.  So I'm

10    going to suspend drug testing conditions.  The defendants shall

11    submit a collection of a DNA sample as directed by the

12    Probation Office.

13         While you're on supervised release, you should comply

14    with all the standard conditions for supervised release that

15    are set forth in the sentencing guidelines.  That's Section

16    5D1.3C, those standard conditions of the guidelines are adopted

17    and incorporated by reference.  In addition, you are prohibited

18    from possessing a firearm, a destructive device, or other

19    dangerous weapon.  You are prohibited from incurring new credit

20    charges or additional lines of credit without the approval of

21    your Probation Officer while the restitution or the fine

22    remains unpaid.  You are to provide the Probation Office with

23    any reasonably requested financial information which

24    information may be shared with the Financial Litigation Unit of

25    the United States Attorney's Office.  You are each to meet with

10

1   the Internal Revenue Service within the first 30 days of your

2   supervision, if not earlier, in order to determine what tax

3   liability may exist and make arrangements for the satisfaction

4   for that liability.

5       As to Mr. Gomez only, during the period of your

6   supervised release, you are prohibited from consuming alcoholic

7   beverages and may be required to attend Alcoholics Anonymous

8   meetings or some suitable substitute as may be directed by your

9   Probation Officer.

10      There is a mandatory special assessment of 100 dollars

11  on each count of conviction.  For Mr. Gomez, the total is 1700

12  dollars, for Ms. Gildea, it's 2300 dollars.

13      Now, there's a request concerning recommendations for

14  placement?

15      MR. SAVAGE:  Two requests, your Honor.  First, I

16  would request the Court to consider recommending to the Bureau

17  of Prisons that the time for Mrs. Gildea be served in a halfway

18  house, I thought Coolidge would be appropriate, or at the

19  discretion of the Bureau of Prisons -- if the Court's not

20  inclined to do that, then we recommend Danbury.

21      MR. MANION:  On behalf of Mr. Gomez, we would like

22  to have a recommendation to Fort Devens.

23      THE COURT:  Well, in each case, it's not my

24  practice to make specific institutional recommendations, but I

25  will add a recommendation that the location of the family be

1    taken account of in selecting a place at that time.  I will not

2    make the first recommendation with respect to Mrs. Gildea.

3        Now, as to the satisfactory compliance with pretrial

4    conditions, I see no problem with self-reporting.  Mr. Gomez

5    will self-report soon and then Mrs. Gildea will self-report in

6    about a year.  I don't know whether -- I guess we should set

7    precise dates now.  Do you have a calendar?

8            (Discussion off the record.)

9            MR. MANION:  Your Honor, Mr. Gomez would like to

10   report in about 30 days to give him time to transition

11   everything at Lamco at a date your Honor selects, probably a

12   Friday, close of business.

13           THE COURT:  The obligation to report is to the

14   institution.

15           MR. MANION:  Yes, your Honor.

16           THE COURT:  What about December 1st, which is a

17   Friday?

18           MR. MANION:  Fine.  Thank you.  Yes.

19           THE COURT:  And, I guess, we can set it a year

20   later by maybe a week, December 7th, 2006 will be the reporting

21   date for Ms. Gildea.

22           MR. SAVAGE:  We have a related request to that,

23   your Honor.  If it's possible, and I don't know why it can't or

24   couldn't be, Ms. Gildea would like to start serving, at least

25   her supervised release --

12

```
 1              THE COURT:  I've explored that and I'm told it's
 2      not possible.
 3              MR. SAVAGE:  Could we serve some conditions that
 4      the Court imposes and reduce her supervised release by a year?
 5              THE COURT:  No, I've already thought that through
 6      and the problem is that she is on pretrial release until the
 7      beginning of the sentence.  She can't be punished while she's
 8      awaiting the commencement of the sentence.
 9              MR. SAVAGE:  But the factors of pretrial release
10      have been taken into account in the Court's consideration for
11      the length of the supervised release including restitution and
12      --
13              THE COURT:  Yeah, I see what you're saying.
14              MR. SAVAGE:  So she gets three years instead of
15      four.
16              THE COURT:  Yeah, actually that's fair.  I'll do
17      that.  We'll amend so Ms. Gildea, the term of supervised
18      release, will be three years.
19              PROBATION OFFICER:  Your Honor, one other issue is
20      that the statutory maximum for supervised release is actually
21      two years on each count.
22              THE COURT:  On all of them?
23              PROBATION OFFICER:  And for Mary Gildea, it's up to
24      one year on Counts 18 to 23.
25      A.  And you imposed four years.
```

```
 1              THE COURT:  Okay.  So concurrent.  Make it 3 and 2.
 2              PROBATION OFFICER:  You can still impose four years
 3    --
 4              THE COURT:  I would have to make it concurrent.
 5    We'll do the bookkeeping.  3 and 2.  3 is for Mr. Gomez is 2 is
 6    for Mrs. Gildea.
 7              MR. MANION:  Supervised release?
 8              THE COURT:  The supervised release, in view of the
 9    fact that she's going to spend an additional year under
10    supervision, which may include, by the way, the pretrial
11    supervision.  I'm not making a general adjustment, but it may
12    be that the pretrial services will recommend a change in
13    reporting obligations.  The change in circumstances that she's
14    under a sentence of incarceration and Mr. Reilly of the
15    Pretrial Services Offices, they may seek to increase the
16    reporting requirement, although I don't intend to find any
17    strong likelihood of flight, but there may be some additional
18    reporting required here during the first year.
19              MR. LEVENSON:  A belated point that may have been
20    implicit in what the Court said, which may be that during this
21    year-long period of pretrial release, as a condition of
22    pretrial release, that conditions that the Court described,
23    such as requiring that the defendant go ahead and meet with the
24    IRS to start settling those obligations.  In other words, the
25    same obligations that would apply during this year --
```

1          THE COURT:  That particular one is covered by I

2     think by what I said when I said that she is to meet within the

3     first 30 days, if not before.  I think there's an incentive to

4     meet before.

5          MR. SAVAGE:  I assume, your Honor, that your

6     sentence contemplates that we'll work out some sort of

7     installment plan for these various payments to be imposed.

8     You're not requiring a lump sum for the special assessment?

9          THE COURT:  I leave it to you to discuss that with

10    Probation in the first instance.

11         MR. SAVAGE:  Okay.

12         THE COURT:  Except for the special assessments,

13    which I do forthwith.  Okay.  All set.  I'll be in recess.

14         THE CLERK:  Mr. Carlos Gomez and Ms. Mary Gildea,

15    you have the right to file a notice of appeal in this case.  If

16    you do wish to file an appeal, you must file it within 10 days

17    from the date the judgment is entered.  If you cannot afford an

18    attorney to file the appeal on your behalf, you may request a

19    Clerk of the Court to file the appeal for you and I will do

20    so.  Do you understand?

21         THE DEFENDANT:  Yes, sir.

22         THE DEFENDANT:  Yes.

23         THE CLERK:  All rise.  The Court is in recess.

24         (Ends 4:45 p.m.)

25

# EXHIBIT 4B

AO 245B     Judgment in a Criminal Case - D. Massachusetts
            Statement of Reasons - Sheet 1

# UNITED STATES DISTRICT COURT
## District of Massachusetts

UNITED STATES OF AMERICA                    **STATEMENT OF REASONS**
### V.

MARY GILDEA                                 Case Number: **1: 05 CR 10022  - 002 - GAO**

                                            JOSEPH F. SAVAGE, JR
                                            _Defendant's Attorney_

[ ]     The court adopts the factual findings and guideline application in the presentence report.

                        **OR**

[x]     The court adopts the factual findings and guideline application in the presentence report, except (see attachment, if necessary):

Pursuant to USSG section 4A1.3, the court determined that the criminal history category II overstated the seriousness of the defendant's record, and that a category I was more accurately reflective of that history.

                                            [ ]  See Continuation Page

**Guideline Range Determined by the Court:**

Total Offense Level:          23
Criminal History Category:    I
Imprisonment Range:           46        to  57        months
Supervised Release Range:     2         to  3         years
Fine Range:              $  $10,000.00       to $  $9,540,198.00

Defendant's Soc. Sec. No.:    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            10/18/05
                                                     Date of Imposition of Judgment
Defendant's Date of Birth:    00-00-1957
                                                     /s/ George A. O'Toole, Jr
Defendant's USM No.:          25572-038
                                                     Signature of Judicial Officer
Defendant's Residence Address:
                                                     The Honorable George A. O'Toole
14 Darrell Drive
North reading, MA  01864                             Judge, U.S. District Court
                                                     Name and Title of Judicial Officer

                                                     October 19, 2005
                                                     Date
Defendant's Mailing Address:

c/o Lanco Scaffolding, Inc
33 Earle Street,  Somerville, MA  02143

AO 245B     Judgment in a Criminal Case - D. Massachusetts
Statement of Reasons - Sheet 2

DEFENDANT:     MARY GILDEA
CASE NUMBER:   **1: 05 CR 10022   - 002 - GAO**

Statement of Reasons - Page _____ of _____  2

## STATEMENT OF REASONS

☐ Fine waived or below the guideline range because of inability to pay.

Total Amount of Restitution:     $ _____

☐ Discretionary restitution is not ordered because the complication and prolongation of the sentencing process resulting from the fashioning of a restitution order outweighs the need to provide restitution to any victims, pursuant to 18 U.S.C. § 3663(a)(B)(ii) (or in offenses committed before April 23, 1996, pursuant to 18 U.S.C. § 3663(d)).

☐ Restitution pursuant to the mandatory victim restitution provisions is not ordered in this title 18 property offense because the number of identifiable victims is so large as to make restitution impracticable, pursuant to 18 U.S.C. § 3663A(c)(3)(A).

☐ Restitution pursuant to the mandatory victim restitution provisions is not ordered in this title 18 property offense because determining complex issues of fact and related to the cause of amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process, pursuant to 18 U.S.C. § 3663A(c)(3)(B).

☐ For offenses committed on or after September 13, 1994 but before April 23, 1996 that require the total amount of loss to be stated, pursuant to Chapters 109A, 110, 110A, and 113A of Title 18, restitution is not ordered because the economic circumstances of the defendant do not allow for the payment of any amount of a restitution order, and do not allow for the payment of any or some portion of a restitution order in the foreseeable future under any reasonable schedule of payments.

☐ Partial restitution is ordered, pursuant to 18 U.S.C. § 3553(c),  for the following reason(s):

AO 245B    Judgment in a Criminal Case - D. Massachusetts
Statement of Reasons - Sheet 3

DEFENDANT:    MARY GILDEA
CASE NUMBER:    **1: 05 CR 10022 - 002 - GAO**

Statement of Reasons - Page ___2___ of ___2___

# STATEMENT OF REASONS

☐ The sentence is within the guideline range, that range does not exceed 24 months, and the court finds no reason to depart from the sentence called for by the application of the guidelines.

## OR

☐ The sentence is within the guideline range, that range exceeds 24 months, and the sentence is imposed for the following reasons:

## OR

☒ The sentence departs from the guideline range:

    ☐ upon motion of the government, as a result of a defendant's substantial assistance, or

    ☒ for the following specific reason(s):

Pursuant to USSG section 5K2.0 because the combined circumstances of the likely loss of employment to numerous innocent employees (see United States v Olbres, 99 F.3d 28 (1st Cir. 1996) and serious deleterious impact on innocent minor children (see United States v Rivera, 994 F.2d 992 (1st Cir. 1993) and United States v. Scalmo, 997 F.2d 970 (1st Cir. 1993) in the event of a sentence within the guideline range, all for the reasons stated on the record in open court. A copy of the relevant portion of the transcript is attached.

☐ See Continuation Page

AO 245B    Judgment in a Criminal Case - D. Massachusetts
Statement of Reasons - Sheet 4

DEFENDANT:    MARY GILDEA

Statemennt of Reasons - Page ___4___ of ___2___

CASE NUMBER:  **1:  05  CR  10022   - 002 -  GAO**

## ADDITIONAL FINDINGS AND GUIDELINES APPLICATIONS EXCEPTION

## ADDITIONAL REASONS FOR DEPARTURE FROM THE GUIDELINE RANGE

```
 1                  UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF MASSACHUSETTS

 3                         Criminal No. 05-CR-10022-GAO-1

 4

 5     ******************************
                                    *
 6     UNITED STATES OF AMERICA     *
                                    *
 7                                  *
       vs.                          *    SENTENCING EXCERPT
 8                                  *
                                    *
 9     CARLOS GOMEZ and MARY GILDEA *
                                    *
10     ******************************

11

12

13

14          BEFORE:   The Honorable George A. O'Toole
                            District Judge
15

16

17

18

19

20

21

22
                             Richard H. Romanow
23                           Official Court Reporter
                             1 Courthouse Way
24                           Boston, Massachusetts

25                           October 18, 2005
```

1      Now before turning to the departure issues, let me just
2    turn back to the other factors in the statute as I think they
3    may apply to this case.
4      The nature and circumstances of the offense.  This is
5    Subsection 1.  The need for the sentence as imposed to reflect
6    the seriousness of the offense, to promote respect for the law,
7    and to provide just punishment for the offense.  And this is
8    Subsection 02.  I don't think there's any doubt that the
9    offenses of conviction are serious offenses.  The codification
10   in dollar terms of the scope of the fraud establishes the
11   seriousness and the manner in which the offenses were
12   committed, I think, underscores it.  As the Government points
13   out, the crimes were deliberately planned and carried out over
14   an extended period.  And had they not been detected, as they
15   ultimately were, they would likely have continued indefinitely
16   until detected.  So the net effect of these considerations, it
17   seems to me, is that there's no mitigation to be found in the
18   nature and circumstances of the offenses.
19     Another factor, in Subsection 1, is the history and
20   characteristics of the defendant.  In each case, the defendant
21   has a very minor criminal history and in each case, as I said
22   before, I think it's appropriately scored in the lowest
23   category, Category I.  So the guidelines, I think, adequately
24   account for that.
25     The need for the sentence imposed to afford adequate

1    deterrence to criminal conduct and to protect the public from

2    further crimes by the defendant is in Subsection 2 of the

3    statute.  The need for what we call specific deterrence, that

4    is, aimed specifically is, I think, relatively low.  From all

5    the information provided, it seems to be a low risk that the

6    defendants will recidivate.  On the other hand, a need for a

7    general deterrence aimed at warning other potential defendants

8    away from similar conduct is relatively high.  These occasions

9    or opportunities, um, for fraud of the kind that's outlined

10    here are not uncommon.  And I think any consideration of the --

11    what the sentence ought to be, including any sentence that

12    might be imposed after departure, must take account of the

13    possibility that the sentence must be understood as having some

14    value for lessening the prospect of -- it should not be

15    understood as lessening the prospect of serious punishment for

16    future offenses.  And I think this is a theme that underscores

17    the guidelines as a whole and the congressional dissatisfaction

18    with preguideline sentencing.  We have to be aware of a concern

19    that economic and white collar crimes are not treated in a

20    separate category and on a different scale from other offenses.

21        Now, the last factor that I think needs to be

22    recognized -- well, there's two, really.  One is restitution,

23    but we'll come back to that, but the other one is the need to

24    avoid unwarranted sentencing disparities among defendants with

25    similar records found guilty of similar conduct.  I've already

1    addressed that in terms of the principles that I apply to the

2    consultation of the guidelines.  I'm particularly concerned

3    about its application in this kind of circumstance because I'm

4    aware of other cases, both before me and other judges of the

5    court, where considerations of the kinds that we've principally

6    focused on here have been relied on as a basis for departure.

7    In fact, I'm made aware of a case in which another judge in

8    this court, just a month ago, departed on these grounds with

9    rather similar confluence of impact on a small business and

10   impact on children of a joint husband and wife conviction.

11        Um, the question is which rule becomes the standard and

12   which becomes the outlier?  I think it's a problem that is not

13   easily resolved.  As I said in the outline of principles that

14   apply, I think any given judge has to be conscious of what his

15   fellows are doing conscientiously in applying the principles in

16   the statute and in the case law and in the guidelines.

17        For the reasons I've already mentioned, the request for

18   departure, I think, has to be faced as a, what I call an

19   orthodox departure under the guidelines and not as an end run

20   around them.  The so-called Olbres departure is a ground that

21   has been recognized by the Circuit as possible, as family

22   circumstances have.  In both cases, I think the Court of

23   Appeals admonishes that the application of those principles to

24   effect a departure should be rare and exceptional.  Those words

25   can't be applied, again, without some consciousness of what

1   else is going on and the real concerns that I have is how

2   slippery the slopes are.  Just as we have an obligation to try

3   to be consistent with what others do, the more consistent we

4   are, the less rare we are.

5       Um, there's no need to reiterate all the facts of the

6   case.  I do accept that Mr. Gomez's skills and experience and

7   what might be called his accumulation of business goodwill has

8   some value, probably significant value.  I think there's

9   probably a difference between being valuable and being

10  indispensable, but it's impossible to try to express that on

11  any place on the scale with any precision.  As Mr. Levenson for

12  the Government points out, and as I've said too many times, one

13  of the saddest but most common facts of sentencing is that

14  innocent family members suffer when another family member,

15  commonly a parent, is punished by incarceration.

16      Um, so my resolution is that either ground is

17  insufficient in itself, but that taken together, I think they

18  make the circumstance of this case exceptional enough that some

19  relief from the guideline range is appropriate to impose a just

20  sentence.  But I do continue to believe that it is important

21  that the punishment be significant enough both as punishment

22  and, after all, that's the primary function, not simply a

23  deterrent value to others or the -- to create a landmark of

24  rehabilitation, but to impose punishment.  I think that the

25  reality still has to be accounted for that the community be not

1    further harmed by the punishment the community imposes.  So

2    in -- so where the balance is, people will reasonably differ.

3         A period of incarceration is warranted in each case.

4    Um, I think -- and I think the Government made the suggestion,

5    particularly to mitigate the impact on the children, that the

6    service of these periods may be staggered, I think was the

7    Government's word, where I call it sequential.  And I think in

8    trying to accomplish all the goals that review an appropriate

9    sentence, I don't think there's any reason to have a different

10   sentence in this case.  The sentence should be the same.  And I

11   believe it should be the custody of the Bureau of Prisons for a

12   period of 12 months followed by a period of supervised release

13   for a period of four years with the condition that the first 12

14   months be spent in home confinement.  A 50,000 dollar fine in

15   each case.  And full restitution can be determined in

16   accordance with 3664(d)(5).

17        I think in light of the restitution amount, I think the

18   Government's request for a fine is high.  It should be more

19   than minimal, though, I think in part because I think it

20   provides an additional quantum of punishment that might

21   substitute for some lesser deserved punishment from the

22   incarceration.

23        So I think that rather than impose the sentence, since

24   it's identical twice, if you would each stand.

25             MR. SAVAGE:  Your Honor, can I be heard?

```
 1              THE COURT:  Yes, you can.  But let me just ask.  I
 2     suggested sequential service, but I leave it to you to decide
 3     the order.  It doesn't matter.  Because it's largely due to
 4     mitigate the harm to the children and not for any business
 5     reason.  I leave it with you to make that choice.
 6              MR. SAVAGE:  Your Honor, I wonder if the Court
 7     would be inclined to entertain increasing the sentence to a
 8     year and a day, so that he could have the opportunity to earn
 9     the good time.
10              THE COURT:  I thought about that, but I chose 12
11     months deliberately.
12              MR. SAVAGE:  After you impose sentence, we would
13     request for the location.
14              THE COURT:  Do you have a --
15              MR. SAVAGE:  We prefer Danbury because --
16              THE COURT:  No, no, I mean as a sequence, because I
17     should say it.  Do you want to talk for a minute?
18              (Off the record discussion.)
19              MR. MANION:  Yes, Mr. Gomez will serve the sentence
20     first, your Honor.
21              THE COURT:  All right.  Miss Gildea, would you
22     stand as well.
23          Carlos Gomez, Mary Gildea, on your conviction of these
24     offenses and pursuant to the Sentencing Reform Act of 1984, it
25     is the judgment of the Court that you be and you hereby are
```

1    committed to the custody of the Bureau of Prisons to be

2    imprisoned for a term of 12 months.  That consists of equal

3    terms of 12 months on each of the counts of conviction all to

4    be served concurrently.  Upon your release from imprisonment,

5    you should be placed on supervised release for a term of four

6    years, to consist of terms of two years -- I'm sorry.  To

7    consist of equal terms on all the counts of conviction to be

8    served concurrently.  Within 72 hours of your release from the

9    custody of the Bureau of Prisons, you shall report in person to

10   the district to which you have been released.

11        You shall make restitution to the following as may be

12   ordered by the Court after hearing within 90 days pursuant to

13   Section 3664 of Title 18, the Internal Revenue Service, Liberty

14   Mutual, The Insurance Group Eastern Casualty Insurance Company,

15   the Carpenters Benefit Fund, The Massachusetts Labor

16   Representative, the amount shall be determined and appropriate

17   credit is to be given for any payments already made.  Payments

18   of restitution will be made to the Clerk of the United States

19   District Court for the transfer to the appropriate person.  You

20   shall notify the United States Attorney for this district

21   within 30 days of any change of your mailing or residential

22   address that occurs while any portion of the restitution

23   remains unpaid.  In addition, a fine in the sum of 50,000 is

24   imposed with the same condition with respect to notifying the

25   United States Attorney of any change in your address applies

1    while any portion of the fine remains unpaid.

2         It is a condition of your supervised release that the

3    first 12 months be spent in home confinement with an electronic

4    monitor on conditions that can be agreed upon with the

5    Probation Office or, in the absence of agreement, can be

6    determined by the Court.  While you're on supervised release,

7    you should not commit any other Federal, state or local crime.

8    I think that neither PSR indicates any involvement with illegal

9    drugs other than the alcoholism that we heard about.  So I'm

10   going to suspend drug testing conditions.  The defendants shall

11   submit a collection of a DNA sample as directed by the

12   Probation Office.

13        While you're on supervised release, you should comply

14   with all the standard conditions for supervised release that

15   are set forth in the sentencing guidelines.  That's Section

16   5D1.3C, those standard conditions of the guidelines are adopted

17   and incorporated by reference.  In addition, you are prohibited

18   from possessing a firearm, a destructive device, or other

19   dangerous weapon.  You are prohibited from incurring new credit

20   charges or additional lines of credit without the approval of

21   your Probation Officer while the restitution or the fine

22   remains unpaid.  You are to provide the Probation Office with

23   any reasonably requested financial information which

24   information may be shared with the Financial Litigation Unit of

25   the United States Attorney's Office.  You are each to meet with

1     the Internal Revenue Service within the first 30 days of your

2     supervision, if not earlier, in order to determine what tax

3     liability may exist and make arrangements for the satisfaction

4     for that liability.

5          As to Mr. Gomez only, during the period of your

6     supervised release, you are prohibited from consuming alcoholic

7     beverages and may be required to attend Alcoholics Anonymous

8     meetings or some suitable substitute as may be directed by your

9     Probation Officer.

10         There is a mandatory special assessment of 100 dollars

11    on each count of conviction.  For Mr. Gomez, the total is 1700

12    dollars, for Ms. Gildea, it's 2300 dollars.

13         Now, there's a request concerning recommendations for

14    placement?

15         MR. SAVAGE:  Two requests, your Honor.  First, I

16    would request the Court to consider recommending to the Bureau

17    of Prisons that the time for Mrs. Gildea be served in a halfway

18    house, I thought Coolidge would be appropriate, or at the

19    discretion of the Bureau of Prisons -- if the Court's not

20    inclined to do that, then we recommend Danbury.

21         MR. MANION:  On behalf of Mr. Gomez, we would like

22    to have a recommendation to Fort Devens.

23         THE COURT:  Well, in each case, it's not my

24    practice to make specific institutional recommendations, but I

25    will add a recommendation that the location of the family be

1    taken account of in selecting a place at that time.  I will not

2    make the first recommendation with respect to Mrs. Gildea.

3         Now, as to the satisfactory compliance with pretrial

4    conditions, I see no problem with self-reporting.  Mr. Gomez

5    will self-report soon and then Mrs. Gildea will self-report in

6    about a year.  I don't know whether -- I guess we should set

7    precise dates now.  Do you have a calendar?

8              (Discussion off the record.)

9              MR. MANION:  Your Honor, Mr. Gomez would like to

10    report in about 30 days to give him time to transition

11    everything at Lamco at a date your Honor selects, probably a

12    Friday, close of business.

13              THE COURT:  The obligation to report is to the

14    institution.

15              MR. MANION:  Yes, your Honor.

16              THE COURT:  What about December 1st, which is a

17    Friday?

18              MR. MANION:  Fine.  Thank you.  Yes.

19              THE COURT:  And, I guess, we can set it a year

20    later by maybe a week, December 7th, 2006 will be the reporting

21    date for Ms. Gildea.

22              MR. SAVAGE:  We have a related request to that,

23    your Honor.  If it's possible, and I don't know why it can't or

24    couldn't be, Ms. Gildea would like to start serving, at least

25    her supervised release --

1            THE COURT:  I've explored that and I'm told it's

2    not possible.

3            MR. SAVAGE:  Could we serve some conditions that

4    the Court imposes and reduce her supervised release by a year?

5            THE COURT:  No, I've already thought that through

6    and the problem is that she is on pretrial release until the

7    beginning of the sentence.  She can't be punished while she's

8    awaiting the commencement of the sentence.

9            MR. SAVAGE:  But the factors of pretrial release

10   have been taken into account in the Court's consideration for

11   the length of the supervised release including restitution and

12   --

13           THE COURT:  Yeah, I see what you're saying.

14           MR. SAVAGE:  So she gets three years instead of

15   four.

16           THE COURT:  Yeah, actually that's fair.  I'll do

17   that.  We'll amend so Ms. Gildea, the term of supervised

18   release, will be three years.

19           PROBATION OFFICER:  Your Honor, one other issue is

20   that the statutory maximum for supervised release is actually

21   two years on each count.

22           THE COURT:  On all of them?

23           PROBATION OFFICER:  And for Mary Gildea, it's up to

24   one year on Counts 18 to 23.

25   A.  And you imposed four years.

13

1          THE COURT:  Okay.  So concurrent.  Make it 3 and 2.

2          PROBATION OFFICER:  You can still impose four years

3     --

4          THE COURT:  I would have to make it concurrent.

5     We'll do the bookkeeping.  3 and 2.  3 is for Mr. Gomez is 2 is

6     for Mrs. Gildea.

7          MR. MANION:  Supervised release?

8          THE COURT:  The supervised release, in view of the

9     fact that she's going to spend an additional year under

10    supervision, which may include, by the way, the pretrial

11    supervision.  I'm not making a general adjustment, but it may

12    be that the pretrial services will recommend a change in

13    reporting obligations.  The change in circumstances that she's

14    under a sentence of incarceration and Mr. Reilly of the

15    Pretrial Services Offices, they may seek to increase the

16    reporting requirement, although I don't intend to find any

17    strong likelihood of flight, but there may be some additional

18    reporting required here during the first year.

19         MR. LEVENSON:  A belated point that may have been

20    implicit in what the Court said, which may be that during this

21    year-long period of pretrial release, as a condition of

22    pretrial release, that conditions that the Court described,

23    such as requiring that the defendant go ahead and meet with the

24    IRS to start settling those obligations.  In other words, the

25    same obligations that would apply during this year --

1       THE COURT:  That particular one is covered by I

2   think by what I said when I said that she is to meet within the

3   first 30 days, if not before.  I think there's an incentive to

4   meet before.

5       MR. SAVAGE:  I assume, your Honor, that your

6   sentence contemplates that we'll work out some sort of

7   installment plan for these various payments to be imposed.

8   You're not requiring a lump sum for the special assessment?

9       THE COURT:  I leave it to you to discuss that with

10  Probation in the first instance.

11      MR. SAVAGE:  Okay.

12      THE COURT:  Except for the special assessments,

13  which I do forthwith.  Okay.  All set.  I'll be in recess.

14      THE CLERK:  Mr. Carlos Gomez and Ms. Mary Gildea,

15  you have the right to file a notice of appeal in this case.  If

16  you do wish to file an appeal, you must file it within 10 days

17  from the date the judgment is entered.  If you cannot afford an

18  attorney to file the appeal on your behalf, you may request a

19  Clerk of the Court to file the appeal for you and I will do

20  so.  Do you understand?

21      THE DEFENDANT:  Yes, sir.

22      THE DEFENDANT:  Yes.

23      THE CLERK:  All rise.  The Court is in recess.

24      (Ends 4:45 p.m.)

25